RECORD NO. 13-2219

In The

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES EX REL.
## MICHAEL K. DRAKEFORD, M.D.,

*Plaintiff – Appellee*,

**v.**

## TUOMEY, d/b/a Tuomey Healthcare System, Inc.,

*Defendant – Appellant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## AT COLUMBIA

————————

## FINAL BRIEF OF APPELLANT

————————

James M. Griffin
Margaret N. Fox
A. Camden Lewis
LEWIS, BABCOCK & GRIFFIN, LLP
1513 Hampton Street
Post Office Box 11208
Columbia, South Carolina  29211
(803) 771-8000

Daniel M. Mulholland III
HORTY SPRINGER & MATTERN
4614 5th Avenue
Pittsburg, Pennsylvania  152138
(412) 687-7677

E. Bart Daniel
ATTORNEY AT LAW
Post Office Box 856
Charleston, South Carolina  29402
(843) 722-2000

*Counsel for Appellant*          *Counsel for Appellant*          *Counsel for Appellant*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA  23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __13-2219__    Caption: __Michael K. Drakeford v. Tuomey__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Tuomey, d/b/a Tuomey Healthcare System, Inc.__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                            ☐ YES ☑ NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ Margaret N. Fox                          Date:        10-15-13

Counsel for: Tuomey Healthcare System, Inc.

## CERTIFICATE OF SERVICE
**************************

I certify that on _____10-15-13_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

G. Norman Acker, III (norman.acker@usdoj.gov)      E. Bart Daniel (bart@bartdaniel.com)
Tracy L. Hilmer (tracy.hilmer@usdoj.gov)           James M. Griffin (jmg@lbglegal.com)
Sandra L. W. Miller (samiller@wcsr.com)            A. Camden Lewis (acl@lbglegal.com)
Kevin M. Barth (kbarth@hbbh.net)                   Daniel Mulholland (dmulholland@hortyspringer.com)

 s/ Margaret N. Fox                                          10-15-13
       (signature)                                            (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. vii

STATEMENT OF JURISDICTION ....................................................... 1

STATEMENT OF ISSUES ................................................................... 3

STATEMENT OF CASE ...................................................................... 4

    A.    Introduction ............................................................................ 4

    B.    Tuomey and the Physician Contracts .................................... 5

    C.    This Litigation ........................................................................ 9

        1.    The First Trial ................................................................ 10

        2.    The First Appeal............................................................. 12

        3.    The Second Trial ............................................................ 13

SUMMARY OF ARGUMENT ............................................................. 17

ARGUMENT ....................................................................................... 19

    I.    The District Court Erred By Granting A New Trial Following
        Tuomey's Victory In The First Trial.................................... 19

        A.    Introduction................................................................... 19

        B.    Standard of Review....................................................... 22

        C.    Martin's Deposition Excerpts were Properly Excluded
            During Trial.................................................................. 23

            1.    McAnaney's Testimony Was Properly Excluded ......... 24

                (a)    McAnaney was a Mediator ................................. 25

i

(b)     McAnaney's Joint Retention Placed Him in a Dual Role ........................................................26

2.     Martin's Testimony Regarding the Opinions of McAnaney was Properly Excluded ................................27

D.     Exclusion of Martin's Deposition Excerpts, if Error, was Harmless.................................................................................28

II.    The Court Erred In Applying An Improper "1 To 1" Relationship Test And By Allowing Subjective Intent That Is Not Expressed By The Face Of The Contract To Determine Whether The Physician Agreements Violated Stark...........................32

A.     Standard of Review .................................................................33

B.     The District Court Improperly Concluded The Jury Could Find That Tuomey Violated Stark Because Its Executives Analyzed and Discussed the Financial Consequences of Entering into Physician Compensation Agreements ...............34

C.     The District Court Improperly Concluded That a Jury Could Find the Physician Employment Agreements Violate Stark because of a "1 to 1" Correlation Between a Physician's Bonus Compensation Based on Personally Performed Services and the Hospital Technical Fees Charged as a Result of the Physician's Services ....................41

D.     The Stark Law Does Not Apply to the Contracts ....................46

III.   Tuomey Is Entitled To A New Trial Because The Trial Judge Provided Erroneous Jury Instructions .................................................48

A.     Standard of Review .................................................................49

B.     The District Court's Many Erroneous Jury Instructions Were Prejudicial and Harmful .................................................49

1. The District Court Erred By Refusing To Instruct The Jury That It Must Determine From the Face of The Contracts Whether The Compensation Took Into Account Anticipated Referrals or Varied With the Volume or Value of Referrals ...................................49

2. The District Court Erred by Failing to Charge the Knowledge Element Set Forth in the Stark Regulation's Definition of Indirect Compensation Agreement.......................................................................50

3. The District Court Erred By Failing to Charge the Jury That to Establish Damages Under the FCA, the Government Must Prove That the Services Received Were Worth Less Than What the Government Paid .............................................................51

4. The District Court Erred by Failing to Instruct the Jury that the only Services that are Relevant are Services for which Facility Fees were Generated as a Result of Outpatient Procedures at Tuomey................54

5. The District Court Erred by Refusing to Charge that Claims Based Upon Differences of Interpretation of Disputed Legal Questions Are Not False Under the FCA ...............................................55

6. The District Court Erred by Refusing to Charge that Tuomey Can Rely on Legal Advice Even if It Turns Out to Be Wrong ...................................................57

IV. The Undisputed Evidence Is That Tuomey Reasonably Relied Upon The Advice Of Its Lawyers And Could Not Have Knowingly Violated The FCA ...........................................................58

    A.    Standard of Review...................................................58

B.  Based on the Uncontradicted Evidence Presented as to Tuomey's Reliance on the Comprehensive Advice of Counsel, no Reasonable Jury Could Have Found That the Government Met Its Burden of Proof as to the Element of Scienter ................................................................................58

1.  Tuomey Proved it Relied on the Advice of Counsel......61

(a)  Tuomey sought the advice of counsel in good faith...............................................................61

(b)  Tuomey provided full and accurate information to its counsel ....................................62

(c)  Tuomey reasonably relied on counsel's advice...................................................................62

(d)  Tuomey faithfully followed the advice of its counsel ................................................................71

2.  The Government Failed to Introduce any Evidence to Undermine Tuomey's Advice of Counsel Defense ........................................................................72

V.  In the Alternative, Tuomey Should Be Granted A New Trial Because Allowing This Verdict To Stand Would Be A Miscarriage of Justice........................................................................76

A.  Standard of Review ................................................................76

B.  The District Court Abused Its Discretion By Refusing To Grant a New Trial ................................................................76

VI.  The District Court Erred In All Damage Calculations And Penalty Assessments And The Total Award Of $237,454,195.00 In Treble Damages And Civil Penalties Violates The Excessive Fines Provision Of The Eighth Amendment And Due Process Clause Of The Fifth Amendment ......81

A.  Standard of Review................................................................81

B.    The Government failed to Prove Damages Under the
      FCA ....................................................................................81

      1.    Tuomey Is Entitled to Judgment As A Matter of
            Law Because There Was No Evidence of any
            Stark-Prohibited Referrals by any of the
            Contracting Physicians ...................................................82

      2.    The Government Failed To Prove Actual Damages
            Under the FCA ................................................................87

      3.    The District Court Erred By Trebling The Total
            Amount of Medicare Payments Because Only
            Actual Damages May Be Trebled Under the FCA.........87

      4.    The District Court Erred by Assessing Penalties
            Based on the 21,730 UB92/04 Forms Rather Than
            the Cost Reports ..............................................................89

C.    The Award of $237,313,065 is Barred by the Excessive
      Fines Provision of the Eighth Amendment...............................91

      1.    Tuomey's conduct, even if proven, did not harm
            the Government in any way...........................................93

      2.    The Severity of the Fine Far Outweighs the
            Gravity of the Alleged Offense .....................................94

      3.    Tuomey's Alleged Conduct In This Case Is Not
            Connected to Other Illegal Conduct ..............................96

      4.    The Actual Damages Are Unconstitutionally
            Disproportional To Other Related Penalties...................96

D.    The Award of Approximately One-Quarter of a Billion
      Dollars Violates Tuomey's Due Process Rights.......................99

E.    Because The Award of Civil Penalties Under the FCA Is
      Unconstitutional, No Such Penalties Should Be Awarded.....102

CONCLUSION ..................................................................................103

REQUEST FOR ORAL ARGUMENT ..............................................104

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*Adkins v. Crown Auto, Inc.*,
    488 F.3d 225 (4th Cir. 2007) ........................................................................58

*Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*,
    99 F.3d 587 (4th Cir. 1996) .........................................................................76

*Austin v. Paramount Parks, Inc.*,
    195 F.3d 715 (4th Cir. 1999) .......................................................................33

*Auto Indus. Supplier Employee Stock*
*Ownership Plan (ESOP) v. Snapp Sys., Inc.*,
    2008 WL 5383372 (E.D. Mich. Dec. 23, 2008), *aff'd sub nom.*,
    *Auto Indus. Supplier Employee Stock*
    *Ownership Plan (ESOP) v. Ford Motor Co.*,
    435 F. App'x 430 (6th Cir. 2011)................................................................86

*Bobby v. Bies*,
    129 S. Ct. 2145 (2009)................................................................................19

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988).....................................................................................45

*Cline v. Wal-Mart Stores, Inc.*,
    144 F.3d 294 (4th Cir. 1998) .......................................................................76

*Commercial Contractors, Inc. v. United States*,
    154 F.3d 1357 (D.C. Cir. 1998)...................................................................88

*Conner v. Schrader-Bridgeport Intern., Inc.*,
    227 F.3d 179 (4th Cir. 2000) .......................................................................22

*Cook v. Navistar Int'l. Transp. Corp.*,
    940 F.2d 207 (7th Cir. 1991) .......................................................................29

*Demaine v. Bank One*,
904 F.2d 219 (4th Cir. 1990) ........................................................33

*Gonzalez v. Fresenius Med. Care N. Am.*,
689 F.3d 470 (5th Cir. 2012) ........................................... 58-59, 88

*Haygood v. Auto-Owners Ins. Co.*,
995 F.2d 1512 (11th Cir. 1993) ....................................................29

*Hays v. Hoffman*,
325 F.3d 982 (8th Cir. 2003) ........................................................90

*Hudson v. United States*,
522 U.S. 93 (1997).....................................................................100

*Ierardi v. Lorillard, Inc.*,
1991 WL 158911 (E.D. Pa. Aug. 13, 1991) ..................................84

*Invention Submission Corp. v. Dudas*,
413 F.3d 411 (4th Cir. 2005) ........................................................47

*Jablonski v. St. Paul Fire & Marine Ins. Co.*,
2009 WL 2252094 (C.D. Cal. 2009) .............................................24

*Knussman v. Md.*,
272 F.3d 625 (4th Cir. 2001) ........................................................76

*Konkel v. Bob Evans Farms, Inc.*,
165 F.3d 275 (4th Cir. 1999) ........................................................33

*Kotteakos v. United States*,
328 U.S. 750 (1946), *abrogated on other grounds by*
*Desert Palace Inc. v. Costa*,
539 U.S. 90 (2003)........................................................................28

*Martin v. Lloyd*,
700 F.3d 132 (4th Cir. 2012) ......................................................101

*Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*,
875 F.2d 1026 (2d Cir. 1989) ........................................................57

*Mikes v. Strauss,*
    274 F.3d 687 (2d Cir. 2001) ...........................................................................51

*Myrick v. Prime Ins. Syndicate, Inc.,*
    395 F.3d 485 (4th Cir. 2005) ........................................................................33

*Noel v. Artson,*
    641 F.3d 580 (4th Cir. 2011) ........................................................................49

*Pharmacia Corp. v. Alcon Labs., Inc.,*
    201 F. Supp. 2d 335 (D.N.J. 2002) ...............................................................58

*Philip Morris USA v. Williams,*
    549 U.S. 346 (2007) ......................................................................................99

*Price v. City of Charlotte,*
    93 F.3d 1241 (4th Cir. 1996) ..................................................................34, 86

*QBE Ins. Corp. v. Jorda Enters., Inc.,*
    277 F.R.D. 676 (S.D. Fla. 2012) ...................................................................84

*Rehab. Ass'n of Virginia, Inc. v. Kozlowski,*
    42 F.3d 1444 (4th Cir. 1994) ......................................................................101

*Ryan v. Miller,*
    303 F.3d 231 (2d Cir. 2002) ............................................................24, 27, 28

*SEC v. Prince,*
    2013 WL 1831841 (D.D.C. May 2, 2013) ...............................................63, 71

*Sprague v. Ticonic Nat'l Bank,*
    307 U.S. 161 (1939) ......................................................................................47

*St. Louis, I.M. & S. Ry. Co. v. Williams,*
    251 U.S. 63 (1919) ........................................................................................99

*State Farm Mut. Auto Ins. Co. v. Campbell,*
    538 U.S. 408 (2003) ..........................................................................94, 97, 99

*Taylor v. Va. Union Univ.*,
    193 F.3d 219 (4th Cir. 1999) ...................................................................19, 28

*United States v. Advance Tool Co.*,
    902 F. Supp. 1011 (W.D. Mo. 1995), *aff'd on other grounds*,
    1996 U.S. App. LEXIS 13238 (8th Cir. 1996) ...............................................91

*United States v. All Children's Health Sys., Inc.*,
    2013 WL 1651811 (M.D. Fla. Apr. 16, 2013) ...............................................82

*United States v. Anchor Mortgage Co.*,
    711 F.3d 745 (7th Cir. 2013) ........................................................................87

*United States v. Bajakajian*,
    524 U.S. 321 (1998) ...............................................................................91, 92

*United States v. Bourseau*,
    531 F.3d 1159 (9th Cir. 2008) ......................................................................93

*United States v. Bunk*,
    2012 WL 488256 (E.D. Va. Feb. 14, 2012) (*Bunk II*)...........................*passim*

*United States v. Cabrera-Diaz*,
    106 F. Supp. 2d 234 (D.P.R. 2002) ...........................................................102

*United States v. DeFries*,
    129 F.3d at 1293 (D.D.C. 1997) .............................................................74-75

*United States v. Fadul*,
    2013 WL 781614 (D. Md. Feb. 28, 2013)...............................................91-92

*United States v. Greber*,
    760 F.2d 68 (3d Cir. 1985) ...........................................................................15

*United States v. Heater*,
    63 F.3d 311 (4th Cir. 1995) ..........................................................................23

*United States v. Hedgepeth*,
    418 F.3d 411 (4th Cir. 2005) ........................................................................23

*United States v. Kernan Hosp.*,
    880 F. Supp. 2d 676 (D. Md. 2012)..............................................................56

*United States v. Kivanc*,
    714 F.3d 782 (4th Cir. 2013) .......................................................................49

*United States v. Mackby*,
    261 F.3d 821 (9th Cir. 2001) .......................................................................92

*United States v. Medica Rents Co. Ltd.*,
    2008 WL 3876307 (5th Cir. Aug. 19, 2008) ...............................................56

*United States v. Miller*,
    658 F.2d 235 (4th Cir. 1981) .......................................................................59

*United States v. Newport News Shipbuilding, Inc.*,
    276 F. Supp. 2d 539 (E.D. Va. 2003) .....................................................59, 61

*United States v. Pa. Indus. Chemical Corp.*,
    411 U.S. 655 (1973).....................................................................................101

*United States v. Polytarides*,
    584 F.2d 1350 (4th Cir. 1978) .....................................................................59

*United States v. Quest Diagnostics*,
    2013 WL 5763181 (2d Cir. 2013) ................................................................27

*United States v. Rogan*,
    517 F.3d 449 (7th Cir. 2008) .......................................................................52

*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010) (*SAIC*) ................................................51, 88

*United States v. United Techs. Corp.*,
    626 F.3d 313 (6th Cir. 2010) .......................................................................88

*United States v. Williams*,
    553 U.S. 285 (2008).....................................................................................101

*United States v. Wilson*,
   624 F.3d 640 (4th Cir. 2010) .................................................................22, 76

*United States ex rel. Aflatooni v. Kitsap Physicians Serv.*,
   314 F.3d 995 (9th Cir. 2002) ........................................................................82

*United States ex rel. Augustine v. Century Health Servs.*,
   289 F.3d 409 (6th Cir. 2002) ................................................................. 89-90

*United States ex rel. Colucci v. Beth Israel Med. Ctr.*,
   785 F. Supp. 2d 303 (S.D.N.Y. 2011) .....................................................39, 58

*United States ex rel. Davis v. District of Columbia*,
   679 F.3d 832 (D.C. Cir. 2012).........................................................51, 52, 87

*United States ex rel. Drakeford v. Tuomey Healthcare Sys. Inc.*,
   675 F.3d 394 (4th Cir. 2012) ................................................................*passim*

*United States ex rel. Feldman v. Gorp*,
   697 F.3d 78 (2d Cir. 2012) ...........................................................................88

*United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*,
   748 F. Supp. 2d 95 (W.D. Tex. 2010) ..........................................................86

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
   176 F.3d 776 (4th Cir. 1999) (*Harrison I*) ...................................................34

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir. 2003) (*Harrison II*)............................................*passim*

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
   498 F. Supp. 2d 25 (D.C. Cir. 2007) ............................................................89

*United States ex rel. Ketroser v. Mayo Found.*,
   729 F.3d 825 (8th Cir. 2013) ........................................................................56

*United States ex rel. Lockyer v. Haw. Pac. Health Group*,
   343 Fed. Appx. 279 (9th Cir. 2009) ..............................................................56

*United States ex rel. Obert-Hong v. Advocate Health Care*,
    211 F. Supp. 2d 1045 (N.D. Ill. 2002) ............................................................46

*United States ex rel. Quinn v. Omnicare Inc.*,
    382 F.3d 432 (3d Cir. 2004) ...........................................................................82

*United States ex rel. Satalich v. City of Los Angeles*,
    160 F. Supp. 2d 1092 (C.D. Cal. 2001) ..........................................................92

*United States ex rel. Smith v. Gilbert Realty*,
    840 F. Supp. 71 (E.D. Mich. 1993) .................................................................90

*United States ex rel. Villafane v. Solinger*,
    543 F. Supp. 2d 678 (W.D. Ky. 2008) ...............................................13, 36, 38

*United States ex rel. Williams v. Renal Care Group, Inc.*,
    696 F.3d 518 (6th Cir. 2012) ..........................................................................39

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) ..........................................................................56

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) .......................................................................................92

*Visiting Nurse Ass'n v. Thompson*,
    378 F. Supp. 2d 75 (E.D.N.Y. 2004) ..............................................................89

*Wheatley v. Wicomico Cnty., Md.*,
    390 F.3d 328 (4th Cir. 2004) ..........................................................................86

## <u>CONSTITUTIONAL PROVISIONS</u>

U.S. CONST. amend. V ................................................................................*passim*

U.S. CONST. amend. VII...............................................................................1, 4, 12

U.S. CONST. amend. VIII .............................................................................*passim*

## **STATUTES**

18 U.S.C. § 287 ..............................................................................99

18 U.S.C. § 3571(c)(3) ....................................................................99

18 U.S.C. § 3571(d) .........................................................................99

28 U.S.C. § 1291 ...............................................................................2

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1345 ...............................................................................1

31 U.S.C. § 3729 .............................................................................34

31 U.S.C. §§ 3729-33 ........................................................................1

31 U.S.C. § 3729(a) .........................................................................98

31 U.S.C. § 3729(a)(1) ................................................................10, 51

31 U.S.C. § 3730(b) ...........................................................................9

31 U.S.C. § 3929 *et seq.* ...................................................................4

42 U.S.C. § 1320a-7(b) ....................................................................37

42 U.S.C. § 1320a-7d(b)(3)(A) ........................................................95

42 U.S.C. § 1320a-7b(b)(3)(B) ........................................................37

42 U.S.C. § 1395nn ...........................................................................4

42 U.S.C. § 1395nn(a) .....................................................................32

42 U.S.C. § 1395nn(a)(1) .................................................................82

42 U.S.C. § 1395nn(a)(2)(B) ...........................................................34

42 U.S.C. § 1395nn(g)(2) .......................................................53

42 U.S.C. § 1395nn(g)(6)(B) ..................................................95

42 U.S.C. § 1395nn(h)(5)(B) ..................................................83

S.C. Code Ann. § 33-31-801 ....................................................5

## **RULES**

Fed. R. Civ. P. 50 ................................................................33

Fed. R. Civ. P. 59 ......................................................3, 80, 103

Fed. R. Civ. P. 59(a) ................................................18, 47, 60, 76

Fed. R. Civ. P. 59(d) ...........................................................19

Fed. R. Civ. P. 61 ........................................................19, 23, 28

Fed. R. Evid. 103(a) ...........................................................23

Fed. R. Evid. 403 ...........................................................26, 28

Fed. R. Evid. 408 ...........................................................25, 26

Fed. R. Evid. 702 ...............................................................83

## **REGULATIONS**

42 C.F.R. § 411.351 ............................................................42

42 C.F.R. § 411.354(c) .........................................................34

42 C.F.R. § 411.354(c)(2) ......................................................35

42 C.F.R. § 411.357I(c) ........................................................45

42 C.F.R. § 412.112 ............................................................85

66 Fed. Reg. 856 (Jan. 4, 2001) ...........................................................37, 38, 46, 100

69 Fed. Reg. 16054 (March 26, 2004) ...............................................................*passim*

72 Fed. Reg. 51012 (Sept. 5, 2007) ........................................................................37

73 Fed. Reg. 48434 (Aug. 19, 2008) .......................................................................42

## **OTHER AUTHORITIES**

John T. Boese, *Civil False Claims & Qui Tam Actions* § 3.01[B] .........................52

Gossett, "Chevron, Take Two: Deference to Revised Agency
Interpretations of Statutes," 64 *U. Chicago Law Review* 681 (1997).....................45

Model Rule of Professional Conduct 1.9;
Restatement 3d of Law Governing Lawyers § 132 ..................................................27

RESTATEMENT (SECOND) OF JUDGMENTS § 27 ........................................................19

## STATEMENT OF JURISDICTION

This action arose under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33. The complaint set forth claims for damages under the FCA and for equitable relief under theories of payment by mistake and unjust enrichment. Jurisdiction in the district court was proper under 28 U.S.C. §§ 1331 (federal question) and 1345 (United States as plaintiff).

The FCA claim was first tried to a jury in March 2010. The jury returned a verdict for Tuomey. On July 13, 2010, the district court entered orders granting a new trial on the FCA claim and granting judgment to the United States on the equitable claims. The district court entered final judgment on the equitable claims and Tuomey timely filed its notice of appeal on July 16, 2010. On appeal, this Court reversed the equitable judgment on the grounds that it violated Tuomey's Seventh Amendment right to a jury trial and remanded this case for retrial.

At the re-trial, which was conducted from April 16, 2013 through May 8, 2013, the jury entered a verdict for the Government on the FCA claim. On October 2, 2013, the district court entered an Amended Order and Opinion[1] granting the

---

[1] The original order entered September 30, 2013 directed that damages be entered in the amount of the jury's verdict of $39,313,065 plus treble damages and penalties in the amount of $237,454,195 under the FCA. (ECF 881 & 882.) Judgment was entered in this amount on October 1, 2013 (ECF 882) and Tuomey filed a Notice of Appeal on this same date (ECF 883). Upon motion by the

1

Government's motion for penalties and damages and ordered the Clerk to enter final judgment against Tuomey for $237,454,195 plus interest at the legal rate. (JA 4067.) The Clerk entered final judgment on October 2, 2013 as ordered. (JA 4068.) Tuomey filed an Amended Notice of Appeal on October 2, 2013, appealing the October 2, 2013 Order and final judgment, as well as the district court's 2010 New Trial Order. Jurisdiction in this Court is proper under 28 U.S.C. § 1291. (JA 4069-4070.)

---

Government to correct the judgment amount (ECF 884), the district court amended the opinion (JA 4043-4067) and order prior to the appeal being docketed in this Court and directed that final judgment be entered for a total amount of $237,454,195 (JA 4067).

## STATEMENT OF ISSUES

I.      **DID THE DISTRICT COURT ERR BY GRANTING A NEW TRIAL FOLLOWING TUOMEY'S VICTORY IN THE FIRST TRIAL?**

II.      **DID THE DISTRICT COURT ERR BY APPLYING AN IMPROPER "1 TO 1" RELATIONSHIP TEST AND BY ALLOWING SUBJECTIVE INTENT THAT IS NOT EXPRESSED BY THE FACE OF THE CONTRACT TO DETERMINE WHETHER THE PHYSICIAN AGREEMENTS VIOLATED STARK, THEREBY DENYING TUOMEY JUDGMENT AS A MATTER OF LAW?**

III.      **IS TUOMEY ENTITLED TO A NEW TRIAL BECAUSE THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY ON THE STARK LAW MANDATED BY THIS COURT AND PROVIDED MULTIPLE ERRONEOUS JURY INSTRUCTIONS?**

IV.      **SHOULD TUOMEY BE AWARDED JUDGMENT AS A MATTER OF LAW BECAUSE THE UNDISPUTED EVIDENCE IS THAT TUOMEY REASONABLY RELIED UPON THE ADVICE OF ITS LAWYERS AND COULD NOT HAVE KNOWINGLY VIOLATED THE FALSE CLAIMS ACT?**

V.      **SHOULD TUOMEY BE GRANTED A NEW TRIAL UNDER RULE 59 BECAUSE ALLOWING THIS VERDICT TO STAND WOULD BE A MISCARRIAGE OF JUSTICE?**

VI.      **DID THE DISTRICT COURT ERR IN AWARDING JUDGMENT IN THE AMOUNT OF $237,454,195 BECAUSE THE COURT APPLIED THE INCORRECT MEASURE OF DAMAGES UNDER THE FALSE CLAIMS ACT, ERRONEOUSLY TREBLED THE AMOUNT OF THE JURY'S VERDICT AND ASSESSED OVER ONE-HUNDRED MILLION DOLLARS IN CIVIL PENALTIES, RESULTING IN A TOTAL JUDGMENT THAT VIOLATES THE EXCESSIVES FINES PROVISION OF THE EIGHTH AMENDMENT AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT?**

## STATEMENT OF CASE

### A.    Introduction

This is a case where the United States has pursued a cause of action under the False Claims Act, 31 U.S.C. §§ 3929 *et seq.* ("FCA") against Appellant Tuomey Healthcare System, Inc. ("Tuomey") through two trials and one appeal to this Court.  The action is based on the Government's contention that Tuomey violated the Ethics in Patient Referrals Act, 42 U.S.C. § 1395nn, (also known as the "Stark Law") when it entered into part-time employment contracts ("Contracts") with 19 physicians on its medical staff.  However, as will be explained below, the Stark Law does not even apply to the Contracts.  Tuomey won the first trial, but the district court granted the Government a judgment of $44,888,651 on its equitable claims and also granted the Government a new trial.

On appeal, this Court reversed the equitable judgment on the grounds that it violated Tuomey's Seventh Amendment right to a jury trial.  *United States ex rel. Drakeford v. Tuomey Healthcare Sys. Inc.*, 675 F.3d 394, 409 (4th Cir. 2012). This Court also provided guidance on how certain provisions of the Stark Law were to be interpreted in the second trial, which guidance was ignored by the district court. *Id.* at 408-409. At the second trial of the Government's FCA claim (which should never have happened), the jury returned a verdict in favor of the Government for $39,313,065. The district court then awarded judgment to the Government in the

amount of $237,454,195, reflecting treble damages and per-claim penalties under the FCA (JA 4068), an amount that was not supported by the evidence and which violated the Fifth and Eighth Amendments to the Constitution. Tuomey now appeals for the second time, and for the reasons set forth in this brief, respectfully requests this Honorable Court to vacate the district court's One-Quarter of a Billion Dollars judgment and remand the matter back to the district court with instructions to enter judgment in favor of Tuomey on all of the Government's claims.

**B.    Tuomey and the Physician Contracts**

Tuomey is a nonprofit community[2] hospital located in Sumter, South Carolina serving an area designated as medically underserved by the federal government. (JA 3200:8-15.) Tuomey is also the hospital for service men and women at Shaw Air Force Base and their dependents and has been since the base hospital closed several years ago. (JA 3204:23-3205:10.) Tuomey's charitable mission is to provide high quality healthcare to all patients, regardless of ability to pay.

Recruiting surgeons to rural communities is challenging for hospitals like Tuomey. Surgeons are required to provide 24-hour emergency call coverage much

---

[2] Tuomey is governed by a Board of Trustees composed of community volunteers, physicians, and Tuomey's chief executive officer. The Board exercises general oversight over hospital operations, and governs the hospital's finances, including matters such as fundraising, capital expenditures, and physician recruitment. (JA 2948:5-2955:12, 3238:4-17; PX 442 (JA 4685-4688).) All corporate powers of Tuomey are "exercised by or under the authority" of the Board and its affairs are "managed under the direction" of the Board. *See* S.C. Code Ann. § 33-31-801 (1976, as amended).

more frequently in smaller medical communities than specialists who practice in large metropolitan areas, where there are many more surgeons within each specialty. (JA 2236:9-24.) Starting around 2000, surgeons who had previously performed surgical procedures at the hospital were beginning to perform more outpatient procedures in their offices or off-site surgery centers. (JA 2797:18-2798:11.) This trend created an environment in which surgeons no longer needed the hospital and could thus give up their privileges. (JA 2876:13-22.) By giving up their hospital privileges, the doctors would be relieved of the burden of taking emergency room calls. (JA 2797:18-2798:11.) In addition, as surgeons began to retire, the other physicians in the practice were required to account for their portion of on-call nights until a new surgeon could be recruited to the group. (JA 2232:7-2233:9) (Dr. Henry Moses: "[W]hile I had no plans to leave, had we gotten down to a three man group and unable to recruit I would very much have been looking at alternative sources of employment."). This exacerbated the difficulty Tuomey had in recruiting new specialists.

The employment agreements with the surgeons were essential to Tuomey's efforts to recruit and retain good doctors in this medically underserved area. However, the Government sued over these agreements. (ECF 1, 59, & JA 64-97.) The Government does not claim that Tuomey or any of its employed physicians performed unnecessary services under the agreements or that Tuomey over-billed

6

for the services provided.  Rather, the Government argues that paying physicians

productivity bonuses based upon their personally performed professional services

violates the Stark Law simply because each time a physician performs a procedure

in the hospital, the hospital can also submit a bill to Medicare for its services.

According to the Government, this creates an improper "1 to 1" relationship

between the bonus payment and patient referrals. The Government's position is

directly contrary to regulatory commentary issued by the Centers for Medicare and

Medicaid Services ("CMS") when it promulgated regulations implementing the

Stark Law. The Government's position is also contrary to the legal advice Tuomey

received from its lawyers regarding the Contracts.

Tuomey sought the advice of its long time legal counsel Nexsen Pruet on

how to address the growing challenges of recruiting and retaining physicians. (JA

2803:5-20, 3199:10-3208:10.)   Tuomey's CEO was adamant that he would "do

nothing that even puts us close to the line of being illegal." (PX 46 (JA 4339:4-8).)

Nexsen Pruet ultimately recommended Tuomey enter into the Contracts with the

physicians.[3] (JA 2807:22-25, 3209:21-25, 3216:15-17; PX 559 (JA 4776-4782).)

Under the Contracts, the physicians would perform all of their outpatient

procedures at Tuomey while maintaining their private practices.  (JA 2312:2-4,

---

[3] One option Tuomey considered was a joint venture between the hospital and the physicians for the operation of an ambulatory surgery center. Tuomey's Board chose the part-time employment agreements over the joint venture based in part upon the advice of counsel.

3293:12-14.) During 2004 and 2005, Tuomey negotiated with all of the specialist physicians on its medical staff. Eventually, the gastroenterologists, obstetrician/gynecologists (OB/GYNs), general surgeons, and one of Sumter County's two ophthalmologists entered into the Contracts.[4] (*E.g.*, PXs 27(JA 4158-4179), 33 (JA 4221-4238), 36 (JA 4257-4275), 39 (JA 4295-4313), & 176 (JA 4455).)

All of the Contracts included essentially the same terms. Each physician was paid a base salary, plus a productivity bonus equal to 80 percent of the amounts collected for the physician's personally performed professional services, plus an additional "quality incentive" of up to 7 percent of the physician's productivity bonus. (JA 1868:15-19, 2042:4-20.) Tuomey also paid the physicians' malpractice insurance premiums, and like other Tuomey employees, the physicians were eligible for certain fringe benefits, including health insurance coverage. (JA 2042:21-2043:7; *e.g.*, PX 53 (JA 4398-4410).) The Contracts were for a 10-year term and provided that the physicians would not compete with Tuomey during the term of the Contracts and for three years thereafter. (JA 3390:16-19.)

---

[4] The Contracts were between the individual physicians and limited liability subsidiaries of Tuomey. There were separate LLCs employing the doctors in each specialty. (JA 1965:3-1967:1; PX 176 (JA 4455).) For example, the gastroenterologists contracted with Tuomey Gastroenterology Services, LLC. (PX 176 (JA 4455).) Tuomey Professional Services, LLC, was the sole member of each specialty LLC and Tuomey hospital was the sole member of Tuomey Professional Services. (*Id.*)

In addition to conducting its own analysis of the Contracts, Nexsen Pruet consulted with Richard Kusserow, former Inspector General for the Department of Health and Human Services (PX 99A (JA 4425-4435)) and with Hall Render, the nation's largest healthcare law firm (DXs 204 (JA 4937-4940), 232 (JA 4943-4959).)  Also, Cjeka, a national consulting firm with expertise in physician compensation, concluded that the amounts earned by the physicians under the Contracts would be fair market value. (JA 1905:24-1906:4, 3212:14-3213:5; PX 559 (JA 4781).) Moreover, the gastroenterologists were represented by an attorney who specialized in healthcare contracts.  (JA 2333:5-17.) Having consulted with their attorney, the gastroenterologists confidently entered into the part-time Contracts.

## C.    This Litigation

In addition to the surgeons who signed the Contracts, Tuomey engaged in lengthy contract negotiations with Relator Dr. Michael Drakeford, the head of Palmetto Orthopedics, Sumter County's only orthopedic surgery group.  Drakeford was not satisfied with the amount of money he could earn and the negotiations ended in July 2005. (JA 2831:7-19, 2836:7-2837:6; PX 156 (JA 4451).)  In October 2005, Drakeford filed this action under the *qui tam* provisions of the False Claims Act (FCA), 31 U.S.C. § 3730(b). The United States intervened in September 2007. The Government alleged that the Contracts violated the Stark

9

Law and that Tuomey knew this. Therefore, (according to the Government) Tuomey's claims for Medicare payment of hospital services it provided to patients referred by the contracting physicians violated the FCA. *See* 31 U.S.C. § 3729(a)(1). The Government also asserted equitable claims for payment under mistake of fact and unjust enrichment. *See* (JA 64-97).

### 1.    The First Trial

The FCA claim was tried before a jury in March 2010. The jury returned a verdict in favor of Tuomey.[5]  (JA 1268-1269); *see also*, JA 1275:4-6 (Court noting jury found against government completely on FCA claim). The Government then filed a motion for judgment as a matter of law, or in the alternative, a new trial on the FCA claim (ECF No. 516) and a motion for judgment as a matter of law on the Government's common law equitable claims for unjust enrichment and payment by mistake of fact (ECF 511). At the hearing on these motions, the Government argued various evidentiary rulings by the district court prevented it from fully developing its evidence of Tuomey's knowledge that the Contracts violated the Stark Law. Over Tuomey's objection, the district court concluded that it had erred

---

[5] Answering two special interrogatories, the jury stated "that Tuomey violated the Stark Law" but found "that Tuomey did not violate the False Claims Act." (JA 1268-1269.) Thus, the jury ruled in Tuomey's favor on the FCA claim - the only cause of action against Tuomey.

only in excluding 17 pages of Gregg Martin's deposition.[6] (JA 1282:1-23.) Based on this alone, the district court granted the Government's motion for a new trial on the FCA claim ("2010 New Trial Order"). (JA 1332, 1345.) The district court rejected the Government's request to retry only the knowledge element of the FCA, and instead granted a new trial as to all issues, including whether the Contracts violated the Stark Law. (JA 1309:2-1310:7.)

The district court's Order granting a new trial did not contain any findings of fact or conclusions of law, nor did the Order address whether the exclusion of Martin's deposition was harmless. The Order simply stated,

> [F]or the good cause shown as set out orally at the hearing on June 3, 2010, it is hereby Ordered that the United States' Motion for a New Trial is GRANTED.

(JA 1345.)

As to the motion for judgment on the equitable claims, the Government argued that the jury's answer to the Stark Law interrogatory was, by itself, a sufficient basis for equitable relief. (JA 1301:4-18.) Tuomey opposed the motion,

---

[6] Judge Perry stated his ruling was error because it "violated a basic principle that the plaintiff had the right to call as an adverse witness an officer of the defendant corporation." (JA 1343:13-18.) Importantly, he rejected the Government's basis that the error "prevented the United States from fully developing an issue at trial – namely the 'knowledge' requirement of the False Claims Act." *Compare* (JA 1323) *with* (JA 1332, 1345). Likewise, he rejected the Government's contention that he had not ruled on the other evidentiary issues raised at the hearing. *Id.* (rejecting Government's language that "the court reserves judgment on the other evidentiary issues raised by the United States"); *see also*, (JA 1328-1329) (objecting to the language rejected by the district court).

arguing *inter alia* (1) that the government had an adequate legal remedy under the FCA, and was therefore precluded from seeking equitable relief, and (2) that the court could not award equitable relief without first conducting a hearing in equity. (JA 1302:24-1308:19.) The district court granted the Government's motion, entering judgment for the Government in an amount of $44,888,651, plus pre- and post-judgment interest. (JA 1334, 1336.)

2.    The First Appeal

Subsequently, Tuomey filed a motion to certify the 2010 New Trial Order for interlocutory appeal. (ECF 552.) The district court granted this motion Order. (JA 1345.) Tuomey then filed a petition for permission to appeal the certified order with this Court. (App. No. 10-254, ECF 2.) On October 26, 2010 this Court denied Tuomey's petition. (App. No. 10-254, ECF 20.) Tuomey also appealed the district court's 2010 Equitable Claims Order (App. No. 10-1819). (ECF 546.) Following oral argument, this Court held the district court denied Tuomey its Seventh Amendment right to a jury trial and thus, vacated the district court's 2010 Equitable Claims Order. *See Drakeford*, 675 F.3d at 409.

In addition, this Court issued guidance to the district court concerning the "volume or value" standard under the Stark Law. This Court examined the Stark regulations, official agency commentary and concluded "that compensation based

on the volume or value of anticipated referrals implicates the volume or value standard." *Id.* at 408-409. This Court then instructed,

> **Accordingly, the question, which should properly be put to a jury, is whether the contracts, *on their face*, took into account the value or volume of anticipated referrals**.

*Id*. (emphasis added).

This Court also ruled that a hospital, in the exercise of its business judgment, may consider income from patient referrals when deciding whether to enter into employment agreements with physicians. Specifically, this Court agreed with Tuomey's argument that subjective intent of the parties should not determine whether the volume or value standard is implicated, stating "[w]e agree with the *Villafane*[7] court that intent alone does not create a violation." *Id.* at 409 n.25.

### 3.    The Second Trial

The second trial took place from April 16, 2013 through May 8, 2013.[8] At the second trial, Tuomey offered testimony from healthcare attorneys Tim Hewson of Nexsen Pruett and Steve Pratt of Hall Render.  The testimony of both attorneys was consistent with the prior opinions they provided to Tuomey – and on which Tuomey relied – that the Contracts were legal.   (JA 3220:1-4, 3601:9-13.)

---

[7] *United States ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 693 (W.D. Ky. 2008) ("[T]he text and history of the Stark Law's desire to create a 'bright-line' rule would seem to argue against establishing a violation on the basis of intent alone.").

[8] On remand, this case was reassigned to the Honorable Margaret B. Seymour.

Specifically, each lawyer advised Tuomey that the Contracts did not violate the Stark Law because the total compensation provided under the agreements was based solely upon the physicians' personally performed professional services and did not take into account or vary with the value or volume of referrals. (JA 3209:10-3212:6, 3538:19-3540:4.)

The district court refused, without explanation[9] and contrary to the mandate of this Court, to present the question of "whether the contracts, *on their face*, took into account the value or volume of anticipated referrals" to the jury at the second trial. As a result, the jury was not provided the appropriate guidepost by which to evaluate evidence of Tuomey's business evaluation of various proposed financial arrangements with the surgical specialists. The Government exploited the district court's rejection of this Court's ruling throughout the second trial and implored the jury to look beyond the face of the Contracts and judge Tuomey's intentions, contrary to the directions of this Court.

The Government's fair market value expert McNamara (who is not an attorney) made repeated statements that it was improper to consider referral dollars when entering into contracts with referring physicians. (JA 2490:16-2492:2, 2523:1-16, 2531:10-23.) And, the Government in closing argument argued that

---

[9] The district court did not explain why it was not obligated to follow this Court's instruction. The district court stated that under the language provided by this Court "the jury would be limited to the four corners of the agreement, regardless of the parties actual relationship." (JA 1473 (ruling on Gov't Req. No. 8).)

14

Tuomey violated Stark by considering or talking about referral dollars. (JA 3881:25-3890:7.) The Government played excerpts from various tapes of meetings conducted well before the Contracts were agreed upon involving discussions relating to proposed joint venture arrangements and even misrepresented law from a letter from Richard Kusserow (who is also not an attorney) that addressed the Anti-Kickback Statute (AKS), not the Stark Law. *Compare* (JA 3892:18-3893:1, 4-6) *with* PX 99A (JA 4427 (discussing AKS, not Stark)). Similarly, the Government misrepresented law from the opinion letter of Steve Pratt by cherry-picking a sentence from the AKS analysis and presenting it to the jury as if it were written about Stark. *Compare* (JA 3894:6-13) *with* DX 232 (JA 4951-4952, § B ¶ 2).[10] Then the Government asked the jury to disregard the terms of the Contracts and focus instead on Tuomey's intent or reason for entering into the agreements. *E.g.*, (JA 3874:5-21; 3894:6-13). When Tuomey pointed out that the intent section of Kusserow's letter addressed the AKS and that Tuomey was not accused of violating the AKS, the Government's rebuttal argument compounded the error by arguing that Kusserow said that the AKS and Stark are closely related. (JA 3906:17-23.)

---

[10]  Astonishingly, the Government not only blatantly misrepresented analysis within letters from Kusserow and Pratt to the jury, but it took Anti-Kickback law analysis from the Third Circuit and presented it in a slide to the jury as if it were applicable to a Stark analysis. *See United States v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985) (discussing evidence of intent creating AKS (**not Stark**) liability.)

The jury's verdict was the product of confusion brought about by the Government's inaccurate presentation of Stark and the district court's erroneous jury instructions. The jury found that Tuomey submitted 21,730 claims in violation of the FCA with a total value of $39,313,065.  (JA 3987-3988.) These numbers were apparently based on the testimony of Government witness Ruben Steck (JA 2702:11-2703:3) who was disqualified as an expert by the district court (JA 2679:8-1318:9).  The Government subsequently moved the Court for a $5,500 civil penalty for each of the 21,730 claims and for a trebling of the value of the claims under the FCA. (ECF 818.) The Government also asked the district court to enter judgment on its equitable claims.  (ECF 826.) Tuomey filed post-trial motions for judgment as a matter of law or in the alternative for a new trial on the legal claims (ECF 827); summary judgment and/or judgment as a matter of law on the Government's equitable claims (ECF 823) and a motion to compel the Government to elect remedies (ECF 824).

On October 2, 2013, the district court granted the Government's motion for penalties and damages in its entirety and entered judgment against Tuomey for $237,454,195, plus interest at the legal rate.  (JA 4068.) The remaining pending motions were denied. (JA 4043-4067.)  Thereafter, Tuomey appealed the October 2, 2013 Order and Judgment.  (JA 4069.)   Additionally, Tuomey appealed the district court's 2010 New Trial Order. *See* (JA 1332, 1345, 4069.)

16

# SUMMARY OF ARGUMENT

The district court should never have vacated Tuomey's defense verdict in the first trial. As is evident from the record, the district court judge erroneously concluded that the entire deposition testimony from Tuomey's Gregg Martin was excluded, when in fact the court only excluded 17 pages of Martin's deposition testimony. The exclusion of this testimony was proper because the Government was attempting to back-door evidence that had been excluded. However, even if the lower court erred, this evidentiary ruling was harmless. As a result, this Court should enter judgment for Tuomey based upon the first jury's verdict.

Moreover, based upon the evidence presented during the second trial, Tuomey is entitled to judgment as a matter of law. The Government convinced the district court to ignore this Court's mandate that the question of whether Tuomey paid for anticipated referrals in violation of the Stark Law must be determined from the face of the Contracts. The Government could not and did not submit evidence from which a reasonable jury could find that the compensation provided on the face of the contracts took into account the value or volume of anticipated referrals. Rather, the undisputed testimony established that the Stark Law did not apply to the Contracts. In addition, the undisputed testimony established that Tuomey had been advised by two prominent healthcare law firms that the

Contracts did not violate the Stark Law and therefore, Tuomey could not have knowingly submitted any claims in violation of the False Claims Act.

In the alternative, this Court should vacate the judgment and order a new trial because the district court failed to instruct the jury on the appropriate elements of the Stark Law, the False Claims Act and the defense of advice of counsel. In addition, the district court applied the incorrect measure of damages, improperly trebled damages and imposed civil penalties based upon irrelevant claim forms. The resulting judgment of more than One-Quarter of a Billion Dollars violates Tuomey's Eighth Amendment and Due Process constitutional rights and results in a miscarriage of justice under Rule 59(a), Fed. R. Civ. P.

# ARGUMENT

## I. The District Court Erred By Granting A New Trial Following Tuomey's Victory In The First Trial.

### A. Introduction

The jury returned a verdict for Tuomey in the first trial, finding Tuomey did not violate the False Claims Act.[11]  Upon motion of the Government, the Honorable Matthew Perry granted the Government a new trial because the court sustained an objection by Tuomey during trial to the introduction of deposition excerpts in which Tuomey's Vice President Gregg Martin testified to what Tuomey's lawyer Hewson was told by another lawyer, Kevin McAnaney, who was jointly retained by Tuomey and Palmetto Orthopedics.  In contravention of Federal Rule of Civil Procedure 59(d), the district court's order did not set forth why the exclusion of the excerpts could have substantially swayed the jury's verdict.  *See Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (*en banc*); Fed. R. Civ. P. 61; (ECF 580.)   In fact, the district court *never* ruled on the question of

---

[11] The Government continually relies on the Stark interrogatory answer from the first trial. That answer is a legal nullity, entitled to no preclusive effect. A finding that is *contrary to* the ultimate judgment is entitled to no preclusive effect.  *See Bobby v. Bies*, 129 S. Ct. 2145, 2149 (2009) ("[I]ssue preclusion is a plea available to *prevailing parties*…. [It] does not transform final judgment losers…into partially prevailing parties." (emphasis added)); *see also*, RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. H & illus. 14 (1982).  That rule governs here: the jury's finding of a Stark Law violation was contrary to its ultimate verdict *against* the Government. Therefore, the Stark Law finding was unnecessary to the jury's verdict and must be disregarded.

whether the exclusion of the Martin deposition excerpts, if error, was harmless. During the July 13, 2010 status conference, the district court recognized that it had not determined whether the exclusion of the deposition excerpts, if error, was harmful, and pledged to make an explicit ruling in its order:

> Now, … in your status report, you do point out a principle that is quite true, and that is, for an evidentiary ruling to rise to the level of granting a new trial the court would have to determine whether the ruling was harmless, or whether the party who sought the exclusion of that evidence was prejudiced.
>
> Now, that is a matter that you have pointed out to me in this status report.  I will give it consideration and will announce my response to it in the order following today's hearing.
>
> (JA 1344:5-14.)

However, the court's order granting a new trial did not address why the exclusion of Martin's deposition excerpts was prejudicial.  Instead, it merely granted a new trial "for the good cause shown as set out orally at the hearing on June 3, 2010." (JA 1332, 1345.)

Regardless, the exclusion of Martin's deposition excerpts was not error.  The 17 pages from Martin's deposition, in which Martin testified to what Hewson told Martin that McAnaney had told Hewson, was an attempt by the Government to prove Tuomey knew the part-time Contracts were illegal.  All McAnaney said was the documents he reviewed might raise "red flags" and issues regarding fair market value.  (JA 2053: 2-25); *see also*, ECF 487 at 104:17-105:7.  However, McAnaney

admittedly was not hired to render an opinion on the legality of the Contracts (JA 144:10-18) and he was not a fair market value expert (JA 143:11-13.)[12] Accordingly, his assessment does not support the Government's position that Tuomey knew the Contracts were illegal.

Even if the exclusion was error – which it was not – it was harmless at best. As discussed below, the evidence was cumulative and its exclusion did not prevent the Government from establishing its claim.  Moreover, Judge Perry's ruling was limited to the 17 pages of testimony offered by the government, page159, line 19 – page 175, line 18.  *See* (JA 1311-1314).  The Government never asked for any additional excerpts to be introduced from Martin's deposition.   It was not a ruling as to all testimony from Martin, as Judge Perry apparently believed. (JA 823:15-824:9.)

At a post-trial hearing, Judge Perry stated that he had erred in excluding the Martin deposition excerpts because the Government "had the right to call as an adverse witness an officer of the defendant corporation" (JA 1343:13-18) and that Tuomey's objection did not render Martin's testimony *as a whole* improper:

> None of the objections to the proffered publication of that deposition rose to the level of rendering that proposed testimony improper. Now, to the extent that questions may have been put to the witness that were improper, *those could have been interposed by way of objection to specific questions*.

(JA 1343:22-1344:1) (emphasis added).

---

[12] McAnaney was not proffered as an expert witness at either trial.

However, that is exactly what *did* happen during the trial: The Government proffered selected portions of Martin's deposition as evidence and the district court sustained Tuomey's objection to the admission of *those specific questions and answers*. The Government never offered—and the district court never excluded – the deposition as a whole.

In other words, Judge Perry ordered a new trial based on the mistaken belief that the court had excluded the entirety of Martin's deposition, instead of just a few pages. The district court did not hold that the particular excerpts offered by the Government were admissible.  Indeed, such a ruling would have been nonsensical because the court had already re-affirmed its ruling that McAnaney's testimony (the substance of which the Government sought to introduce through the deposition excerpts) was inadmissible.

## B.    Standard of Review

The question before the Court is whether it was error for Judge Perry to order a new trial. The decision to grant or deny a new trial is reviewed for abuse of discretion.  *Conner v. Schrader-Bridgeport Intern., Inc.*, 227 F.3d 179, 200 (4th Cir. 2000). A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law.  *United States v. Wilson*, 624 F.3d 640, 649 (4th Cir. 2010).

22

Furthermore, if the Court finds an evidentiary ruling to be erroneous, it then reviews the error for harmlessness. Fed. R. Civ. P. 61; *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005). Evidentiary errors are harmless where the Court can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995) (internal citations and quotations omitted); *see also*, Fed. R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party….") In this case, Judge Perry granted a new trial on the mistaken basis he committed error by excluding Martin's entire deposition testimony. Exclusion of the designated excerpts was proper. At most it was harmless error. The district court's ruling failed to consider recognized factors constraining its exercise of discretion, relied on erroneous factual or legal premises and was controlled by errors of law. Therefore, this Court should reverse the grant of a new trial and reinstate Tuomey's victory.

## C. Martin's Deposition Excerpts were Properly Excluded During Trial.

The Government repeatedly sought to present evidence to the jury that Tuomey knew McAnaney had concerns regarding the Contracts in an effort to

support the Government's theory that Tuomey knew the Contracts were illegal.[13]

The district court properly refused to permit McAnaney to testify and Judge Perry *never* reversed this ruling. Since McAnaney was precluded from testifying, the court properly excluded the deposition excerpts of Gregg Martin because it was an improper attempt to get McAnaney's testimony in through the "backdoor." *E.g.*, *Ryan v. Miller*, 303 F.3d 231, 248-49 (2d Cir. 2002); *Jablonski v. St. Paul Fire & Marine Ins. Co.*, 2009 WL 2252094, at *6 (C.D. Cal. 2009).

### 1.    McAnaney's Testimony Was Properly Excluded.

The Government attempted to introduce the testimony of Kevin McAnaney - a third party neutral, jointly hired by Tuomey and Drakeford because the parties had reached an impasse in their negotiations regarding Drakeford's part-time contract.    *See* PX 117 (JA 4439-4440); (JA 243:4-6 ("jointly engaged Mr. McAnaney to assess"), 195:13-16 ("address our impasse"), 201:10-13 ("engaged to make an assessment").)  McAnaney was not retained to provide an opinion about the legality of the Contract, but instead to provide his assessment of how the Government would view the proposed Drakeford part-time Contract. (JA 144:10-18, 202:8-14, 218:21-219:2.)  An assessment of how Government enforcers would

---

[13] All the Government contended was that McAnaney gave Tuomey "warnings," said the Contract raised "red flags," and that "the government was not going to like this." McAnaney never said the proposed Drakeford Contract was illegal.

view a contract, as opposed to his legal opinion as to whether the Contract complied with the law, would not put Tuomey on notice the Contracts were illegal.

Tuomey sought to exclude McAnaney's testimony at the first trial, and Judge Perry agreed, as evidenced by the following exchange:

> MR. LEWIS: … we strenuously ask the court to preclude his testimony under 408 and the fact that if you are now forcing him to choose one client over another in a joint representation agreement and his duty is to step back and do nothing.

> THE COURT: All right. Upon consideration I'm of the view that Mr. McAnaney should not testify.

> (JA 691:21-692:2.)

Notably, Judge Perry affirmed this ruling at the June 3, 2010 Motions hearing. (JA 1276:14-21.)

### (a)    McAnaney was a Mediator.

McAnaney's testimony was not admissible pursuant to Fed. R. Evid. 408.[14] McAnaney was jointly retained by Tuomey and Dr. Drakeford, which means he owed a duty of loyalty to both parties. (JA 138:19-139:1.) McAnaney viewed his role as a "tie-breaker." (JA 139:21-141:4.)  Recognizing that there was a potential for a conflict of interest, the terms of the engagement letter provided the same protections afforded in a mediation agreement.  *See* PX 117 (JA 4439-4440). McAnaney was to be guided by the parties "joint instructions" in performing under

---

[14] "Evidence of the following is not admissible… (2) conduct or a statement made during compromise negotiations about the claim."  Fed. R. Evid. 408.

the joint agreement. Id. His fees were split equally between the parties; a waiver of confidentiality of the communications with McAnaney required consent by both parties; and McAnaney's engagement could be terminated by either party in the event he had a conflict of interest.  Id.  Each side was permitted to provide Mr. McAnaney with information and documents it did not want shared with the other side and Mr. McAnaney was allowed to have confidential communications with one party and keep that from the other party.  Id. His testimony was therefore inadmissible under Fed. R. Evid. 408 and was properly excluded.

> (b)    *McAnaney's Joint Retention Placed Him in a Dual Role*.

Judge Perry's ruling to exclude McAnaney was also correct because McAnaney had an irreconcilable conflict of interest in his dual role.[15]  Tuomey's counsel, Tim Hewson brought this conflict of interest to Dr. Drakeford's attorney's attention in his September 2, 2005 correspondence:  "I am requesting that you cease all contact with Mr. McAnaney regarding this matter as a result of Mr. McAnaney's conflict of interest…."  PX 78 (JA 4418).  While Tuomey was required to waive attorney-client privilege to assert its defense of advice of

---

[15] Even if Fed. R. Evid. 408 is found inapplicable to McAnaney's engagement with Tuomey and Palmetto Orthopedics, his testimony was still properly excluded under Fed. R. Evid. 403 because any probative value the evidence may have is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and needlessly presenting cumulative evidence.

counsel, this did not waive the duty of loyalty McAnaney owed to Tuomey as a former client. This duty is especially important in matters substantially related to the matter in which the attorney previously represented the client. *See* Model Rule of Professional Conduct 1.9; Restatement 3d of Law Governing Lawyers § 132; *cf. United States v. Quest Diagnostics*, 2013 WL 5763181 (2d Cir. 2013) (upholding district court's dismissal of qui tam suit filed by defendant's former attorney in part because of ethics prohibition against "side switching." The Second Circuit affirmed on other grounds and did not address Rule 1.9).

2. <u>Martin's Testimony Regarding the Opinions of McAnaney was Properly Excluded.</u>

Unable to put McAnaney on the witness stand to elicit testimony regarding his confidential opinion, the Government sought to improperly "back door" this evidence through excerpts from the deposition of Martin. *Ryan*, 303 F.3d at 248-49. In *Ryan*, the court excluded the improperly obtained confession of Ryan's codefendant as unreliable and inadmissible, *id.* at 237, but then allowed investigating officers to testify about what they did in response to the confession, *id.* at 240. The Second Circuit held that this was error, stating "If the substance of the prohibited testimony is evident even though it was not introduced in the prohibited form, the testimony is still inadmissible." *Id.* at 248-49.

Application of the *Ryan* holding to this case supports the exclusion of Martin's testimony. Examination of the 17 page excerpt the Government sought to introduce into evidence (JA 99:19-115:18) illustrates the Government's attempt to circumvent the district court's ruling regarding Mr. McAnaney and thereby undermine Fed. R. Evid. 403 and his role of a mediator. The Government sought to introduce the very testimony the court excluded – McAnaney's opinion – by playing portions of Martin's deposition in which he testified to what Hewson told him about what McAnaney said to Hewson regarding the proposed Drakeford Contract. Because the district court had already ruled such McAnaney evidence inadmissible, the court's exclusion of the Martin deposition excerpts about what McAnaney said was proper.

## D. Exclusion of Martin's Deposition Excerpts, if Error, was Harmless.

Federal Rule of Civil Procedure 61 provides that "no error in admitting or excluding evidence … is ground for granting a new trial" unless the error affects a party's substantial rights, *i.e.*, it is prejudicial. An error is harmless if the court can "say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Taylor*, 193 F.3d at 235 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)), *abrogated on other grounds by Desert Palace Inc. v. Costa*, 539 U.S. 90 (2003). Despite the absence of such analysis in the order, the

28

exclusion of Martin's testimony, if found to be error, is harmless and thus, does not constitute legal error warranting the award of a new trial.

The exclusion of Martin's deposition excerpts was harmless because it was cumulative of other evidence presented by the Government, and thus, the government was not precluded from presenting the substance of its claim at trial. *Haygood v. Auto-Owners Ins. Co.*, 995 F.2d 1512, 1517 (11th Cir. 1993) (holding that the erroneous exclusion of evidence is harmless when no "crucial piece of information could be gleaned" from the excluded evidence "that was not adequately brought out through other evidence"); *Cook v. Navistar Int'l. Transp. Corp.*, 940 F.2d 207, 213 (7th Cir. 1991) (holding that if the "substance" of excluded evidence is made available to the jury through the inclusion of other evidence, the exclusion is harmless). Martin's deposition testimony reveals he had, at best, only a hazy recollection of what Hewson told him regarding what McAnaney said to Hewson during the June 22, 2005 conference call. Martin could say no more than Hewson said that McAnaney "had expressed some concerns" (JA 110:6-15) and "that there were issues related to compliance and…comments made about fair market value and bona fide employment" (JA 114:14-24). When asked about "red flags," he recalled "there was some of that kind of comment," but the concerns were not "insurmountable" and could "be overcome if they [were] attended to." (JA 104:22-105:8.) Moreover, Martin could not recall if the

comments regarding "red flags" were related to the under-arrangements[16] or the part-time contracts." (JA 106:5-20.). At most, Martin's testimony would have presented evidence that Martin was aware McAnaney had concerns about either the part-time Contracts or under-arrangements.

This same information – that Tuomey knew of McAnaney's concerns – was presented at the first trial in the audio recording of the July 25, 2010 Tuomey Board Meeting. The audio played for the jurors – and the transcript put in front of them while listening, contained statements by Greg Thompson, a Tuomey board member, acknowledging that McAnaney had concerns about the business arrangements he reviewed. (JA 693:4-22; PX Ex. 466 (JA 4704:10-4705:6).) Additionally, the district court permitted Richard Kusserow,[17] the former HHS Inspector General retained by Tuomey to review the part-time Contracts, to testify about his evaluation of the part-time Contracts. As set forth in his testimony, and in his written evaluation which was also admitted into evidence (PX 99A (JA 4425-4435)), Kusserow stated the OIG would potentially have concerns regarding whether the doctors' salaries were fair market value, or instead excess

---

[16] There were two separate business proposals under consideration, a type of joint venture called an under-arrangement and a part-time employment agreement.

[17] Kusserow admitted at the first trial that his testimony was being used to "sink" Tuomey's case. (JA 325:19-326:10; DX 242B (JA 4960).)

compensation to induce referrals from the doctors. (JA 311:9-20.)[18]   Kusserow testified his evaluation was sent to Tuomey.   Moreover, following Kusserow's testimony, the Government introduced audio of a January 19, 2004 Outpatient Surgical Advisory Counsel Meeting in which Hewson, Cox, Martin, Watkins, and several of the doctors discussed the concerns raised by Kusserow.   (JA 335:13-336:24; PX 427 (JA 4575:10-4576:10).)

Finally, and perhaps most telling, is *the Government's* argument both during trial and in its post-trial motions that the evidence admitted at trial was so strong – including the evidence of scienter – that the Government was entitled to judgment as a matter of law on its FCA claim.    (JA 971:1-975:13, 1271:1-15); *see also*, (ECF No. 516-1 at 4-6; ECF No. 527 at 3-5.)  Given the apparent cumulativeness of Martin's deposition testimony excerpts with evidence admitted at trial, the Government could not have been prejudiced.   Rather, even if the exclusion of Martin's testimony was error – it was harmless because the Government was not precluded from presenting evidence establishing an element of their claim – scienter.  Accordingly, the district court erred in granting a new trial.

---

[18] Notably, Kusserow, like McAnaney, was not a fair market value expert and neither was retained to provide Tuomey with a fair market value analysis.  (JA 312:17-18, 143:11-13.) Kusserow is also not an attorney. (JA 1682:12-23.)

II.    **The Court Erred In Applying An Improper "1 To 1" Relationship Test And By Allowing Subjective Intent That Is Not Expressed By The Face Of The Contract To Determine Whether The Physician Agreements Violated Stark.**

The district court's decision to deny Tuomey's motion for judgment as a matter of law was controlled by erroneous legal rulings involving the Stark Law. All of the Government's claims against Tuomey, both under the FCA as well as the equitable claims, are based on its contention that Tuomey violated the Stark Law when it submitted claims to Medicare for hospital services that were referred by the physicians who were parties to the Contracts. The Stark Law provides that if a physician has a financial relationship with an entity like a hospital, then the physician may not refer Medicare patients to the hospital and the hospital may not present a claim to Medicare for the services furnished pursuant to the physician's referral unless the financial relationship falls within an exception set forth in the statute or its implementing regulations. 42 U.S.C. § 1395nn(a). However, in order for the Stark Law to apply at all, there must be a financial relationship between the physician and the hospital. As explained below, the Contracts did not give rise to a financial relationship as that term is defined in the regulations. But the district court gave incorrect instructions to the jury on this key point which ignored the plain language of the regulations and their commentary as well as the clear mandate of this Court. For this reason alone, the judgment should be reversed and

32

the district court should be directed to enter judgment in favor of Tuomey on all counts.[19]

## A.    Standard of Review

The Fourth Circuit reviews the grant or denial of judgment as a matter of law *de novo*.  *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727 (4th Cir. 1999).  A district court should grant judgment as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient basis to find for the party on the issue." Fed. R. Civ. P. 50. Judgment as a matter of law is proper "if a reasonable jury could reach only one conclusion based on the evidence," or if the jury's verdict was necessarily "based on speculation or conjecture." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005).  A party is entitled to judgment as a matter of law if the Court "determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." *Konkel v. Bob Evans Farms, Inc.* 165 F.3d 275, 279 (4th Cir. 1999). The evidence must be viewed in the light most favorable to the non-moving party, but a mere "scintilla" of evidence is not enough; the plaintiff must "adduce substantial evidence in support of [its] claim." *Demaine v. Bank One*, 904 F.2d 219, 220 (4th Cir. 1990). The Court is not a "rubber stamp

---

[19]Tuomey requests that this Court rule on the application of the Stark Law to the contracts based upon the entire factual record, irrespective of this Court's ruling on the appeal from the new trial order, and direct the district court to enter judgment for Tuomey on all equitable claims and the FCA cause of action.

convened merely to endorse the conclusions of the jury, but rather ha[s] a duty to reverse the jury verdicts if the evidence cannot support [them]." *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996).

**B.    The District Court Improperly Concluded The Jury Could Find That Tuomey Violated Stark Because Its Executives Analyzed and Discussed the Financial Consequences of Entering into Physician Compensation Agreements.**

Because the Stark Law does not create its own cause of action, the Government sought relief under the FCA predicated on alleged Stark Law violations.[20]  *Drakeford*, 675 F.3d at 396.  A financial relationship between a hospital and a physician must exist before the Stark Law applies. A financial relationship includes a "compensation arrangement." 42 U.S.C. § 1395nn(a)(2)(B). The regulations implementing Stark promulgated by CMS further define the universe of "compensation arrangements" to include direct or indirect compensation arrangements. 42 C.F.R. § 411.354(c).

---

[20] To establish Tuomey's liability under the FCA, the Government was required to prove that Tuomey (1) submitted a claim to Medicare for payment, (2) that was false, (3) Tuomey knew the claim was false when Tuomey submitted it, (4) the falsehood was material, and (5) the false claim caused the Government to pay out money to Tuomey.  *See United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (*Harrison I*); 31 U.S.C. § 3729. In this case, the Government contends that Tuomey submitted claims to Medicare for services performed pursuant to referrals by the contracting physicians, that those claims were false because the Contracts violated Stark, and that Tuomey knew the Contracts violated Stark.

The Government contends that the Contracts were indirect compensation arrangements. An indirect compensation arrangement exists only when (1) the hospital and the physician are connected by an unbroken chain of entities with financial relationships between them; (2) the aggregate compensation received by the physician "*varies with, or takes into account*, the volume or value of referrals or other business generated by the referring physician"; and (3) the hospital has knowledge of the fact that the physician's compensation so varies. 42 C.F.R. § 411.354(c)(2)(emphasis added). The Contracts do not meet the second and third elements of this definition, as explained below.

In its prior opinion in this case, this Court explained that if a hospital provides fixed compensation to a physician "that is not based solely on the value of the services the physician is expected to perform, but also takes into account additional revenue the hospital anticipates will result from the physician's referrals, that such compensation by necessity takes into account the volume or value of such referrals." *Drakeford*, 675 F.3d at 408-09. This Court then directed that on retrial, "the question, which should properly be put to a jury, is whether the contracts, *on their face*, took into account the value or volume of anticipated referrals." *Id.* at 409. Despite this Court's explicit mandate, on remand the district court refused to

instruct the jury to determine whether the Contracts ***on their face*** took into account

the value or volume of anticipated referrals.[21]

Instead, the district court permitted the jury to find that the Contracts "took

into account" the value or volume of referrals solely based upon extrinsic evidence

of intent offered through the testimony of Tuomey's executives and legal counsel.

In its post-trial order, the district court stated:

> [T]he Government presented evidence from other witnesses tending to
> show that Tuomey took into account the volume or value of referrals,
> such as the statements of Gregg Martin, William A. Pollard, and Jay
> Cox. Further, it was for the jury to judge Ms. Saccone's credibility
> regarding the use of her calculations and to consider her position
> along with other evidence in the record. A reasonable jury could have
> found that Tuomey took into account the volume or value of referrals
> in establishing physicians' compensation, so as to make the
> arrangements subject to the Stark Law.

(JA 4052.)

This was error. The Stark Law is not a "thought crime" law. The Stark Law was

intended to create "bright line" rules which can only be violated by one's actual

conduct, not intent. *Villafane*, 543 F. Supp. 2d at 69. In its prior opinion, this Court

"agree[d] with the *Villafane* court that intent alone does not create a violation."

*Drakeford*, 675 F.3d at 409 n.25. Except for the knowledge element of the indirect

compensation arrangement exception, it is a strict liability civil statute.  (JA

---

[21]  Specifically Tuomey requested that the jury be charged "***you must decide
whether the contracts, on their face, took into account the value or volume of
anticipated referrals***."  (JA 1464-1471).

3543:3-21; 3592:3-11.)   As CMS stated in the Phase I commentary, "we have attempted, as much as possible, to establish "bright line" rules so that physicians and healthcare entities can ensure compliance and minimize administrative costs." 66 Fed. Reg. 856, 860 (Jan. 4, 2001). CMS specifically applied this bright-line concept to the volume-or-value standard. *Id.* at 865-66. Thus, the existence of an indirect compensation arrangement covered by the Stark Law depends on how the compensation was paid, not how it was made.[22]

In fact, the 2007 amendment of the Stark regulations supports this conclusion. In those amendments, CMS clarified the regulatory language by replacing the term "otherwise reflects" which appeared from time to time to "takes into account." 72 Fed. Reg. 51012, 51087 (Sept. 5, 2007). CMS explained that the terms had been used interchangeably in the regulations, and this was a non-substantive change "to clarify that we do not interpret 'otherwise reflects' and 'takes into account' (with respect to referrals and as these terms are used in certain exceptions) as having separate and different meanings." *Id.* at 51027. Thus, "takes into account" does not and cannot refer to what the parties were thinking when

---

[22] Whether the parties intended to pay physicians for referrals might be relevant under the Anti-Kickback Statute (AKS). 42 U.S.C. § 1320a-7b(b)(prohibits the remuneration "to induce either the referral of an individual, or furnishing or arranging for a good or service for which payment may be made under a Federal Healthcare Program). However, the Government has never accused Tuomey of violating the AKS, nor could it, since the AKS does not apply to employment contracts. 42 U.S.C. § 1320a-7b(b)(3)(B).

they negotiated or agreed upon compensation. Rather, it can only refer to an *objective* analysis of how the compensation is paid under the terms of the agreement. *See Villafane*, 543 F. Supp. 2d at 693.

This Court clearly stated in its mandate to the district court that the jury had to decide *on the face of the Contracts* whether the compensation varied with or took into account the volume or value of referrals. *Drakeford*, 675 F.3d at 409. Yet, the district court incorrectly concluded that a reasonable jury could find the Contracts took into account the value or volume of referrals based upon the testimony of Tuomey's executives and statements made by counsel and consultants during recorded meetings before the Contracts were entered into.

Even under the district court's incorrect construction of the term "take into account," hospitals can still consider the financial consequences of a course of action without violating Stark. The Government's fundamental premise – that Stark forbids hospitals from competing for business or evaluating the financial impact of employment decisions – is simply wrong. CMS has cautioned that "while [Stark] must be implemented to achieve its intent, we should be cautious in interpreting its reach so broadly as to prohibit potentially beneficial financial arrangements." 66 Fed. Reg. at 860 (further noting "[W]e believe that compliance with … this rulemaking should not cause undue disruption of the healthcare delivery system.").

38

Nothing in Stark, or the Medicare statute[23] more generally, prohibited Tuomey's Board from performing its fiduciary duty to preserve and promote Tuomey's financial viability. *See United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 528 (6th Cir. 2012) (rejecting Government's argument that a dialysis provider violated the FCA by forming a subsidiary "for the sole purpose of increasing its profit margins" and stating, "Why a business ought to be punished solely for seeking to maximize profits escapes us."); *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 314 (S.D.N.Y. 2011) ("The worst that can be said of [Beth Israel] is that it took advantage of the uncertainty in the regulations to maximize its Medicare billings. This is not fraud.")

In addition, the district court concluded that the jury was entitled to ignore the trial testimony of Kim Saccone, a compensation consultant retained by Nexsen Pruet. In the prior appeal before this Court, the Government argued that Saccone crafted the physician agreements to take into account the value or volume of anticipated referrals. At the retrial of this case, Ms. Saccone was crystal clear that the compensation paid to the physicians under the terms of the Contracts was not

---

[23] In fact, the very first section of the Medicare statute of which the Stark Law is a part states: "Nothing in this title shall be construed to authorize any Federal office or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person."

39

based in any way upon the value or volume of anticipated referrals.[24] The Government's argument that compensation under the Contracts took into account the volume or value of referrals rests <u>entirely</u> on its assertion that Saccone used the net present value of the non-compete clause to calculate compensation under the Contracts. Similarly, the reasoning of this Court's previous opinion directly reflects the Government's mischaracterization of Saccone's testimony. This Court noted the Government's contention that Tuomey "included a portion of the

---

[24]    Q: So does [PX 53 (JA 4400)] reflect that you calculated the base salaries for each of these plans based on the MGMA data and the doctors' historical net collections for personally performed professional services?

A: Yes, those base salary ranges originally came from the 25th percentile MGMA data.

Q: So there's nothing involving any technical fees or referrals to the hospital involved in the base salary?

A: No

Q: And the base salary as described in this plan, it also has nothing to do with Plaintiff's Exhibit 47, which was non-compete analysis for the GI doctors?

A: No, that's never used again.

Q: That wasn't used in any way as part of any of these compensation plans, was it?

A: No.

(JA 1922:10-25; PX 47 (JA 4372-4374); *see also*, (JA 1923:1-1926:23 (testifying non-compete analysis was "totally unrelated" to compensation determination).)

anticipated facility component referrals in the physicians' fixed compensation." *Drakeford*, 675 F.3d at 407. Saccone's testimony in the second trial – as corroborated by Hewson (JA 3454:5-13),[25] who designed the Contracts – made absolutely clear that the compensation formula was based solely on the value of the services the contracting physicians were expected to perform (JA 1903:16-1905:2). There was never any evidence to the contrary.

Thus, the unrefuted testimony is that compensation under the Contracts simply did not take into account the revenue Tuomey anticipated would result from the physicians' referrals.[26]

### C. The District Court Improperly Concluded That a Jury Could Find the Physician Employment Agreements Violate Stark because of a "1 to 1" Correlation Between a Physician's Bonus Compensation Based on Personally Performed Services and the Hospital Technical Fees Charged as a Result of the Physician's Services.

The district court also ruled that a jury could conclude that the compensation provided under the Contracts *varied with* the volume or value of referrals because

---

[25] Hewson did not testify at the first trial. Therefore, this Court did not have the benefit of his testimony when *Drakeford* was decided.

[26] It is permissible to incorporate non-compete provisions in a hospital-physician contract. CMS expressly stated in the Stark Phase II commentary that "non-compete covenants in employment contracts generally do not take into account the volume or value of referrals [as long as the] payment for [the] non-compete covenant [is] fair market value." 69 Fed. Reg. 16054, 16088 (March 26, 2004). Hewson testified that he specifically relied on this legal authority when he designed the Contracts and advised Tuomey that they complied with Stark. (JA 3304:8-3305:14.)

of an alleged never-before-recognized illegal "1 to 1" correlation between physicians' professional services and the hospital's technical component. (JA 4051-4052.) The district court concluded that because each time a physician personally performed procedures in the hospital, the hospital could also bill for the "technical component" services it provided to the patients, that the jury could have found that the bonus compensation varied with the value or volume of referrals. The district court committed reversible error in so concluding.

It is clear from the face of the Contracts and the uncontradicted evidence presented at trial that the aggregate compensation received by the physicians under the Contracts was based solely on collections for *personally performed professional services*. The Stark regulations provide that a *physician's personally performed services are not "referrals"* under Stark. 42 C.F.R § 411.351. It follows that compensation based only on such services cannot vary with the volume or value of referrals, since such services are not referrals. *See* 73 Fed. Reg. 48434, 48709 (Aug. 19, 2008) (stating that "physicians can be paid a percentage of revenues or collections for *personally performed services*" (emphasis in original)). Hewson, who drafted the Contracts, testified that the Contracts, by intent and design, paid physicians only for their personally performed services. (JA 3210:25-3211:16, 3240:10-16.)

The Contracts established a formula for the physicians' base salary that was derived from the data regarding the physicians' historical collections, which is directly related to their personally performed professional services. For the gastroenterologists, this base amount was expressed as a minimum number of procedures rather than as a dollar amount, but in all cases the base salary formula was designed to ensure that the contracting physicians performed services commensurate with the compensation they were receiving. (JA 3291:8-3292:19.) By tying the physicians' compensation to what the market paid in terms of collections and by reducing the base salary of a physician who did not work hard, the base salary formula actually ensured that physicians were paid and would continue to be paid at fair market value levels for their own work. (JA 1923:5-1924:10, 3315:16-3317:1.)

Hall Render attorney and healthcare law professor Steve Pratt reviewed the compensation formula in the Contracts and concluded that the formula compensated physicians only for their own personally performed professional services. (JA 3539:11-18.) Pratt set forth his analysis in two written legal opinions on which Tuomey relied. (JA 1485:13-24; DXs 204 (JA 4937-4940), 232 (JA 4943-4959).) Pratt confirmed his analysis during his trial testimony. (JA 2122:9-13.) Two of the contracting physicians, Doctors Moses and McDuffie, testified that they were only paid for the services they performed. (JA 2330:14-25; 2243:19-

2244:9.)   No component of the physicians' pay depended on the amount of Tuomey's charges or collections for facility fees; the physicians received the same amount of pay regardless of whether, or how much, Tuomey collected.  Id.  In fact, there were at least two occasions when Tuomey was presented with suggested modifications to the arrangements which, if added, would have resulted in technical fees being a component of the physicians' compensation.  These requests were denied. (JA 2349:18-2350:15, 2836:7-2837:6, 3261:22-3262:20 (discussing PX 124 (JA 4441-4443)).)

Unable to refute this evidence, the Government resorted to claiming that the supposed "1 to 1" correlation between the physicians' personally performed professional services and Tuomey's technical component billings was evidence that compensation did vary with or take into account the volume or value of referrals. (JA 3871:13-3872:20.)

Payment of a productivity bonus based on a physician's personally performed professional services is allowed even if the payment is "inevitably linked to a facility fee" paid to the hospital. 69 Fed. Reg. at 16088-89. The Phase II commentary describes a scenario in which a physician employed in a hospital's outpatient clinic is paid for each patient seen. At the same time, the hospital bills a facility fee, *i.e.* technical component, for each of those patient visits. Given that "the payment to the physician is inevitably linked to a facility fee," the question

was "whether the payment to the physician would be considered an improper productivity bonus based on a … referral (that is, the facility fee)." Id. CMS's response closes the door on the Government's "1 to 1" relationship argument:[27]

> The fact that corresponding hospital services are billed would not invalidate an employed physician's personally performed work, for which the physician may receive a productivity bonus (subject to the fair market value requirement).[28]

Id. at 16089.[29]

As a matter of law, then, the correlation between the payments to the contracting physicians for their personally performed services and Tuomey's

---

[27] Tuomey would urge this Court to defer to the well-reasoned commentary of CMS, the agency charged with interpreting the Stark Law, rather than the convenient (and wrong) litigating position of the Justice Department attorneys in this case. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); Gossett, "Chevron, Take Two:  Deference to Revised Agency Interpretations of Statutes," 64 *U. Chicago Law Review* 681, 691 (1997) ("[C]onvenient litigating positions" never receive deference, regardless of whether the interpretation adopted during litigation is a change from prior interpretations or concerns a question that the agency has never previously considered).

[28] The parenthetical reference to the fair market value requirement is specifically referring to the bona fide employment exception to the prohibition against direct compensation arrangements, and not the indirect compensation definition. *See* 42 C.F.R. § 411.357I(c). There is not a fair market value test within the definition of indirect compensation agreements. Fair market value is analyzed under the permitted exceptions to indirect compensation arrangements.

[29] Moreover, when advising Tuomey about the Contracts, Hewson specifically relied on this official commentary by CMS and considered it to have the force of law. (JA 3297:3-3302 (discussing 69 Fed. Reg. at 16087-89).)

facility fees does not mean that compensation paid to the physicians under the Contracts *varied with* the volume or value of their referrals to Tuomey. The district court's conclusion that the existence of the "1 to 1" ratio creates a Stark violation[30] is incorrect as a matter of law.

### D.    The Stark Law Does Not Apply to the Contracts.

The evidence at trial indisputably established that the compensation paid under the Contracts was based solely on the value of the services the physician was expected to perform and was not based in any way upon the value of anticipated referrals.   Therefore, the Contracts did not take into account anticipated referrals and did not vary with the value or volume of referrals. As a result, the Contracts were not, as a matter of law, indirect compensation agreements as defined by Stark. This was the reasoned legal opinion offered by Hall Render attorney and healthcare law professor Pratt when he advised Tuomey on the Contracts in 2005.

---

[30] A finding that Stark does not apply to the Contracts is consistent with the intent of the law and regulations. Stark is targeted at financial relationships between physicians and entities that "may result in overutilization" of designated health services. 66 Fed. Reg. at 860. The prototypical example of overutilization is a physician ordering lab work to be performed by others, when the physician is part owner of the lab and has a financial interest in the resulting income stream. In such cases, the physician can multiply his income by the stroke of the pen. This danger simply does not exist when a physician's compensation is based on personally performed professional services, because there is a limit on the amount of work one physician can do. *See United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1051 (N.D. Ill. 2002) (holding that when "percentage compensation is based on personally performed services, not referrals, there is no economic inducement to refer patients.").

(JA 3535:17-3540:4); *see also*, DXs 204 (JA 4937-4940) & 232 (JA 4943-4959). The Government failed to present substantial evidence from which a reasonable jury could reach a conclusion contrary to Professor's Pratt's opinion.

The district court however did not limit the jury's analysis to the face of the Contracts, as directed by this Court and as done by Professor Pratt. Instead, the district court upheld the jury's verdict by permitting evidence of intent that is not expressed by the face of the Contracts to determine whether the compensation took into account anticipated referrals or varied with the volume or value of referrals. The district court erred by refusing to apply the law established by this Court. *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939) ("Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is controlling as to matters within its compass."); *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 414 (4th Cir. 2005) ([T]he mandate rule is "more powerful than the law of the case doctrine.")  Under the correct standard that should have been applied upon re-trial, Tuomey is entitled to judgment as a matter of law.[31]

---

[31] Alternatively, Tuomey is requesting a new trial because of the district court's erroneous jury charge on this critical issue. *See supra*, Section III. Additionally, Tuomey seeks a new trial on this issue under FRCP 59(a).

## III.    Tuomey Is Entitled To A New Trial Because The Trial Judge Provided Erroneous Jury Instructions.

This Court in *Drakeford* provided the district court with explicit directives regarding the factual issues which must be placed before the jury during the second trial. Despite the Court's mandate, the district court, without explanation, refused to put the question of "*whether the contracts, on their face, took into account the volume or value of anticipated referrals*" before the jury.  And, the district court refused to limit the damages award to only those claims presented "for payment of facility fees generated as a result of outpatient procedures performed pursuant to the contracts." In addition, the district court provided erroneous jury instructions regarding the proper measure of damages under the FCA.

The district court also failed to instruct the jury that differences in interpretation growing out of a disputed legal question are not false under the FCA; refused to instruct the jury on all of the elements of the regulatory definition of an "indirect compensation arrangement" under Stark; and failed to provide adequate jury instructions on the advice of counsel defense.  Although Tuomey is entitled to a new trial as a result of any one of these errors, the cumulative effect of the district court's refusal to present the issues before the jury within the framework mandated by this Court, and its refusal to instruct the jury on the correct legal standards deprived Tuomey of a fair trial.

## A.     Standard of Review

A district court will be reversed for declining to give a proposed jury instruction only when the requested instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011). In reviewing the adequacy of jury instructions, the appellate court determines "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Id.* (quotation marks omitted); *United States v. Kivanc*, 714 F.3d 782, 794 (4th Cir. 2013).

## B.     The District Court's Many Erroneous Jury Instructions Were Prejudicial and Harmful.

1.     The District Court Erred By Refusing To Instruct The Jury That It Must Determine From the Face of The Contracts Whether The Compensation Took Into Account Anticipated Referrals or Varied With the Volume or Value of Referrals.

Tuomey specifically requested the following be included in the Court's instructions on the definition of indirect compensation arrangement: "*the question, which should properly be put to a jury, is whether the contracts, on their face, took into account the volume or value of anticipated referrals.*" (JA 1429-1431, 1464-

49

1471, 3917:20-25.) This requested instruction contains the exact language from this Court's central holding and mandate that the jury be presented the question of whether the contracts, on their face, took into account the value or volume of anticipated referrals. *Drakeford*, 675 F.3d at 409. The district court simply refused to provide this requested instruction in violation of this Court's mandate. (JA 1473, 3978-3979.)  The district court erred. Furthermore, this error was not harmless. As argued previously, without limiting the jury's inquiry to the face of the Contracts, the jury was permitted to find a Stark violation through intent alone.

> 2. The District Court Erred by Failing to Charge the Knowledge Element Set Forth in the Stark Regulation's Definition of Indirect Compensation Agreement.

The district court refused Tuomey's request for the jury to be instructed on this knowledge element.  (JA 1429, 1470-1471, 3917:15-25, 3978-3979.)  The district court did not give any explanation for its refusal. The proposed charge is a correct statement of the law, taken directly from the language of the regulation. Furthermore, by refusing this charge, the district court improperly removed an element of proof from the Government's case.

3.    <u>The District Court Erred By Failing to Charge the Jury
That to Establish Damages Under the FCA, the
Government Must Prove That the Services Received
Were Worth Less Than What the Government Paid.</u>

Under the FCA the Government is entitled to recover from a defendant an "amount of *damages* which the government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1) (emphasis added). The measure of damages under the FCA is limited to the amount by which the value of the services provided by Tuomey was less than what the Government paid. *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 839 (D.C. Cir. 2012); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 923 (4th Cir. 2003) *(Harrison II)*.  To recover damages, the Government is required to prove that Tuomey's services were worthless or medically unnecessary. *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1259 (D.C. Cir. 2010) (*SAIC*); *Mikes v. Strauss*, 274 F.3d 687, 701 (2d Cir. 2001).

In *Harrison II*, the defendant's false certification caused the Government to award a subcontract for which the defendant was ineligible. *See* 352 F.3d at 914-15. The question for the district court was how to measure FCA damages. Recognizing that the general measure of FCA damages is "the amount of money the government paid by reason of the false statement above what it would have paid absent the false statement," *id.* at 922, the Fourth Circuit held that Harrison was required to prove "how much more the government paid [the defendant] to

51

perform the subcontract than it would have paid another firm absent the false …

certification" *id.* at 923. Because the work was actually performed, there was "no

evidence that the government did not get what it paid for or that another firm could

have performed the work for less." *Id.* Thus, there were no actual damages under

the FCA.[32] *See also*, *Davis v. Dist. of Columbia*, 679 F.3d at 850 ("[t]o establish

damages, the government must show not only that the defendant's false claims

caused the government to make payments that it would have otherwise withheld,

but also that the performance the government received was worth less than what it

believed it had purchased.")

The district court refused to instruct the jury on the FCA measure of

damages.[33] *See* (JA 1476, 3983).  Instead, over Tuomey's objection (JA 1436), the

district court charged the jury that the measure of damages was the total amount of

money paid to Tuomey for claims submitted in violation of Stark (JA 3946:24-

---

[32] The Fourth Circuit thus rejected the rationale adopted by the Seventh Circuit in *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), which the district court cited in its order. In *Rogan*, the court found it immaterial that the United States would have paid for medically necessary procedures regardless of Stark and AKS violations, stating only that "[w]hen the conditions" set by Medicare "are not satisfied, nothing is due." *Id.* at 453. A leading treatise on the FCA has characterized the result in *Rogan* as "extremely harsh" and its analysis as "perfunctory and superficial." John T. Boese, *Civil False Claims & Qui Tam Actions* § 3.01[B].

[33] Tuomey requested that the jury be instructed that to prove damages, the Government must prove that the services received were worth less than what the Government believed it had paid for. (JA 1437).

3947:15). The district court concluded that *Harrison II* does not apply because it is "based on a cause of action arising solely under the FCA." The district court reasoned "[h]ere, the FCA causes of action are based on the Stark Law, which prohibits *any* payment of an impermissible claim." (JA 4056.) The district court quotes at length from the Stark statutory remedy provisions and then concludes:

> Following Tuomey's argument to its logical conclusion, the Government nearly always would obtain a benefit in terms of healthcare services provided under Medicare or Medicaid. Thus, under most circumstances, the Government would be limited to civil penalties. Such a result is contrary to the plain wording of the [Stark] statute.

(JA 4057.)

In so holding, the district court ignores the fact that the Government can seek administrative sanctions for alleged violations of the Stark Law in the form of civil monetary penalties or exclusion, 42 U.S.C. § 1395nn(g)(2), which it chose not to pursue here. Instead, it decided to intervene in an FCA action and therefore must prove, as *Harrison II* requires, that it did not get what it paid for in connection with the claims in question.

Moreover, the district court's logic is inconsistent with this Court's observation that there is no implied cause of action under Stark Law. *Drakeford*, 675 F.3d at 396. Rather, the district court impermissibly creates an implied Stark cause of action by awarding Stark's administrative remedies in a civil action

brought under the FCA. The district court abused its discretion by providing incorrect jury instructions on the measure of damages under the FCA.

> 4.    The District Court Erred by Failing to Instruct the Jury that the only Services that are Relevant are Services for which Facility Fees were Generated as a Result of Outpatient Procedures at Tuomey.

In *Drakeford*, this Court clearly stated that the relevant claims were those Tuomey "presented, or caused to be presented, to Medicare and Medicaid…for payment of facility fees generated *as a result of outpatient procedures performed pursuant to the contracts*." 675 F.3d at 399 (emphasis added). This Court also observed with approval that "the district court…instructed the jury to determine the number and value of claims for services that the physicians referred pursuant to the contracts, and for which Tuomey also received payment." *Id.* at 400. As a result, Tuomey filed a motion in limine to limit the Government's damages claimed under the FCA to facility fees it incurred for outpatient procedures performed by the contracting physicians. (ECF 667.) In addition, Tuomey submitted the following jury instruction setting forth this Court's directive:

> The only services that are relevant in this case are services for which facility fees were generated as a result of outpatient procedures at Tuomey hospital provided in conjunction with personally performed professional services performed by the physicians while the contracts were in effect.
>
> (JA 1445).

The district court however denied Tuomey's motion (JA 1383:4-1386:12), refused to provide the requested charge (JA 1477), and instead erroneously instructed the jury that "[t]he relevant claims are the claims for inpatient and outpatient hospital services that were referred by the physicians while they had such part-time arrangements with Tuomey" (JA 3947:21-3948:1). *See also*, (JA 3984). The district court's evidentiary ruling and jury instruction in this regard directly conflicts with this Court's ruling. Furthermore, the harm to Tuomey was substantial. The Government's witness Ruben Steck previously testified that the amount of total facility fees for outpatient surgical procedures performed under the part-time employment agreements was $7.3 million. (JA 1385:5-18.) However, as a result of the trial court's erroneous evidentiary ruling and jury instructions, the jury determined that the total claims amount was $39,313,065.00, which included inpatient and outpatient claims.

5.    The District Court Erred by Refusing to Charge that Claims Based Upon Differences of Interpretation of Disputed Legal Questions Are Not False Under the FCA.

The jury heard evidence of conflicting legal opinions and assessments regarding whether the Contracts complied with the Stark Law and other healthcare laws. Drakeford's attorney Smith testified about his concerns over the Contract being offered to Drakeford. McAnaney also testified in the second trial about the assessment he gave regarding the proposed Drakeford Contract. Nexsen Pruett's

Hewson and Hall Render's Pratt also testified that each advised Tuomey that the Contracts were Stark Law compliant. In *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008) this Court stated that "differences in interpretation growing out of a **disputed legal question** are ... not false under the [**False Claims Act**]." *Id.* at 377 (internal quotation marks omitted) (emphasis added). This is because to be "false" the alleged statement or conduct must represent an "objective and verifiable falsehood." *United States v. Kernan Hosp.*, 880 F. Supp. 2d 676, 688 (D. Md. 2012); s*ee also*, *United States v. Medica Rents Co. Ltd.*, 2008 WL 3876307, at *3 (5th Cir. Aug. 19, 2008) (where there was substantial confusion created by contradictory instructions and guidance the evidence does not support a reasonable inference that the defendants knowingly submitted false or fraudulent claims); *United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013) (defendant's reasonable interpretation of any ambiguity inherent in the regulation "belies the scienter necessary to establish a claim of fraud under the FCA"); *United States ex rel. Lockyer v. Haw. Pac. Health Group*, 343 Fed. Appx. 279, 281 (9th Cir. 2009) (non-compliance with the Medicare regulations due to a good faith interpretation of the regulations is insufficient to establish scienter under FCA).

The evidence presented by the Government and Tuomey established the existence of differences of interpretation of the Stark Law as applied to the Contracts. Thus, Tuomey requested the following jury instruction:

> Claims submitted based on differences of interpretation growing out of disputed legal questions, such as differing interpretations of the Stark Law, are not considered "false" under the False Claims Act. Therefore, if you determine that Tuomey believed the physician contracts complied with the Stark Law, you must find in favor of Tuomey.
>
> (JA 1446).

The district court improperly refused to charge this correct legal principle. *See* (JA 1478, 3918:25-3919:7, 3983). This was an abuse of discretion, because the requested charge was supported by the facts and was an accurate statement of the law.

> 6.    The District Court Erred by Refusing to Charge that Tuomey Can Rely on Legal Advice Even if It Turns Out to Be Wrong.

The Government disagreed with the legal advice provided to Tuomey by its lawyers. The Government asserted this advice was wrong and Tuomey was not entitled to rely upon it.  Tuomey therefore requested that the jury be instructed that Tuomey may have an advice of counsel defense even if the attorneys' advice turned out to be wrong. (JA 1441, 3920:1-4.) This is a correct statement of law. *See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1028 (2d Cir. 1989) ("[E]ven if the attorney's professional advice had been wrong,

it does not follow that…reliance on that advice would have constituted bad faith.");

*Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 376 (D.N.J. 2002)

(holding that a defendant can rely on counsel's advice even if that advice was

ultimately determined to be wrong). The district court's refusal to provide this

instruction (JA 1477) is an abuse of discretion.

**IV.    The Undisputed Evidence Is That Tuomey Reasonably Relied Upon The Advice Of Its Lawyers And Could Not Have Knowingly Violated The FCA.**

    **A.    Standard of Review**

Tuomey appeals the district court's denial of its motion for judgment as a

matter of law based upon its defense of reliance on counsel. This Court reviews the

district court's ruling on a motion for judgment as a matter of law *de novo. Adkins*

*v. Crown Auto, Inc.*, 488 F.3d 225, 231 (4th Cir. 2007).

    **B.    Based on the Uncontradicted Evidence Presented as to Tuomey's Reliance on the Comprehensive Advice of Counsel, no Reasonable Jury Could Have Found That the Government Met Its Burden of Proof as to the Element of Scienter.**

The FCA is intended to punish wrongdoing, not honest mistakes. *Colucci*,

785 F. Supp. 2d at 316. Accordingly, a defendant may be held liable under the

FCA only for a *knowing* submission of a false claim. *See Harrison II*, 352 F.3d at

817.   "[C]laims for services rendered in violation of a statute do not necessarily

constitute false or fraudulent claims under the FCA." *Gonzalez v. Fresenius Med.*

*Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012) (internal quotation marks omitted). In this case, the Government was required to prove that Tuomey knew that the Contracts violated Stark and, therefore, that claims resulting from referrals by the contracting physicians were false. Evidence that a defendant relied on advice of counsel in good faith negates the requisite intent needed to establish violation of the FCA. *United States v. Newport News Shipbuilding, Inc.*, 276 F. Supp. 2d 539, 565 (E.D. Va. 2003) (*Newport News*); *see also*, *United States v. Polytarides*, 584 F.2d 1350, 1353 (4th Cir. 1978) ("The basis for the defense of action taken on the advice of counsel is that, in relying on counsel's advice, defendant lacked the requisite intent to violate the law."); *cf. United States v. Miller*, 658 F.2d 235, 237 (4th Cir. 1981) (stating that the reliance defense "is designed to refute the government's proof that the defendant intended to commit the offense").

The district court acknowledged in the post-trial order that the jury found Tuomey reasonably relied upon this advice from when the Contracts were first made until Tuomey learned of Kevin McAnaney's assessment of the proposed agreement with Dr. Drakeford.[34]  (JA 4055.)  The court concluded however that "a reasonable jury could have found that Tuomey possessed the requisite scienter once it determined to disregard McAnaney's remarks."  (JA 4055-4056.)  The

---

[34] The Order states "[t]he parties agree that the jury evidently rejected Tuomey's advice of counsel defense commencing with Tuomey's knowledge of McAnaney's position, grounded on the fact that the jury excluded damages from fiscal year 2005."  (JA 4055.)

district court's conclusion is based upon an incorrect application of the law regarding advice of counsel. Such a conclusion is fatally flawed and would, if allowed to stand, gut the viability of advice of counsel. After all, advice of counsel has little use when the rules are clear. The point of seeking legal advice is to get guidance when the law is *not* clear. So long as the client actually relies on counsel and that reliance is reasonable, the protections of advice of counsel apply.[35] Under the district court's analysis, an advice of counsel defense would never be available where there are conflicting legal opinions. The district court clearly erred by failing to enter judgment as a matter of law for Tuomey where the unrefuted evidence showed Tuomey relied on its advice of counsel.[36] *See* (JA 2780:18-3019:25, 3187:1-3601:25).

---

[35] The trial evidence showed that the Government's claims calculations were made on a government fiscal year basis. The government fiscal year runs from October 1st through September 30th. By acknowledging that Tuomey relied on counsel through September 30, 2005, the jury's verdict imposing liability and damages after that date is completely inconsistent with the evidence. There was no evidence that Tuomey received any legal advice beyond September 30, 2005 that conflicted with the advice it had received before that date. The last evidence in the record regarding Tuomey's advice of counsel was Steve Pratt's written legal opinion, dated September 20, 2005, which stated that the Contracts did not violate Stark because the law did not apply. DX 232 (JA 4953-4955). Thus, the jury's finding that Tuomey reasonably relied on advice of counsel through September 30, 2005, is inconsistent with its finding that Tuomey did not reasonably rely upon its counsel's advice after this date. There is insufficient evidence to support the jury's rejection of Tuomey's reliance on counsel defense after September 30, 2005.

[36] Additionally, Tuomey seeks a new trial on this issue under FRCP 59(a).

1.     <u>Tuomey Proved it Relied on the Advice of Counsel.</u>

To negate the scienter requirement of an FCA claim by asserting advice of counsel, the defendant must prove (1) the advice of counsel was sought in good faith; (2) the client provided full and accurate information to counsel; (3) the client received the advice that can be reasonably relied upon, and (4) the client faithfully followed this advice. *Newport News*, 276 F. Supp. 2d at 565.

*(a)     Tuomey sought the advice of counsel in good faith.*

As stated above, Tuomey had a legitimate problem recruiting physicians to the underserved community of Sumter where physicians face a poor payor mix. (JA 1532:1-1533:9, 1536-:1-15, 2327:6-25, 2791:15-25, 3202:4-3204:22.) Because of the long wait times, the surgeons began considering taking their surgeries away from Tuomey and to a physician-owned outpatient surgical center. (JA 2799:13-24.)  In response to these problems, Tuomey created a Surgical Committee to research potential resolutions. (JA 2797:18-2800:8.)  Realizing Tuomey would lose surgical specialists essential to providing adequate healthcare in the community, the Committee looked to Nexsen Pruet for a legal way to address these problems. (JA 1608:13-17, 2800:9-2803:20, 2805:6-2807:2, 2818:18-2819:20.)

> (b)    *Tuomey provided full and accurate information to its counsel.*

Throughout the entire process, Tuomey provided its counsel with any and all information requested by its counsel. (JA 2805:24-2806:10, 2968:23-2969:9.) Hewson testified he was granted full access to anything he requested from Tuomey. (JA 3216:8-14.)   In addition, after Cejka was retained at the advice of Hewson (JA 3212:7-3213:5), Tuomey provided Ms. Saccone with full and accurate information each time it was requested (JA 2805:24-2806:3).

Furthermore, having given Hewson all of the information he requested, Tuomey relied on him to pass this information along to McAnaney and Pratt. (JA 2379:12-18, 2405:7-24, 3010:2-5.) Hewson testified at trial that he provided McAnaney with all of the information needed for him to perform his assessment and likewise, gave Pratt all of the information he needed for his opinion. (JA 3270:7-22, 3463:21-3464:4; *see* PX 116 (JA 4436, ¶ A).) Tuomey never withheld information or provided inaccurate information to counsel.

> (c)    *Tuomey reasonably relied on counsel's advice.*

Having provided its counsel with accurate and complete information, Tuomey relied on experienced counsel from two prominent law firms to develop contracts that complied with the Stark Law. (JA 2950:5-2949:1, 2987:14-

2991:11.)[37] Nexsen Pruet had served as Tuomey's lawyers for over 20 years, and its attorneys had advised Tuomey regarding other issues such as healthcare law, taxes, and benefits. (JA 2803:9-2804:9, 3196:8-19); *see SEC v. Prince*, 2013 WL 1831841, at *28 (D.D.C. May 2, 2013) (considering length of relationship between the defendant and counsel as evidence of the defendant's good faith in seeking counsel's advice). Nexsen Pruet's advice to Tuomey was a collaborative effort of numerous attorneys. (JA 3196:20-3198:25.) Specifically, Hewson's practice had focused entirely on healthcare law since 1990. (JA 3190:19-20.) A major portion of his practice was dedicated to ensuring hospital-physician contracts complied with state and federal law, and advising clients on the Stark Law was part of his daily practice. (JA 3190:21-3193:10.) Based on Hewson's vast experience ensuring the compliance of hundreds of physician contracts with the Stark Law and his frequent dealings with fair market value analysts, it was reasonable for Tuomey to rely on his advice to retain Cejka. (JA 3212:7-3213:5.) Moreover, it was reasonable for Tuomey to rely on Hewson's and Pratt's assessments that Cejka had done a thorough, credible job. (JA 3540:6-3541:9.)

---

[37] Tuomey's reliance on counsel was particularly reasonable given the overwhelming evidence that the Stark statute, regulations, and commentary are confusing and unsettled. Even the Government's witnesses and representatives acknowledged the complexity and uncertainty inherent within Stark and the regulations. (JA 2066:7-19, 3059:2-10.)

The uncontradicted evidence established the following:

- Nexsen Pruet researched, designed, drafted, and recommended Tuomey enter into the Contracts;

- Nexsen Pruet advised Tuomey that the Contracts complied with all laws, including the Stark Law;

- Nexsen Pruet advised Tuomey that the compensation did not vary with or take into account the volume or value of referrals or the hospital's technical fees, but rather paid the physicians for personally performed professional services;

- Nexsen Pruet engaged Cejka, a fair market value consulting firm, to work on the Contracts and recommended that Tuomey rely on Cejka's opinion that the physicians' compensation was both fair market value and reasonable;

- Nexsen Pruet engaged Richard Kusserow and evaluated his comments on the proposed agreements;

- Hewson advised Tuomey that Cindy Hutto of Nelson Mullins had negotiated and approved the gastroenterologists' Contracts, further demonstrating that the Contracts complied with Stark;

- Tuomey provided Nexsen Pruet with all information needed for the firm to give its legal advice, never pressured Nexsen Pruet for a certain result, and never asked for anything improper;

- Hewson considered McAnaney's comments and concerns (made in a phone call to which Tuomey was not a party) but fundamentally disagreed with McAnaney. He discussed this with Tuomey and continued to advise Tuomey that the Contracts complied with the law and that compensation in excess of collections did not violate Stark;

- Nexsen Pruet intended for Tuomey to rely on their advice about McAnaney's comments and the "Drakeford letter," and Tuomey did rely on that advice;

- Hewson stands by all his advice to Tuomey and its Board that the Contracts were entirely legal.

(JA 3209:7-3220:4.)

Hewson advised Tuomey the Contracts were legal under the Stark Law. (Id.) Tuomey relied on Hewson's comprehensive legal advice throughout the entire process, and Hewson made sure Tuomey was well-informed on the progress of the Contract's formation. (JA 2425:16-2428:9.) Hewson provided regular updates and drafted memoranda describing in detail the many steps taken to ensure that the Contracts complied with the law. Specifically, Hewson explained the purpose and legality of each of the relevant contract provisions, including every component of compensation, with specific reference to Stark authorities supporting each one. Those authorities included commentary from CMS published in the Federal Register that Hewson specifically relied on when formulating the Contracts. (JA 3295:14-3305:19); *see* 69 Fed. Reg. at 16088. Hewson testified that Cejka was engaged to work for Nexsen Pruet and that Cejka's opinion letters and other work product were reviewed and approved by him from a legal standpoint. (JA 3305:20-3313:23.) Hewson testified that Cejka's methodology and work product – including documents criticized by the Government as raising Stark Law issues, *see* PXs 47 (JA 4372-4374), 53 (JA 4398-4410), 84 (JA 4423), & 530 (JA 4770-4771), did not

present any Stark problems. (Id.) Hewson advised Tuomey that it should rely on Cejka's opinions. (JA 3212:14-3213:5.)

Nexsen Pruet further retained Kusserow, the former inspector general, to review the Contracts and provide feedback based on his experience in and familiarity with the regulatory environment surrounding Stark. (JA 3213:6-19.) Following the Kusserow call, Hewson provided the Tuomey Board with the Kusserow letter and several memoranda that explained how the comments of non-lawyer Kusserow were being vetted and, if warranted, addressed in the Contracts so as to ensure Tuomey complied with Stark. (JA 3213:8-3214:1, 3313:24-3315:15, 3493:11-3496:8 (discussing PX 99A (JA 4425-4435)); *see* DX 59 (JA 4882-4934).

In an effort to reach an agreement with Dr. Drakeford and at the behest of Drakeford's counsel, Tuomey instructed Hewson to have "a conversation" with McAnaney regarding his thoughts on the unexecuted contract for Dr. Drakeford. (JA 2972:6-2973:17.) During a telephone call, McAnaney told Hewson that a regulator working for the Government might look unfavorably on a contract that provided a physician with compensation higher than collections for his personally performed services. (JA 3329:14-3332:18.) Just as he had done following his conversation with Kusserow, Hewson relayed McAnaney's assessment of the Contract to the Board. (JA 3218:1-3219:11.) Hewson informed the Board that in

response to this assessment, he had gone back and reviewed the issue thoroughly and based on this review, it was legal to compensate a physician in excess of his collections where the compensation was based only on personally performed services. (Id.); *see also*, (JA 3531:6-3532:25, 3555:20-3556:3).

Thereafter, Dr. Drakeford sent a letter dated July 19, 2005 to the Board allegedly summarizing McAnaney's views. (JA 3219:12-3220:4); PX 148 (JA 4447-4450). The "Drakeford letter" was drafted by Mr. Smith, Drakeford's attorney (JA 2096:7-2098:8), while Smith and members of his firm were actively researching federal *qui tam* law for *this very suit* in which they stand to make millions (JA 2135:20-2168:16). The letter parroted McAnaney's primary concern that paying more than collections could not be fair market value. *See* PX 148 (JA 4448). The letter noted no other concerns regarding the legality of the unexecuted contract with Dr. Drakeford, which is consistent with Hewson's testimony. *Compare* (JA 4447-4450) *with* (JA 3218:13-22). Although Dr. Drakeford's summary was self-serving and contained numerous false statements, Hewson nevertheless advised Tuomey to take the allegations seriously. (JA 3332:19-3341:2.) Accordingly, Nexsen Pruet advised Tuomey to ask Hall Render for advice on the legality of the Contracts in light of the allegations and to convene a Board meeting to obtain legal advice on the issues. (JA 3336:6-3337:12.)

Following the advice of Hewson, Tuomey retained the services of Steve Pratt and the Hall Render firm to provide an independent opinion regarding the legality of the Contracts after Dr. Drakeford's counsel and McAnaney raised concerns. Pratt initially practiced healthcare law at Hall Render for 14 years until 2000, when he left to be in-house counsel for Ascension Health, the parent company for a group of approximately 100 hospitals in 25 states. After four years as in-house counsel, Pratt returned to Hall Render and continued to advise clients as to Stark, as well as other healthcare laws and regulations. Hall Render is the largest healthcare firm in the country, and nationally renowned for its expertise in healthcare law.[38] In addition, Pratt has been a healthcare law professor since 2000 and presently teaches a class on Stark Law at Indiana University School of Law. (JA 3505:10-3510:8.)

Pratt provided Tuomey with two well-researched opinions in which he concluded that Stark did not apply to the Contracts, but even if it did, the Contracts fell within an exception and were thus legal. (JA 3535:17-3540:5 (explaining analysis contained in DX 204 & 232)); DXs 204 (JA 4937-4940) & 232 (JA 4943-4959). Pratt's preliminary opinion (provided to the Board at a meeting convened in response to the Drakeford letter) concluded that the Contracts complied with applicable IRS rules, the AKS, and Stark. *See* DX 204 (JA 4937-4940). As part of

---

[38] McAnaney also acknowledged that Hall Render is a very respected and well-known national healthcare firm. (JA 2064:4-14.)

his Stark analysis, Pratt concluded that the Contracts were "commercially

reasonable." Id. Specifically, Pratt explained:

> We understand that it is very likely that the Practice will not generate
> a profit from the services that will be rendered by the employed
> physicians. We considered whether an employment arrangement that
> is not profitable could qualify as "commercially reasonable," and we
> conclude that it can. In our experience, most physicians who are
> directly or indirectly employed by a hospital do not generate a profit.
> It is common for a hospital owned physician practice to operate at a
> financial loss. Generating a profit is only one of many factors that
> need to be considered when determining if an arrangement is
> "commercially reasonable."

DX 204 (JA 4939).

This legal opinion is significant because it directly contradicted McAnaney's basic

premise that the government regulators would question the commercial

reasonableness and fair market value of physician compensation arrangements that

paid a physician more than collections for personally performed services. Pratt was

admittedly experienced and qualified to provide this commercial reasonableness

opinion, as he not only analyzes the commercial reasonableness of compensation

arrangements as part of his daily legal practice, but he also teaches law students

how to do the same.

Hall Render issued its final opinion letter to Tuomey on September 20,

2005. *See* DX 232 (JA 4943-4959). In this letter, Pratt confirmed his preliminary

opinions that the Contracts were legally compliant and commercially reasonable.

69

Id. Pratt advised Tuomey that Stark did not apply to the Contracts because Tuomey did not have an indirect financial relationship with the physicians:

> [I]n order for the Physicians to have an indirect compensation arrangement with Tuomey, the aggregate compensation paid to the Physician by the Practice Group must vary with or otherwise reflect the volume or value of DHS referrals or other business generated by the Physician for Tuomey. It does not. …The aggregate compensation paid to the Physicians is determined by the services that are personally performed by the Physician.… [T]hese services do not constitute "referrals" as the Stark law defines the term "referral."

DX 232 (JA 4954).

Tuomey was entitled to rely on this written advice from an eminently qualified healthcare lawyer and professor of Stark Law. In contrast, McAnaney's comments did not even rise to the level of a competing legal opinion. Even so, Pratt carefully considered McAnaney's comments and responded to them. The result was a carefully reasoned, credible legal opinion that the Stark Law did not even apply to the Contracts.

Having received opinions from two reputable healthcare attorneys that the Contracts complied with Stark, Tuomey's reliance on their advice was reasonable. Such reasonableness is not defeated by McAnaney's oral assessment, which amounted to little more than an off-the-cuff observation that the government would not like payment to the doctors that was more than their collections – although no statute, regulation, or official commentary forbids it. This is especially true given

that McAnaney's comments related to fair market value, on which he is not an expert.

> *(d)    Tuomey faithfully followed the advice of its counsel.*

There is not a shred of evidence that Tuomey failed to faithfully follow the advice it was given by counsel. Instead, it actively sought out competent legal counsel, asked the tough questions, provided its counsel with full and accurate information, and only then entered into the Contracts. (JA 2301:6-2303:14, 2846:6-18, 2957:13-2969:21.) There is no evidence that anyone at Tuomey believed that Nexsen Pruet's advice was unsound. *See* (JA 1963:8-2023:21, 2200:5-2352:15, 2370:12-2433:22, 2780:18-3019:25, 3187:1-3601:25); *see also*, *Prince*, 2013 WL 1831841, at *29 (noting that reasonableness of reliance was supported by the absence of evidence that anyone at the defendant company thought counsel's advice was incorrect). Rather, the unrefuted evidence at trial shows that in reliance on their attorneys' advice that compensation had to be fair market, Tuomey repeatedly refused to offer more compensation to a physician than what Cejka had determined was fair market value. (JA 2961:2-19, 2833:20-2837:6.) Dr. Moses similarly testified that each time the gastroenterologists asked for an increase in pay, Tuomey adamantly adhered to keeping the compensation within the fair market value range established by Cejka. (JA 2237:20-2238:16.)  Moreover, when

McAnaney assessed Drakeford's unexecuted Contract in June 2005, Tuomey faithfully followed Hewson's advice in retaining Pratt.

Attorneys Hewson and Pratt both repeatedly advised Tuomey the Contracts were legal. During their trial testimony, both strongly reaffirmed that advice without qualification or reservation. (JA 3220:1-4, 3601:9-13.) Unrefuted evidence also established that Hutto, a healthcare lawyer with Nelson Mullins, helped design the gastroenterologists' Contracts and approved them. (JA 2331:3-2345:19, 3241:2-3215:4.) The testimony is clear that Tuomey followed the advice of its counsel through the entire process. (JA 2425:6-2428:9, 2845:13-2846:23, 2967:21-2969:21, 3216:5-3217:17, 3540:6-3543:21.)

2.   <u>The Government Failed to Introduce any Evidence to Undermine Tuomey's Advice of Counsel Defense.</u>

At trial, it was not disputed that Tuomey acted on the advice of counsel. Rather, the Government challenged the correctness of the advice and argued that Tuomey was not entitled to rely on the well-founded legal advice of its counsel. Perhaps the most vivid demonstration of how one-sided the evidence was regarding the reasonableness of Tuomey's reliance was the willingness of the Government to effectively concede the applicability of advice of counsel until McAnaney became involved. (JA 3903:15-3904:23.) This concession is also an admission that the "intent" evidence introduced by the Government prior to June 2005 was not sufficient to prove scienter.

72

In light of this concession and the jury verdict, the relevant inquiry becomes what, if any, evidence the Government presented to strip Tuomey of the advice of counsel defense after June 2005. The answer is that no such evidence was introduced. At most, the Government can point to McAnaney, whom Tuomey and Dr. Drakeford's practice retained to provide a neutral assessment (not a legal opinion) of a single, unexecuted contract for Dr. Drakeford.[39] (JA 2061:22-2062:22, 3548:6-3549:14.) However, the Government's reliance on McAnaney to undermine the reasonableness of Tuomey's reliance on advice of counsel must fail because Tuomey reasonably relied on Hewson and Pratt to evaluate McAnaney's comments. Moreover, McAnaney did not offer a legal opinion on the Contracts in 2005 or at trial, and the evidence showed that his assessment was not neutral.

McAnaney was not retained to, and did not, provide a legal opinion to Tuomey as to whether the single contract he examined complied with the Stark Law. (JA 2064:19-2065:7, 3325:1-17 (discussing PX 117 (JA 4439-4440)).) Within the limited scope of his engagement, McAnaney provided Hewson with his assessment of how government regulators would view the agreements – that the government would likely think the compensation paid to the physicians over their collections was for referrals. (JA 2070:15-2071:14.) However, McAnaney also

---

[39] Notably, 16 Contracts were already executed prior to the joint retention of McAnaney to provide an assessment. (JA 3217:18-22.)

told Hewson that the mere fact that physicians are paid more than collections is not determinative of whether compensation is fair market value. (Id.) Significantly, McAnaney never stated that the Contracts violated Stark.

Hewson considered McAnaney's thoughts, and based on his experience and understanding of the law, fundamentally disagreed with McAnaney's view that physicians could not be paid a salary of more than their collections for personally performed services. (JA 3330:1-3332:18.) Accordingly, he informed Tuomey that McAnaney's assessment did not change his position.

Similarly, Pratt agreed with Hewson's opinion of the legality of the Contracts. (JA 3532:8-25.)  While the Government attempted to discredit Pratt's analysis by implying Hewson withheld relevant information, this point is a red herring. Tuomey provided all of the relevant information to Hewson as he was formulating the Contracts. Tuomey relied on Hewson to provide information to Pratt. Hewson did not withhold any information from Pratt, (JA 3270:7-22), but even if he had, the Government offered no evidence that Tuomey knew information had been withheld. Without such knowledge, there is no basis for a conclusion that Tuomey's reliance on counsel was unreasonable. More importantly, even after the Government pointed out all of the information allegedly withheld and concealed by Hewson, Pratt unequivocally testified his opinion *would not have changed*. (JA 3601:9-13); *see United States v. DeFries*, 129 F.3d at 1293,

1309-1310 (D.D.C. 1997) (recognizing that the advice of counsel defense does not require that counsel has perfect knowledge of all facts).

Finally, Hewson and Pratt advised Tuomey against consenting to McAnaney putting his assessment in writing at the request of Drakeford's attorney, Smith. (JA 3338:11-13, 3524:10-3527:23.) Both Hewson and Pratt recognized that McAnaney had a conflict of interest arising from the joint representation of both Drakeford and Tuomey because of the significant disagreement that had arisen between the parties. (JA 3339:3-10, 3525:20-3527:23.) Likewise because he was jointly hired, there was concern the communication would not be protected by the attorney-client privilege. (JA 3525:20-3526:17.) Thus, Hewson, with permission from the Board, instructed McAnaney not to issue a letter setting forth his assessment of a single, unexecuted contract. Importantly, this decision cannot be evidence of reckless disregard. Tuomey made the informed decision to rely on advice from Nexsen Pruet, its counsel for twenty years, and Hall Render, a preeminent nationwide law firm specializing in healthcare law, rather than on the assessment – **not legal opinion** - of an attorney with whom Tuomey had never worked and who reviewed a single, unexecuted part-time Contract. There is absolutely no evidentiary support for the jury's rejection of Tuomey's advice of counsel defense. As a result, the district court clearly erred by failing to enter judgment as a matter of law for Tuomey.

75

**V.    In The Alternative, Tuomey Should Be Granted A New Trial Because Allowing This Verdict To Stand Would Be A Miscarriage Of Justice.**

**A.    Standard of Review**

On review of a motion for new trial, under Fed. R. Civ. P. 59(a), this Court is permitted to weigh the evidence and consider the credibility of witnesses. *Knussman v. Md.*, 272 F.3d 625, 647 (4th Cir. 2001).  A new trial will be granted if "(1) the verdict is against the clear weight of the evidence, (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). The decision to grant or deny a new trial is within the sound discretion of the district court and is to be respected absent an abuse of discretion. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *Wilson*, 624 F.3d at 649 (citation omitted).

**B.    The District Court Abused Its Discretion By Refusing To Grant a New Trial.**

The district court abused its discretion by refusing to grant a new trial.  First, as stated above, the evidence was clear that the physicians' compensation did not vary with or take into account their referrals to Tuomey, and thus the Stark

76

Law did not apply to the Contracts. (JA 3536:4-3540:4.) Saccone testified that the compensation models she designed did not reflect any technical fee income to Tuomey. (JA 1851:12-19 (discussing PX 47 (JA 4372-4374)), 1903:16-1905:2.) Hewson confirmed that the Contracts were designed to pay physicians only for their personally performed services. (JA 3210:25-3212:6.) Doctors Moses and McDuffie testified that they were paid only for their personally performed services and their compensation was not tied to Tuomey's technical fees. (JA 2204:14-23, 2230:14-2231:2.) It is undisputed that the physicians were paid regardless of whether Tuomey received a facility fee related to the contracting physicians' surgeries. (Id.)

Second, as explained more fully below, the Government did not present any evidence of claims submitted by Tuomey as a result of physician referrals. The Government admittedly does not track physician referrals and the fact that Tuomey is not even allowed to enter referring physician data on its electronic claims forms is not disputed. (JA 3141:12-3153:9); DXs 350-352 (JA 4963-4979). The CMS definitions of attending and operating physicians do not meet the Stark definition of a "referring" physician. The only way to determine the identity of a referring doctor is by examining the medical records, (JA 3153:4-9, 3598:1-20), and this was not done by any government witness (JA 2361:7-20, 2704:12-17.)

Third, the jury's finding regarding the Government's claims and damages is clearly excessive and is based upon unreliable data. As noted by the Fourth Circuit in *Drakeford*, the relevant claims are those based upon the Contracts, *i.e.*, only the outpatient surgical claims. 675 F.3d at 399. There is simply no basis to support the jury's finding that Tuomey had 21,730 false claims for $39 million dollars when there were only 10,663 outpatient claims for about $6 million dollars.

Fourth and finally, the overwhelming evidence at trial established that Tuomey relied on advice of counsel in good faith throughout the conception, design, and implementation of the Contracts. (JA 2425:6-2428:9, 2845:13-2846:23, 2967:21-2969:21, 3187:3-3341:2, 3366:7-3440:23, 3442:11-3504:23, 3505:8-3601:25.)

The Government's response to this overwhelming evidence confused the jury and led it to think, incorrectly, that if Tuomey talked or thought about referrals then it had violated Stark and the FCA. In its closing, the Government displayed the following excerpt from Pratt's September 20, 2005 opinion letter, which addressed the AKS, not the Stark Law:

> [L]aw enforcement authorities, the courts, and Congress have also demonstrated a willingness to look behind the formalities of a transaction to determine the underlying purpose of payments between health care providers and potential referral sources.
>
> DX 232 (JA 4952).

The Government then argued to the jury, "And that's what you are being asked to do, to look beyond just the formalities…and look at the underlying reasons, the underlying purposes of the contract." (JA 3873:6-16.) The Government then replayed audio of various segments of meetings and told the jury its job was to "scratch away the veneer" and look to the underlying purpose of the Contracts. (JA 3874:5-21.) "[I]f something looks like a duck,…and quacks like a duck, it's a duck. And what they are doing is they are paying for an ongoing stream of referrals." (Id.)  It is obvious that the jury's verdict was a result of the Government's use of intent evidence to confuse the jury into believing that Tuomey violated the Stark Law by considering the financial impact on the hospital's operations in deciding whether to offer the physicians part-time employment agreements.

The district court erroneously permitted the Government to introduce evidence of intent "as to the physicians' contracts and determinations of fair market value." (JA 1381:18-25.) However, the Government's proffered evidence of intent was not used for the purposes for which the district court allowed. Instead, the Government misused this evidence to support its theme that Tuomey had bad intent (*i.e.*, to stifle competition) and was greedy (*i.e.*, it wanted to force patients to pay more by having procedures done at Tuomey). Therefore, in the end, it did not matter to the jury how the physicians were paid under the terms of the Contracts, nor did it matter to the jury that Tuomey's lawyers constructed these

physician agreements, with the assistance of a reputable fair market value appraisal firm, and that Tuomey followed the advice of its attorneys.

The Stark Law is an undeniably complex and evolving set of regulations that are not easily understood even on the most basic level. Recognizing the obvious evidentiary deficiencies in its case, the Government capitalized on this complexity and invited the jury to use an alternate (improper) analysis that was designed to emphasize irrelevant AKS evidence in the record. Compliance with AKS was not legally before the jury and it was not something Tuomey was asked to defend. However, it provided the Government with a means to mislead the jury to think the intent inquiry for the AKS was synonymous with Stark. The jury's verdict shows that the jury was in fact misled by the Government and was led to render a verdict that contradicts the great weight of the evidence presented during trial. To allow this verdict to stand, which is the product of improper and misleading argument, would be a grave injustice.

As demonstrated throughout, the district court failed to apply this Court's mandate on remand and submit to the jury the question of whether the Contracts *on their face* took into account anticipated referrals. Instead, the district court permitted the Government to argue, and allowed the jury to find, that the physician agreements violated the Stark Law solely based upon evidence of subjective intent. As a result, the district court's denial of Tuomey's motion for new trial under Fed. R. Civ. P. 59 was controlled by an error of law and amounts to an abuse

80

of discretion. Therefore, if this Court does not vacate the judgment and enter judgment as a matter of law for Tuomey, the Court should reverse the district court's denial of Tuomey's motion for new trial.

## VI. The District Court Erred In All Damage Calculations And Penalty Assessments And The Total Award Of $237,454,195.00 In Treble Damages And Civil Penalties Violates The Excessive Fines Provision Of The Eighth Amendment And Due Process Clause Of The Fifth Amendment.

### A. Standard of Review

Whether the total award of $237,454,195 is the result of an improper calculation, insufficient evidentiary basis and is a constitutionally impermissible award of damages is a legal question, subject to *de novo* review.

### B. The Government failed to Prove Damages Under the FCA.

In the prior opinion in this case, this Court addressed the issue of damages that the jury should consider on remand. First, this Court made clear that the relevant claims were those Tuomey "presented, or caused to be presented, to Medicare and Medicaid…for payment of facility fees generated as a result of outpatient procedures performed pursuant to the contracts." *Drakeford*, 675 F.3d at 399. This Court also observed with approval that "the district court…instructed the jury to determine the number and value of claims for services that the physicians referred pursuant to the contracts, and for which Tuomey also received payment." *Id.* at 400. However at the re-trial, the district court refused to limit the

Government's evidence to claims for services that the physicians referred pursuant to the Contracts. Moreover, there was insufficient evidence presented from which the jury could determine what claims were submitted as a result of a contracting physician's referral.

    1.    <u>Tuomey Is Entitled to Judgment As A Matter of Law Because There Was No Evidence of any Stark-Prohibited Referrals by any of the Contracting Physicians.</u>

Even if one were to assume Stark applied to the Contracts in this case- which it did not- the judgment should be reversed because the Government failed to introduce any evidence of referrals, and thus failed to provide evidence of "the *sine qua non* of a False Claims Act violation": submission of a false claim. *United States v. All Children's Health Sys., Inc.*, 2013 WL 1651811, at *2 (M.D. Fla. Apr. 16, 2013). Failure by the Government to prove "a real false claim, either in the form of the false claim itself or evidence sufficient to identify such a claim," is failure to prove a violation of the FCA. *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1003 (9th Cir. 2002); *see also*, *United States ex rel Quinn v. Omnicare Inc.*, 382 F.3d 432, 434 (3d Cir. 2004) (Government must prove "actual submission of a false claim" to Medicare.).

The Government's theory is that Tuomey submitted claims that were false because they sought payment "for designated health services furnished pursuant to a referral" by one of the contracting physicians. 42 U.S.C. § 1395nn(a)(1). A

"referral" is "the request or establishment of a plan of care by a physician which includes the provision of the designated health service.'" 42 U.S.C. § 1395nn(h)(5)(B). The "designated health service" at issue in this case is the technical component, *i.e.*, the space, services and equipment provided by the hospital, for which Tuomey bills a facility fee. *See Drakeford*, 675 F.3d at 407 ("[T]he Stark Law and Stark Regulations define a 'referral,' in relevant part, as the request by a physician for a service for which payment may be made under Medicare, but not including any services performed or provided by the referring physician.") Therefore, to prove Tuomey made a "claim" under the FCA, the Government was required to prove that one of the contracting physicians referred a patient to Tuomey for a service and that as a result, Tuomey subsequently billed for the technical component associated with the service referred by the physician.

The Government sought to prove referrals through the testimony of Ruben Steck. Initially, the Government sought to qualify Steck as an expert witness, but the district court refused to allow him to offer any opinions under Fed. R. Evid. 702. (JA 2670:25-2684:9.) Instead, the district court only allowed Steck to testify as a summary witness.[40] (JA 2684:3-5.) Although the district court did not allow Steck to testify as an expert under Fed. R. Evid. 702, the district court nevertheless

---

[40] Steck was also not qualified as an expert by the Court because his work was not the product of reliable principles and methods as required by Federal Rule of Evidence 702. (JA 2674:22-2679:14.) This makes the Government's claims evidence even more suspect.

described Steck as an expert witness in its order denying Tuomey's post trial motion. *See* (JA 4053). Steck's testimony was based on calculations of how many times one of the contracting physicians was listed on the Medicare claims forms UB-92 or UB-04 as an attending physician or an operating physician. (JA 2699:15-2701:8.) The UB-92 form only contains fields identifying "attending physician" and "other physician." (JA 3143:6-3144:4); DX 351 (JA 4975-4976). The UB-04 form contains fields for "attending," "operating," and "other" physicians. (JA 3145:8-3148:13); DX 352 (JA 4977-4979). There is no field for "referring physician" on either form.[41] Thus, there could not be anything in the hospital claims data that Steck reviewed which would identify a referring physician as Stark defines that term. CMS admittedly does not track the identity of referring physicians for Stark purposes, according to its Rule 30(b)(6) corporate designee whose testimony was published to the jury. (JA 3123:14-3124:7.)[42] Likewise,

---

[41] The UB-04 form instructions refer to a "DN" qualifier code that purportedly can be used to identify a referring provider. (JA 3145:13-3148:4.) But, Tuomey's Medicare intermediary does not permit Tuomey to use this qualifier. (JA 3148:5-13.)

[42] Barsky's 30(b)(6) testimony is binding on the Government. *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012); *Ierardi v. Lorillard, Inc.*, 1991 WL 158911, at *2 (E.D. Pa. Aug. 13, 1991).

CMS witness Fred Rooke testified that hospitals are not required to identify referring physicians on Medicare Part A claims forms.[43] (JA 3174:10-13.)

The jury's interrogatory answers about the number of claims that violated the FCA and the dollar value of those claims were based solely on Steck's testimony and were therefore pure speculation. The data Steck relied upon to reach his conclusions was derived from the Medicare claims forms for hospitals, which do not identify the referring physician. The number of referrals claimed by the Government was inflated and speculative because Medicare pays hospitals a flat rate for each inpatient admission, regardless of the number of procedures performed. 42 C.F.R. § 412.112. The Stark Law only applies to the claim for payment that arises from that admission. There can be only one "attending" physician per inpatient admission. (JA 3171:21-24): *see* (JA 2347:12-23). But Steck admitted that his numbers included claims where the contracting physicians were listed as operating physicians, but others were listed as attending physicians. (JA 2704:12-2705:2.)

---

[43] In contrast, the CMS 1500 form, which is used to submit physician claims to Medicare, contains a specific field to identify the "referring physician" using a definition that tracks the Stark definition almost word-for-word. (JA 3150:21-3153:9); DX 350 (JA 4965). However, Steck testified that he only used hospital claims to perform his summary calculations. (JA 2691:1-7.) Thus, to the extent that the 1500 form identified the referring physician, it had no bearing on the numbers that Steck gave to the jury.

The only way to identify the referring physician would be to review the medical record. (JA 3153:4-9, 3155:5-20, 3598:1-20.)  But Steck never looked at any medical records. (JA 2704:12-17.) Neither did Thomas MaCurdy, who gave Steck the Medicare data that Steck analyzed.[44] (JA 2361:7-20.) Nor was the jury provided with a single medical record.[45] Consequently, the trial record contains no evidence from which the jury could possibly identify any claims resulting from referrals by contracting physicians – a necessary and essential element of a Stark violation, which was the sole predicate of the Government's FCA claim. Tuomey is entitled to judgment as a matter of law for this reason alone. *See Price*, 93 F.3d at 1249; *Wheatley v. Wicomico Cnty., Md.*, 390 F.3d 328, 332 (4th Cir. 2004).

---

[44] Steck relied entirely on the data provided by MaCurdy, so his testimony should have been excluded for that reason as well. *See Auto Indus. Supplier Employee Stock Ownership Plan (ESOP) v. Snapp Sys., Inc.*, 2008 WL 5383372, at *6 (E.D. Mich. Dec. 23, 2008), *aff'd sub nom.*, *Auto Indus. Supplier Employee Stock Ownership Plan (ESOP) v. Ford Motor Co.*, 435 F. App'x 430 (6th Cir. 2011) ("a summary witness of a summary witness [is] a role that is not helpful to the litigation.")

[45] The Government did not even attempt to provide the jury with the CD containing its insufficient and unreliable claims data evidence. Without the claims in evidence, "the jury has no evidence upon which to determine that any false claims were submitted." *United States ex rel. Gonzalez v. Fresenius Med. Care N. Am.*, 748 F. Supp. 2d 95, 114 n.32 (W.D. Tex. 2010) (observing that "the electronic claims forms … are not in evidence, nor is any substitute document or testimony about them, so the jury has no evidence upon which to determine that any false claims were submitted …").

86

2.     The Government Failed To Prove Actual Damages Under the FCA.

As explained above, the correct measure of damages under the FCA is the difference in value between what the Government received and what it paid for. *See Davis*, 679 F.3d at 839; *Harrison II*, 352 F.3d at 923.   Here, there was no evidence that the Government did not get what it paid for.   Thus, there were no actual damages under the FCA. Tuomey is therefore entitled to judgment as a matter of law on the Government's claim for damages.

3.     The District Court Erred By Trebling The Total Amount of Medicare Payments Because Only Actual Damages May Be Trebled Under the FCA.

Before the Government can obtain a treble damages award, the Government must first prove actual financial loss for which it is entitled to compensatory damages. *United States v. Anchor Mortgage Co.*, 711 F.3d 745, 750 (7th Cir. 2013). The FCA does not permit the trebling of the total amount of Medicare payments.  In *Anchor Mortgage*, the Seventh Circuit explained:

> The False Claims Act does not specify either a gross or a net trebling approach. Neither does it signal a departure from the norm—and the norm is net trebling. The Clayton Act, which created the first treble-damages action in federal law, 15 U.S.C. § 15, has long been understood to use net trebling. The court finds the monopoly overcharge—the difference between the product's actual price and the price that would have prevailed in competition—and trebles that difference. *See*, *e.g.*, *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). A gross trebling approach, parallel to the one the district court used in this suit, would be to treble the monopolist's price, then subtract the price that would have prevailed

in competition. If there is a reason why the courts should use net trebling in antitrust suits and gross trebling in False Claims Act cases, it can't be found in § 3729—nor does the United States articulate one. 711 F.3d 745, 749 (7th Cir. 2013).

*See also*, *United States ex rel. Feldman v. Gorp*, 697 F.3d 78, 87-88 (2d Cir. 2012)

*United States v. United Techs. Corp.*, 626 F.3d 313, 321-22 (6th Cir. 2010); *SAIC*, 626 F.3d at 1279; *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1372 (D.C. Cir. 1998).

Here, there was no evidence that the Government paid for medical services that were not delivered to the Medicare beneficiaries. In fact, the Government never claimed that Tuomey failed to provide services to its patients as billed, or that any of Tuomey's services were not medically necessary. The Government failed to prove that "but for" the alleged Stark violations, it would have paid any less for the services required by the Medicare beneficiaries who received Tuomey's services.[46] Because the Government has not lost anything, an award of treble damages is not permitted.

---

[46] Furthermore, claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA. *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012).

4.    The District Court Erred by Assessing Penalties Based on the 21,730 UB92/04 Forms Rather Than the Cost Reports.

If any false claims were submitted (and they were not) and if the Government offered competent evidence of those claims (which it did not), the only claims relevant would be the Medicare cost reports filed by Tuomey and not the UB92/04 forms that were the source of the information summarized by Steck. Other courts in healthcare FCA cases involving cost reports, as this case does, have held that the actual "claims" were the cost reports, not the UB-92 or UB-04 forms. For example, one district court rejected the Government's claim that each UB-92 form should be counted as a false claim, holding that such forms "were false or fraudulent because, and only because, the providers' cost reports were false" and therefore "the government is entitled to recover statutory penalties under the FCA only for the providers' submission of 'false or fraudulent' cost reports." *Visiting Nurse Ass'n v. Thompson*, 378 F. Supp. 2d 75, 99 (E.D.N.Y. 2004); *see also*, *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 70-71 (D.C. Cir. 2007) ("[F]actually accurate UB-92 did not constitute submission of a false claim simply because of underlying fraud at the healthcare facility. But that fraud was not truly consummated until the cost report was submitted. It is the cost report that contained the false statements, did the damage, and completed the fraud."); *U.S. ex rel. Augustine v. Century Health Servs.*, 289

89

F.3d 409, 414-415 (6th Cir. 2002) (cost report filed by home health agency found to constitute false certification.)

The Government only presented the certification pages from four Tuomey cost reports. PXs 290-293 (JA 4471-4474). This is not sufficient proof of what information was contained in the cost reports. But even giving the Government the benefit of the doubt that these certification pages constituted evidence of false claims, at most there was only evidence of four claims that could be relevant for the purposes of establishing an FCA violation.

A similar approach has been adopted by other courts. In *Hays v. Hoffman*, 325 F.3d 982 (8th Cir. 2003), the Circuit Court, *sua sponte*, rejected the district court's determination on the number of claims due to evidence presented at trial that was "woefully inadequate for this purpose." *Id*. at 993. The determination of the number of claims was based primarily on the testimony of an auditor who had no firsthand knowledge of how the nursing homes whose claims were at issue were reimbursed by Medicaid, and who testified about cost reports that were never admitted into evidence. *Id*. The Eighth Circuit rejected the district court's determination that 336 false claims were submitted and reduced the number to eight. *Id*. at 993-999; *see also*, *United States ex rel. Smith v. Gilbert Realty*, 840 F. Supp. 71, 74-75 (E.D. Mich. 1993) (where fine based on 58 false claims would be excessive, court reduced number of false claims to the seven certifications

defendants made to the government and imposed a civil penalty for those seven claims); *United States v. Advance Tool Co.*, 902 F. Supp. 1011, 1017-18 (W.D. Mo. 1995) (no damages to the Government, but 686 false claims submitted, minimum statutory fine would be unconstitutional; court reduced number of false claims to 73 – representing each type of tool that did not meet quality standards – and imposed the minimum civil penalty for each), *aff'd on other grounds*, 1996 U.S. App. LEXIS 13238 (8th Cir. 1996) (per curiam) (unpublished).

The district court erred by assessing penalties for each UB92 and UB04 claim form submitted. Rather, at most the civil penalty should be limited to $22,000 ($5,500 per claim penalty sought by the Government times the four cost report certifications that it entered into evidence).

### C.    The Award of $237,313,065 is Barred by the Excessive Fines Provision of the Eighth Amendment.

The FCA's treble damages and civil penalties provisions are subject to the Eighth Amendment's proscription on excessive fines. U.S. CONST., AMEND. VIII. Applying this prohibition, the Supreme Court has made clear that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). As one court in this Circuit recently observed: "It is questionable whether … a civil penalty of $151,118,000.00 could withstand constitutional scrutiny." *United States v. Fadul*, 2013 WL 781614, at *13 n.15 (D. Md. Feb. 28,

2013). The same can be said for the massive civil penalties imposed on Tuomey by the district court.

Courts apply Eighth Amendment considerations to FCA cases because the FCA's treble damages and civil penalty provisions are "essentially punitive in nature." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000); *see also*, *United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001) (holding that the Eighth Amendment applies to False Claims Act cases). The Court should analyze the total amount of the judgment – treble damages and civil penalties – in conducting its review under the Excessive Fines Clause. *See*, *e.g.*, *U.S. ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092, 1102-03 (C.D. Cal. 2001). In undertaking the excessive fines analysis, "[c]ourts have recognized a variety of factors," including: "(1) the extent of the harm caused; (2) the gravity of the offense relative to the fine; (3) whether the violation was related to other illegal activity, and the nature and extent of that activity; and (4) the availability of other penalties and the maximum penalties which could have been imposed." *United States v. Bunk*, 2012 WL 488256, at *4 (E.D. Va. Feb. 14, 2012) (*Bunk II*) (citing, *inter alia*, *Bajakajian*, 524 U.S. at 336-39). Analysis of each of these factors demonstrates that the treble damage and civil penalty award is unconstitutionally excessive.

### 1. Tuomey's conduct, even if proven, did not harm the Government in any way.

With respect to the first factor, the extent of the harm caused, it is the Government's burden to demonstrate the harm to the public fisc. *See*, *e.g.*, *Harrison II*, 352 F.3d at 923 (The Fourth Circuit has "decline[d] to shift the burden of proof on damages" to the defendant, noting that the False Claims Act "specifically places the burden of proving damages on the government"); *see also*, *United States v. Bourseau*, 531 F.3d 1159, 1173 (9th Cir. 2008) (Evaluating excessiveness claim based on findings during bench trial that the government had proven that it "sustained harm to its treasury"). The Government must demonstrate the harm to the treasury, and it cannot do so.

Even if the Court were to consider the total payments to Tuomey as economic harm, which as a matter of law it should not, the damages sought by the Government demonstrate the gross disproportion of the penalties to the claimed damage. Of the alleged claims included in the Steck numbers that were accepted by the jury, 13,009 (59.86 percent of the total) involved payments to Tuomey of less than $550 each. (JA 4001 ¶ 9, 4011.)[47] Applying the minimum statutory penalty of $5,500 per claim results in a greater than 10:1 ratio of penalties to payments, which as discussed below would amount to a presumptively

---

[47] At trial, Mr. Steck testified that Mr. Moran replicated his results. (JA 2669:25-2670:5.)

unconstitutional award. A total of 17,557 claims (80.78 percent of the total), were under $1,375, a greater than 4:1 ratio that the Supreme Court has said would be constitutionally suspect. (JA 4009); *see State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 424-25 (2003) (*State Farm*). In fact, the Steck total included 4,719 claims that were under $100 and *even three claims for which Tuomey was paid less than $1*. (JA 4009.) The median dollar amount of claims reviewed by Mr. Steck was $392.36. (Id.)

## 2. The Severity of the Fine Far Outweighs the Gravity of the Alleged Offense.

The jury found that Tuomey violated the Stark Law. As demonstrated by the testimony offered by various healthcare attorneys at trial, determining whether a particular arrangement between a hospital and physician complies with the law can be very complicated and the answer often is unclear. Because of those complexities, as the trial testimony unequivocally established, Tuomey consulted with multiple law firms and a fair market value consultant, and received opinions as to the fair market value, commercial reasonableness and legality of the Contracts. As Barsky, the CMS official responsible for interpreting the Stark Law said in his 30(b)(6) deposition that was entered into evidence at trial, it is up to the parties to the transaction to determine if a financial relationship is commercially

94

reasonable and the compensation is fair market value.[48] (JA 3046:12-17, 3060:17-3061:3.)

This Court previously ruled that the only relevant procedures in this case are outpatient procedures performed pursuant to the physicians' employment contracts. This was a key part of the mandate, which was inexplicably rejected by the district court. The most the Government can argue it suffered as a result of the Contracts was that theoretically some of the outpatient surgery procedures that the employed doctors performed at Tuomey hospital might have been performed instead at the Westmark ambulatory surgery center. However, such an assertion would be entirely speculative. There was absolutely no evidence presented at trial to show that either (1) the patients or doctors would have chosen Westmark over Tuomey; (2) Westmark would have had the capacity to handle those surgeries; and (3) the surgeries would have been clinically appropriate to perform at an ambulatory surgery center.

In the first trial, Steck testified that the total amount paid to Tuomey for outpatient surgery claims performed by the employed physicians at Tuomey (what he called "Practice Group Related Claims") was $7,359,304. (JA 947:4-948:22.) Mr. Moran calculated that Steck's data reports a count of 10,663 claims and a count of dollars of $6,212,638 for outpatient surgery services performed at

---

[48] CMS is statutorily prohibited from issuing advisory opinions on fair market value. (JA 3057:4-9); *see also*, 42 U.S.C. §§ 1320a-7d(b)(3)(A); 1395nn(g)(6)(B).

Tuomey from October 1, 2005 through June 30, 2009 (the period for which the jury calculated claims and dollars). (JA 4000 ¶ 8, 4009-4010.) Mr. Moran further calculated the differential between what the Government paid Tuomey and what it would have paid Westmark if all the outpatient surgery work that could go to Westmark did go to Westmark (which it did not and could not). This differential is $565,312 and involves only 5,046 claims. (JA 4001-4002 ¶ 10, 4012.) This is the most that the Government could ever claim it "lost" as a result of the employed doctors doing outpatient surgery at Tuomey rather than Westmark. The judgment awarded to the Government – $237,454,195 – is more than 420 times this amount.

### 3. Tuomey's Alleged Conduct In This Case Is Not Connected to Other Illegal Conduct.

Tuomey's lack of any illegal conduct related to the Government's allegations or otherwise, is another reason to find the requested damages excessive. The Stark Law-related allegations in this case are the only allegations of improper conduct. There are no allegations of additional misconduct in this case.

### 4. The Actual Damages Are Unconstitutionally Disproportional To Other Related Penalties.

Noting the "surprisingly little jurisprudence concerning how to determine whether a civil penalty is disproportional to harm," the court in *Bunk II* rejected a simple multiple, because there, as here, the Government did not suffer any damages. *Bunk II*, 2012 WL 488256, at *10. Instead the court considered the

following four factors, each of which counsels in favor of rejecting the government's penalty request in this case:

> (1) the relationship of the mandated civil penalties to the harm, as discussed above; (2) the benefits Defendants derived from the illegally procured . . . contract; (3) the deference to be afforded to legislative judgments as reflected in the statutory language; and (4) the criminal penalties that pertain to the subject matter of Defendants' conduct, as well as certain other more explicit civil penalties.

> *Id.*

As discussed above, and as in *Bunk II*, "the government did not sustain any demonstrable damages and therefore the mandated civil penalties of at least approximately" $119,515,000 "cannot be expressed or justified as a multiple of those damages." *Id.* In addition, in the context of punitive damages, the Supreme Court recognizes that awards exceeding a 4:1 ratio of punitive to actual damages "might be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 424-25. The Government in this case has not been damaged, and the civil penalties and treble damages awarded by the district court therefore obliterate the relevant proportionality measures relating to actual damages.

Regarding whether there was a benefit to Tuomey, the hospital actually experienced a net *loss* of $21,670,377 from Medicare for the fiscal years 2006-2008, *i.e.*, it received less than what it cost to provide services to Medicare patients during the time at issue in this case. (JA 4037 ¶ 3, 4038.) There is no evidence of

any profit received by Tuomey with respect to services provided to patients of the employed physicians whose contracts were at issue in this case. Even if there were such evidence, just like in *Bunk II*, "[t]here is nothing about this level of gain that would justify the minimum mandated civil penalty" that the district court awarded in this case. 2012 WL 488256, at *10.

Statutory penalties must yield when they violate the Constitution. Indeed, "there is nothing in the language Congress adopted in the False Claims Act that suggests that Congress ever contemplated that civil penalties would be imposed at the level required here under facts similar to this case." *Id.* It is the courts, and not the legislature, that have used the "per claim" mechanism to ratchet up the civil penalty amounts to their current astronomically high level.

The FCA permits civil penalties for violations of the statute, but "Congress did not say, as it did in other federal statutes, that a civil penalty shall be assessed for *each false claim* or that a court, in its discretion, may impose a civil penalty up to a certain amount." *Id.* The plain language of the statute provides simply that any person who violates the statute's false claim prohibitions "is liable to the United States Government for a civil penalty of not less than $[5,500] and not more than $[11,000]." 31 U.S.C. § 3729(a).

Finally, the relevant criminal fines under the FCA's criminal analog underscore the excessiveness of the sought penalties in this case. The criminal

FCA and its corresponding fine provision permit a fine of "not more than $500,000" or "not more than the greater of twice the gross gain or twice the gross loss." *Bunk II*, 2012 WL 488256, at *11 n.14 (citing 18 U.S.C. § 287 and quoting 18 U.S.C. §§ 3571(c)(3), (d)). As discussed above, the Government in this case suffered no financial loss and Tuomey did not benefit from a financial gain, and thus the appropriate fine under the criminal provision would be $0 or the statutorily stipulated $500,000.

### D.    The Award of Approximately One-Quarter of a Billion Dollars Violates Tuomey's Due Process Rights.

The total judgment of almost One-Quarter of a Billion Dollars violates both the Eighth Amendment and the Due Process Clause of the Fifth Amendment. As the Supreme Court has stated, awards exceeding a 4:1 ratio of punitive to actual damages "might be close to the line of constitutional impropriety" and a 10:1 ratio would almost always be a due process violation. *State Farm*, 538 U.S. at 424-25. Excessive damage awards have also been held to amount to a taking of property from the defendant without due process. *Philip Morris USA v. Williams*, 549 U.S. 346, 349 (2007). Moreover, statutory damage awards can result in a deprivation of due process when they are "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919). The Due Process and Equal

Protection Clauses protect against sanctions which are "downright irrational." *Hudson v. United States*, 522 U.S. 93, 103 (1997).

When these cases are considered in conjunction with the fact that this financially ruinous award is based on the jury's finding that Tuomey violated the Stark Law, the resulting deprivation of due process becomes more apparent. Tuomey was advised by two very reputable law firms that the physician agreements did not violate Stark. *See supra*, Section IV. As Hall Render attorney and healthcare law professor Steve Pratt pointed out in his opinion letters to Tuomey and his unrefuted testimony at trial, this position is based on the Stark Regulations and on the CMS commentary to those regulations. Id. Tuomey justifiably relied on their advice and interpretation of the commentary, which has consistently established a "bright line" rule with respect to the volume and value standard. (Id.); *See*, *e.g.*, 66 Fed. Reg. at 877. That is why the Fourth Circuit stated that the jury was to decide "whether the contracts, *on their face*, took into account the volume or value of anticipated referrals." *Drakeford*, 675 F.3d at 409 (emphasis added).

The district court's colossal damage award deprives Tuomey of Due Process since it did not have fair warning of what the law prohibited. The jury based its verdict on a heretofore unrecognized standard (subjective intent and/or a "1 to 1" relationship test). Due process requires that a defendant receive fair warning as to

what conduct the Government intended to prohibit. *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)).

> As the Fourth Circuit observed:

> There can be no doubt but that the statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning in the process and making any solid grasp of the matters addressed merely a passing phase.

*Rehab. Ass'n of Virginia, Inc. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994). This is especially true with respect to the Stark Law, which is part of the Medicare statute. The regulations and commentary about what the Stark Law means have been issued in four phases and run on for hundreds of pages. Even the Government's 30(b)(6) witness, Mr. Barsky, had difficulty explaining the regulations in his deposition testimony read at trial and at one point said that *he* would need to consult with *his* attorneys about whether the commentary had the force of law. (JA 3059:2-10.) The judgment of more than One-Quarter of a Billion Dollars based on the jury finding that Tuomey violated a law that even the Government's own official interpreter cannot explain is without a doubt "severe and oppressive" and "obviously unreasonable." *Williams*, 251 US at 66-67. The award undeniably offends fundamental notions of fairness and must be vacated. *United States v. Pa. Indus. Chemical Corp.*, 411 U.S. 655, 674 (1973).

**E.    Because The Award of Civil Penalties Under the FCA Is Unconstitutional, No Such Penalties Should Be Awarded.**

Where, as here, the total amount of civil penalties are constitutionally impermissible, no civil penalty is appropriate. The most recent example of a court determining that the FCA's civil penalties regime violates the constitution in a particular case is *Bunk II*. There, the court determined that the defendant provided 9,136 invoices reflecting pricing that was obtained in violation of the contract with the government and therefore "each of these invoices constitutes a false claim for the purposes of assessing a penalty under the" FCA. 2012 WL 488256, at *4. The court concluded that the minimum statutory penalty award was unconstitutional and ruled that the FCA did not authorize the court to impose a penalty below the statutory minimum. As a result, the court concluded that no civil penalty was appropriate. *See also*, *United States v. Cabrera-Diaz*, 106 F. Supp. 2d 234, 242 (D.P.R. 2002).

## **CONCLUSION**

For the reasons set forth above, Tuomey respectfully asks the Court to hold:

1.     That Tuomey is entitled to judgment as a matter of law because,

> a)     There was insufficient evidence from which a reasonable jury could find that the aggregate compensation under the Contracts took into account or varied with the volume or value of anticipated referrals; and

> b)     There was insufficient evidence from which a reasonable jury could find that Tuomey did not reasonably rely on the advice of counsel;

2.     That the district court erred in granting the Government a new trial after Tuomey's victory on the FCA claim in the first trial; and

3.     That the judgment of $237,454,195  is not supported by the evidence, violates the Eighth Amendment's proscription against excessive fines and results in a deprivation of property in violation of the Fifth Amendment's Due Process Clause.

Tuomey therefore requests that judgment be entered for Tuomey on all claims alleged in this action. Alternatively, Tuomey requests that this Court vacate the entry of judgment and remand the case for a new trial because of the district court's erroneous jury instructions and pursuant to Rule 59 Fed. R. Civ. P.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Tuomey requests oral argument.

Respectfully submitted,

By:     */s/ Margaret N. Fox*
James M. Griffin
Margaret N. Fox
A. Camden Lewis
LEWIS, BABCOCK & GRIFFIN, L.L.P.
PO Box 11208
Columbia, SC 29211
(803) 771.8000

E. Bart Daniel
Seven State Street
Charleston, SC 29401
(843) 722.2000

Daniel M. Mulholland III
HORTY, SPRINGER & MATTERN, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213
(412) 687.7677

Attorneys for Defendant Tuomey
Healthcare System, Inc.

March 18, 2014
Columbia, SC

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*24,869*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>March 18, 2014</u>          <u>*/s/ Margaret N. Fox*          </u>
                                                    *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 18th day of March, 2014, I caused this Final Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

G. Norman Acker, III
OFFICE OF THE U.S. ATTORNEY
310 New Bern Avenue, Suite 800
Raleigh, North Carolina  27601
(919) 856-4530

*Counsel for Appellee*

Tracy L. Hilmer
U.S. DEPARTMENT OF JUSTICE
Post Office Box 261
Washington, DC  20044
(202) 307-0474

*Counsel for Appellee*

Kevin M. Barth
BALLENGER, BARTH & HOEFER, LLP
205 North Irby Street
Post Office Box 107
Florence, South Carolina  29503
(843) 662-6301

*Counsel for Appellee*

Sandra Miller
WOMBLE CARLYLE
  SANDRIDGE & RICE, PLLC
Post Office Box 10208
Greenville, South Carolina  20530
(864) 255-5425

*Counsel for Appellee*

I further certify that on this 18th day of March, 2014, I caused the required copies of the Final Brief of Appellant to be hand filed with the Clerk of the Court.

*/s/ Margaret N. Fox*
*Counsel for Appellant*