No. 13-2219

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

UNITED STATES OF AMERICA, ex rel.
MICHAEL K. DRAKEFORD, MD,

**Plaintiff-Appellee,**

v.

TUOMEY HEALTHCARE SYSTEM, INC.

**Defendant-Appellant.**

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

————————————

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

————————————

STUART F. DELERY
Assistant Attorney General

MICHAEL D. GRANSTON
MICHAEL S. RAAB
TRACY L. HILMER
 (202) 307-0474
 Attorneys, Civil Division
 U.S. Department of Justice
 601 D Street, N.W., Room 9154
 Washington, DC  20004
 Tracy.Hilmer@usdoj.gov

G. NORMAN ACKER, III
 (919) 856-4315
 Assistant United States Attorney
 310 New Bern Ave., Suite 800
 Raleigh, NC  27601
 Norman.Acker@usdoj.gov

Attorneys for the United States of America

March 18, 2014

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... iii

STATEMENT OF JURISDICTION .............................................. 1

STATEMENT OF THE ISSUES .................................................. 2

STATEMENT OF THE CASE ..................................................... 2

STANDARD OF REVIEW ......................................................... 5

STATEMENT OF FACTS ........................................................... 7

    I.  The Relevant Statutory Framework .......................................... 7

        A. The Stark Law and Regulations ...................................... 7

        B.  The False Claims Act ................................................... 11

    II.  The Physician Contracts .................................................... 13

    III. Tuomey's Consultations .................................................... 22

SUMMARY OF ARGUMENT ................................................... 31

ARGUMENT .......................................................................... 36

    I.  The District Court Properly Denied Tuomey's Motion to
        Set Aside the Verdict ....................................................... 36

        A. Substantial Evidence Supported the Jury's Finding
           That Tuomey Violated the Stark Law ........................... 36

           1.  The Aggregate Compensation Varied With the
              Volume or Value of Referrals ................................ 37

           2.  The Compensation Took Into Account the
              Volume and Value of Referrals ............................. 39

           3.  The Jury Properly Calculated the Number
              and Value of Referrals ......................................... 48

B. Substantial Evidence Supported the
False Claims Act Verdict ...............................................................52

    1. The Jury Reasonably Rejected the
Advice of Counsel Defense ...................................................52

    2. The Jury Correctly Calculated Damages ............................59

C. The District Court Properly Denied Tuomey's Motion
for a New Trial Following the Retrial............................................67

II. The District Court's Judgment Awarding Treble Damages
and Penalties at the Statutory Minimum Is Constitutional......................71

A. Treble Damages In This Case Are Remedial,
Not Punitive......................................................................................71

B. The District Court's Damages and Penalties Award
Comports with the Fifth and Eighth Amendments ........................72

III. The District Court Properly Exercised Its Discretion in
Granting the United States' Motion for a New Trial after
the First Trial ..................................................................................80

CONCLUSION...........................................................................................84

ORAL ARGUMENT REQUEST ..........................................................85

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)(B)

# TABLE OF AUTHORITIES

## CASES

Aetna Cas. & Sur. Co. v. Yeatts,
  122 F.2d 350 (4th Cir. 1941) ...................................................5

Akeva L.L.C. v. Mizuno Corp.,
  243 F. Supp. 2d 418 (M.D.N.C. 2003) ...................................53

Bigelow v. RKO Radio Pictures, Inc.,
  327 U.S. 251(1946). ...............................................................54

BMW of North America, Inc. v. Gore,
  517 U.S. 559 (1996) ...............................................................75

Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp.,
  41 F.3d 182 (4th Cir. 1994) .................................................67

Broughman v. Carver,
  624 F.3d. 670 (4th Cir. 2010) ...............................................6

Bryant v. Aiken Reg. Med. Centers, Inc.,
  333 F.3d 536 (4th Cir. 2003) .................................................5

Cook County, Ill. v. United States ex rel. Chandler,
  538 U.S. 119 (2003) .............................................. 63, 71, 76

Dennis v. Columbia Colleton Med. Ctr.,
  290 F.3d 639 (4th Cir. 2001) .................................................5

Duke v. Uniroyal Inc.,
  928 F.2d 1413 (4th Cir. 1991) ...............................................5

Eberhardt v. Integrated Design & Const., Inc.,
  167 F.3d 861 (4th Cir. 1999) ............................................5, 67

Hardin v. Ski Venture, Inc.,
  50 F.3d 1291 (4th Cir.1995) .............................................6, 68

Harrison v. Westinghouse Savannah River Co.,
176 F.3d 776 (4th Cir. 1999) ...................................................................12

Hartsell v. Duplex Prods.,
123 F.3d 766 (4th Cir. 1997) ...............................................................6

Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P.,
210 F.R.D. 673 (D. Minn. 2002) ...........................................................53

Nichols v. Ashland Hospital Corp.,
251 F.3d 496 (4th Cir. 2001) ..........................................................6, 67

Pitrolo v. County of Buncombe,
407 F. App'x 657 (4th Cir. 2011)..........................................................5

Schultz v. Butcher,
24 F.3d 626 (4th Cir. 1994) ...............................................................81

State Farm Mutual Auto. Ins. Co. v. Campbell,
538 U.S. 408 (2003) ......................................................................77

Toepleman v. United States,
263 F.2d 697 (4th Cir. 1959) ..........................................................74

United States ex rel. Bahrani v. Conagra, Inc.,
465 F.3d 1189 (10th Cir. 2006) .........................................................74

United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Center,
2013 WL 6017329 (M.D. Fla. Nov. 13, 2013)...................... 10, 47, 50

United States ex rel. Bunk v. Birkart Globistics,
2012 WL 488256 (E.D. Va. Feb. 14, 2012) .........................................72

United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.,
741 F.3d 390 (4th Cir. 2013) ................................................ 35, 74, 75

United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.,
675 F.3d 394 (4th Cir. 2012) ................................................... passim

United States ex rel. Fry v. Health Alliance of Greater Cincinnati,
2008 U.S. Dist. LEXIS 102411 (S.D. Ohio Dec. 18, 2008)................................66

United States ex rel. Harrison v. Westinghouse Savannah River Co.,
352 F.3d 908 (4th Cir. 2003) ........................................................ 12, 57

United States ex rel. Hutcheson v. Blackstone Med., Inc.,
647 F.3d 377 (1st Cir. 2011) ...................................................65

United States ex rel. Kosenske v. Carlisle HMA, Inc.,
554 F.3d 88 (3d Cir. 2009) ...............................................9, 66

United States ex rel. Longhi v. Lithium Power Techs., Inc.,
575 F.3d 458 (5th Cir. 2009) ...................................................62

United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.,
86 F.3d 332 (4th Cir. 1996) ....................................................6

United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.,
423 F.3d 1256 (11th Cir. 2005) ...............................................66

United States ex rel. Pogue v. Diabetes Treatment Ctrs. of America,
565 F. Supp. 2d 153 (D.D.C. 2008) .........................................66

United States ex rel. Roberts v. Aging Care Home Health, Inc.,
474 F. Supp. 2d 810 (W.D. La. 2007) ....................................47

United States ex rel. Schwedt v. Planning Research Corp.,
59 F.3d 196 (D.C. Cir. 1995).................................................62

United States ex rel. Singh v. Bradford Reg'l Med. Ctr.,
752 F. Supp. 2d 602 (W.D. Pa. 2010) ....................................46

United States ex rel. Villafane v. Solinger,
543 F. Supp. 2d 678 (W.D. Ky. 2008) ................................ 45, 46

United States v. Amerigroup Illinois, Inc.,
488 F. Supp. 2d 719 (N.D. Ill. 2007)......................................73

United States v. Anchor Mortgage Co.,
  711 F.3d 745 (7th Cir. 2013) .................................................................62

United States v. Bajakajian,
  524 U.S. 321 (1998) .............................................................................73

United States v. Bornstein,
  423 U.S. 303 (1976) .............................................................................71

United States v. Butler,
  211 F.3d 826 (4th Cir. 2000) .................................................................53

United States v. Guerrero-Damian,
  2007 U.S. App. LEXIS 19409 (4th Cir. Aug. 27, 2007)......................81

United States v. Halper,
  490 U.S. 435 (1989) .............................................................................71

United States v. Janati,
  374 F.3d 263 (4th Cir. 2004) .................................................................49

United States v. Jiminez,
  507 F.3d 13 (1st Cir. 2007) ...................................................................75

United States v. Leeson,
  453 F.3d 631 (4th Cir. 2006) ...................................................................6

United States v. Mackby,
  339 F.3d 1013 (9th Cir. 2003) ...............................................................73

United States v. Neifert-White Co.,
  390 U.S. 228 (1968) ....................................................................... 63, 71

United States v. Newport News Shipbuilding, Inc.,
  276 F. Supp. 2d 539 (E.D.Va. 2003)....................................................53

United States v. Rogan,
  459 F. Supp. 2d 692 (N.D. Ill. 2006)........................................... passim

United States v. Rogan,
    517 F.3d 449 (7th Cir. 2008) ........................................................ passim

United States v. Russell,
    971 F.2d 1098 (4th Cir. 1992) ............................................................6

United States v. Safari,
    849 F.2d 891 (4th Cir. 1988) ............................................................82

United States v. Science Applications Intern. Corp.,
    626 F.3d 1257 (D.C. Cir. 2010)................................................ 61, 62

United States v. TDC Mgmt. Corp.,
    288 F.3d 421 (D.C. Cir. 2002)...........................................................62

## <u>STATUTES</u>

**False Claims Act (FCA):**

31 U.S.C. §§ 3729-33........................................................... passim

**Stark Law:**

42 U.S.C. § 1395nn ............................................................. passim
42 U.S.C. § 1395nn(a)(1).........................................................7
42 U.S.C. § 1395nn(a)(1)(B) ................................................7, 59
42 U.S.C. §§ 1395nn(a)(2)........................................................8
42 U.S.C. § 1395nn(e)(2).........................................................45
42 U.S.C. § 1395nn(e)(3).........................................................45
42 U.S.C. § 1395nn(g)(1) ................................................ 7, 11, 59
42 U.S.C. § 1395nn(h)(5).......................................................8, 9
42 U.S.C. § 1395nn(h)(5)(B) ...................................................51

Pub. L. 101-239, § 6204, 103 Stat. 2106, 2236-43 (1989) ......................................8

**Other Statutes:**

28 U.S.C. § 1331 ...................................................................1
28 U.S.C. § 1345 ...................................................................1
42 U.S.C. § 1320a-7b.............................................................41

42 U.S.C. § 1395*l*(q)(1) ............................................................8

42 U.S.C. § 1396b(s) ................................................................78

Pub. L. No. 101-410, § 2, 104 Stat. 890 (1990) .......................75

**Legislative History:**

False Claims Act Amendments of 1986,
     S. Rep. 99-345, <u>reprinted in</u> 1986 U.S.C.C.A.N. 5266 ...................74

## <u>REGULATIONS</u>

42 C.F.R. § 405.1803 ..............................................................65

42 C.F.R. § 411.351 ........................................................ 8, 9, 10

42 C.F.R. § 411.353(a) ..............................................................7

42 C.F.R. § 411.353(b) ..............................................................7

42 C.F.R. § 411.353(c) ..............................................................7

42 C.F.R. § 411.353(d) ........................................................7, 11

42 C.F.R. § 411.354 ....................................................... 8, 37, 69

42 C.F.R. § 411.354(c)(2)(ii) ................................................8, 37

42 C.F.R. § 411.354(c)(2)(iii) ..................................................69

42 C.F.R. § 411.357(p) ........................................................ 10, 45

42 C.F.R. § 411.357(p)(2) ........................................................45

42 C.F.R. § 411.357(p)(3) ........................................................41

42 C.F.R. § 413.60 ..................................................................65

42 C.F.R. § 413.64(f)(1) ..........................................................65

**Stark Law Preamble and Commentary**

<u>Phase I, 66 Fed. Reg. 856 (Jan. 4, 2001):</u>

66 Fed. Reg. 856 ............................................................ 11, 65

66 Fed. Reg. 859 ..................................................................65

66 Fed. Reg. 860 ..................................................................65

66 Fed. Reg. 879 ..................................................................41

<u>Phase II, 69 Fed. Reg. 16054 (Mar. 26, 2004):</u>

69 Fed. Reg. 16054 ................................................................11

69 Fed. Reg. 16069-70 ............................................................41

69 Fed. Reg. 16088 ....................................................................41
69 Fed. Reg. 16088-89 .............................................................38

Phase III, 72 Fed. Reg. 51012 (Sept. 5, 2007):

72 Fed. Reg. 51012 ...................................................................11
72 Fed. Reg. 51013 ...................................................................11
72 Fed. Reg. 51030 ............................................................. 11, 46

## **RULES**

Fed. R. App. P. 4(a)(1)(B) ..........................................................1
Fed. R. Civ. P. 50(b) ..................................................................4
Fed. R. Civ. P. 51(d) ................................................................69
Fed. R. Civ. P. 59 .....................................................................67
Fed. R. Civ. P. 61 ..................................................................6, 82

## **OTHER AUTHORITIES**

Richard A. Posner, Economic Analysis of Law (8th ed. 2011)................................75

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

No. 13-2219
_____

UNITED STATES OF AMERICA, ex rel.
MICHAEL K. DRAKEFORD, MD

Plaintiff-Appellee,

v.

TUOMEY HEALTHCARE SYSTEM, INC.

Defendant-Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
_____

BRIEF FOR APPELLEE UNITED STATES OF AMERICA
_____

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345. The

court entered a final judgment on October 2, 2013. Joint Appendix (JA) 4068.

Tuomey Healthcare System, Inc. (Tuomey), filed a notice of appeal on October 3,

2013, within the time specified under Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.  Whether, in light of this Court's previous ruling in this case and the substantial record evidence supporting the jury's verdict, the district court properly entered judgment in favor of the United States.

2.  Whether the district court's award under the False Claims Act of treble damages and penalties at the statutory minimum amount was constitutional.

3.  Whether, after the first trial, the district court properly exercised its discretion to grant the United States' motion for a new trial on its False Claims Act count.

## STATEMENT OF THE CASE

This case is before the Court for a second time following a retrial of the United States' claims under the False Claims Act, 31 U.S.C. §§ 3729-33 (1986) (the FCA), and theories of payment by mistake and unjust enrichment, as directed by this Court.  See United States ex rel. Drakeford v. Tuomey Healthcare System, Inc., 675 F.3d 394 (4th Cir. 2012).  The retrial resulted in a jury verdict in favor of the United States (JA 3987-88) and a subsequent judgment by the district court entering an award of treble damages and statutory penalties under the FCA in the total amount of $237,454,195.  In light of this judgment, the district court dismissed the remaining causes of action without prejudice.  JA 4067.

The case concerns compensation arrangements that Tuomey Healthcare System, Inc. ("Tuomey") entered into with 19 referring physicians. Relator Michael K. Drakeford, MD, brought this civil action in October 2005 under the qui tam provisions of the FCA, 31 U.S.C. § 3730. The United States intervened in September 2007 and added claims for payment by mistake and unjust enrichment. The case was initially tried to a jury in 2010. In special interrogatories, the jury found that the arrangements violated the physician self-referral prohibition of the Medicare Act, commonly known as the Stark Law, 42 U.S.C. § 1395nn, but not the FCA. Based on the jury's finding that Tuomey had violated the Stark Law, the district court entered judgment against Tuomey for $44.9 million on the United States' theories of payment by mistake and unjust enrichment. The district court also concluded that it had erroneously excluded material evidence relevant to Tuomey's knowledge under the FCA count, and accordingly ordered a new trial on that count. Tuomey appealed the district court's judgment, and also sought interlocutory review of the new trial order.

This Court declined to entertain Tuomey's petition for review of the district court's new trial order. Appeal No. 10-254. However, the Court determined that, by granting a new trial on the government's FCA claim, the district court had effectively nullified the jury's finding regarding the Stark Law. Accordingly, the

Court vacated the judgment and remanded the case for a new trial of all the issues. Drakeford, 675 F.3d at 403-05.

In addition to ordering a retrial of the whole case, the Court provided guidance regarding two "purely legal" threshold issues that it correctly presumed would recur on remand to the district court. Id. at 406. Specifically, this Court held: (1) that the "facility components" of the inpatient and outpatient services provided by the 19 physicians at Tuomey were "referrals" within the meaning of the Stark Law, id. at 406-07, and (2) that "compensation arrangements that take into account anticipated referrals do not meet the fair market value standard" and do implicate the "volume or value" standard of the Stark Law, id. at 407-09.

On remand, the district court allowed a period of limited additional discovery. The district court then conducted a four-week retrial and submitted the case to the jury with instructions consistent with this Court's ruling. After less than five hours of deliberations, the jury returned a verdict finding, once again, that Tuomey had violated the Stark Law. The jury further concluded that Tuomey had violated the FCA by submitting 21,730 false claims for payment to the Medicare program, with a value of $39,313,065. JA 3987-88. The United States moved for entry of judgment in its favor, and an award of treble damages and penalties at the minimum amount set forth in the FCA. Tuomey moved for a judgment in its favor as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the

alternative, for a new trial. As set forth in its Amended Order and Opinion, JA

4043-67, the district court granted the United States' motion, and denied

Tuomey's.  This appeal ensued.

## STANDARD OF REVIEW

As the prevailing party under the jury's verdict, the United States is

entitled to have all facts and "every legitimate inference" viewed in its favor with

respect to Tuomey's appeal of the denial of its Rule 50 motion.  Dennis v.

Columbia Colleton Med. Ctr., 290 F.3d 639, 644 (4th Cir. 2001); Duke v. Uniroyal

Inc., 928 F.2d 1413, 1417 (4th Cir. 1991).  The verdict may be set aside only if

"'the only conclusion a reasonable jury could have reached is one in favor of the

moving party.'"  JA 4050-51 (quoting Pitrolo v. County of Buncombe, 407 F.

App'x 657, 659 (4th Cir. 2011).  Further, "[i]n drawing all reasonable inferences in

favor of the non-movant, the court may not weigh the evidence or assess the

credibility of the witnesses."  JA 4051 (citing Pitrolo and Dennis).  Determinations

made under Rule 50 are reviewed de novo.  Bryant v. Aiken Reg. Med. Centers,

Inc., 333 F.3d 536, 543 (4th Cir. 2003).

A district court's decision whether or not to grant a new trial "is a matter

resting in the sound discretion of the trial judge, and . . . his action thereon is not

reviewable upon appeal, save in the most exceptional circumstances."  Eberhardt v.

Integrated Design & Const., Inc., 167 F.3d 861, 869 (4th Cir. 1999) (quoting Aetna

Cas. & Sur. Co. v. Yeatts, 122 F.2d 350, 354 (4th Cir. 1941)) (internal quotation marks omitted); Nichols v. Ashland Hospital Corp., 251 F.3d 496, 500 (4th Cir. 2001).

Questions of law are reviewed de novo. E.g., Broughman v. Carver, 624 F.3d 670, 674-75 (4th Cir. 2010); United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co., 86 F.3d 332, 334 (4th Cir. 1996).

A district court's evidentiary rulings are reviewed for abuse of discretion, United States v. Leeson, 453 F.3d 631, 636 (4th Cir. 2006), and also are subject to the harmless error standard and thus may not be grounds for setting aside a verdict or vacating or modifying a judgment unless an error is shown to have affected the substantial rights of a party. Fed. R. Civ. P. 61.

The district court's decision to give, or not give, a jury instruction, as well as the content of an instruction, are reviewed for abuse of discretion. United States v. Russell, 971 F.2d 1098, 1107 (4th Cir. 1992). The question on review is "whether the district court's instructions, construed as a whole, properly informed the jury of the controlling legal principles without misleading or confusing the jury." Hartsell v. Duplex Prods., 123 F.3d 766, 775 (4th Cir. 1997); Hardin v. Ski Venture, Inc., 50 F.3d 1291, 1294 (4th Cir.1995).

## STATEMENT OF FACTS

### I.    The Relevant Statutory Framework

This Court set out the elements of the Stark Law and the False Claims Act in its prior opinion, summarized below.  See Drakeford, 675 F.3d at 397-98.

### A.    The Stark Law and Regulations

The purpose of the Stark Law is to ensure that a doctor who sends a Medicare beneficiary to a hospital for a test or a procedure does so because it is in the best interest of the patient, and not because the doctor stands to gain financially from making the referral.  The Stark Law establishes the clear rule that the United States will not pay for items or services ordered by any physician having a "financial relationship" with a hospital, unless the relationship meets the requirements of a statutory or regulatory exception.   42 U.S.C. §§ 1395nn(a)(1), (g)(1); see United States v. Rogan, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), aff'd, 517 F.3d 449 (7th Cir. 2008).  As this Court explained:

> The Stark Law, and regulations promulgated pursuant thereto ("Stark Regulations") prohibit a physician who has a "financial relationship" with an entity—such as a hospital—from making a "referral" to that hospital for the furnishing of certain "designated health services" for which payment otherwise may be made by the United States under the Medicare program.  42 U.S.C. § 1395nn(a)(1); 42 C.F.R. § 411.353(a).  A hospital may not submit for payment a Medicare claim for services rendered pursuant to a prohibited referral.  42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b). The United States may not make payments pursuant to such a claim, and hospitals must reimburse any payments that are mistakenly made by the United States. 42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353(c), (d).

7

However, when a physician initiates a service and personally performs it, that action does not constitute a referral under the Stark Law. 42 U.S.C. § 1395nn(h)(5); 42 C.F.R. § 411.351.

The Stark Law and Stark Regulations define a "financial relationship" to include "a compensation arrangement" in which "remuneration" is paid by a hospital to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §§ 1395nn(a)(2), (h)(1); 42 C.F.R. § 411.354. An indirect financial relationship exists if, inter alia, there is an indirect compensation arrangement between the referring physician and an entity that furnishes services. An indirect compensation arrangement exists if, inter alia, the referring physician receives aggregate compensation that "*varies with, or takes into account, the volume or value of referrals or other business generated* by the referring physician for the entity furnishing" services. 42 C.F.R. § 411.354(c)(2)(ii) (emphasis added).

Drakeford, 675 F.3d at 397-98, quoted by JA 4044.

Tuomey submitted its claims for payment to Medicare electronically, initially using Form UB-92, and later using the revised Form UB-04. JA 4975-79. Hospitals use the UB-92/04 form for both inpatient and outpatient claims. Hospitals are required by statute to identify the "referring" physician on outpatient claims. 42 U.S.C. § 1395*l*(q)(1).[1] The UB-92/04 forms include boxes for the hospital to identify the "attending" and "operating" physicians. The instructions for these forms require a hospital to identify the "attending" physician, and also to identify the "operating" physician" if that person is different from the "attending" physician. JA 4975-79. As the district court instructed the jury, with Tuomey's

---

[1] This provision was enacted as part of the original Stark Law. See Pub. L. 101-239, § 6204, 103 Stat. 2106, 2236-43 (1989).

assent (JA 3762-64), an "attending physician" is "the individual who has overall

responsibility for the patient's medical care and treatment reported in a

claim/encounter," and an "operating physician" is "the individual who has overall

responsibility for performing the surgical procedure."  In pertinent part, the district

court also instructed the jury on the Stark Law's definition of "referring physician"

as follows:

> In the case of an item or service for which payment may be made
> under Medicare, the request by a physician for the item or service,
> including the request by a physician for a consultation with another
> physician, and any test or procedure ordered by, or to be performed by
> or under the supervision of that other physician, constitutes a
> "referral" by a "referring physician."  The request or establishment of
> a plan of care by a physician that includes the provision of the
> designated health service also constitutes a "referral" by a "referring
> physician."

JA 3977-78; see 42 U.S.C. § 1395nn(h)(5); 42 C.F.R. § 411.351.

The statutory and regulatory scheme of the Stark Law is designed to define

"financial relationships" broadly, and then to filter out acceptable relationships

through analysis of the exceptions.  See United States ex rel. Kosenske v. Carlisle

HMA, Inc., 554 F.3d 88, 95 (3d Cir. 2009); Rogan, 459 F. Supp. 2d at 716.  Thus,

as this Court recognized, once the United States has established that an indirect

compensation arrangement exists, the defendant – in this case, Tuomey – bears the

burden of showing that the arrangements fall within the applicable exception.

Drakeford, 675 F.3d at 405; Kosenske, 554 F.3d at 95; Rogan, 459 F. Supp. 2d at

716; <u>United States ex rel. Baklid-Kunz v. Halifax Hospital Med. Center</u>, 2013 WL 6017329 (M.D. Fla. Nov. 13, 2013), at *6.  For employed physicians, the indirect compensation exception requires, among other things, that physician compensation be (1) "equal to the 'fair market value for services and items actually provided'; (2) 'not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician' for the hospital and (3) 'commercially reasonable.'" <u>Drakeford</u>, 675 F.3d at 398, quoting 42 C.F.R. § 411.357(p).

"Fair market value" compensation is defined as:

> . . . the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party. . . . Usually, the fair market price is. . . the compensation that has been included in bona fide service agreements with comparable terms at the time of the agreement, . . . [and] has not been determined in any manner that takes into account the volume or value of anticipated or actual referrals.

42 C.F.R. § 411.351; <u>Drakeford</u>, 675 F.3d at 398 n.7.  "A 'commercially reasonable' arrangement is one that 'would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician . . . of similar scope and specialty, even if there were no potential [service] referrals' pursuant to the arrangement.  69 Fed. Reg. at 16,093."  <u>Drakeford</u>, 675 F.3d at 398 n.8.

It is not sufficient that the paper contract appear to comply with the provisions of the Stark Law and regulations.  As stated by the Centers for Medicare and Medicaid Services (CMS) in its commentary to the Stark regulations, which this Court previously held was entitled to deference, 675 F.3d at 407 note 21:  "The arrangement must satisfy the [indirect compensation] exception in operation, not just on the face of the documentation."  72 Fed. Reg. 51012, 51030 (Sept. 5, 2007) (Phase III Regulations).[2]

The Stark Law is a strict liability statute, with no scienter requirement. Any amounts reimbursed by Medicare in violation of the Stark Law must be repaid. 42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353(d); Drakeford, 675 F.3d at 397-98; Rogan, 517 F.3d at 453.

### B.    The False Claims Act

The False Claims Act (FCA) imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government.  31 U.S.C. §§ 3729(a)(1). The FCA defines "knowingly" as "actual knowledge," "reckless disregard," or "deliberate ignorance" of the truth or falsity of the information, and expressly

---

[2] CMS is the Department of Health and Human Services (HHS) component charged with administering the Medicare and Medicaid programs.  CMS issued the Stark regulations in three phases:  the Phase I rules, 66 Fed. Reg. 856 (2001); the Phase II rules, 69 Fed. Reg. 16,054 (2004); and the Phase III rules, 72 Fed Reg. 51,012 (2007).  The agency intended for the three phases to be "read together as a unified whole."  72 Fed. Reg. at 51013.

requires "no proof of specific intent to defraud." Id. § 3729(b).  In order to establish liability under the FCA, the government must prove, by a preponderance of the evidence, id. § 3731(c), "(1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due."  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999) ("Harrison I"); accord United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 913 (4th Cir. 2003) ("Harrison II").

Because compliance with the Stark Law is a condition of payment by the Medicare program, a claim filed in violation of the statute is both false and material.  Accordingly, the district court charged the jury, "[i]f a defendant has violated a statute that the government has made a condition of payment, such as the Stark Law, then the defendant submits a false or fraudulent claim.  For purposes of this case, a claim is false if it was submitted to Medicare in violation of the Stark Law."  JA 3980.  Thus, once the jury determined that Tuomey's physician arrangements violated the Stark Law, the jury then had to determine (1) whether Tuomey submitted the false claims "knowingly" – that is, with actual knowledge, in deliberate ignorance, or with reckless disregard that those claims

12

violated the Stark Law, 31 U.S.C. § 3729(b); and (2) if so, the number and value of the false claims submitted to, and reimbursed by, Medicare with such knowledge.

## II.    The Physician Contracts

The evidence introduced at the retrial confirmed this Court's description of the relevant terms of the physician contracts and the background relating to their adoption.  Drakeford, 675 F.3d at 398-99.  That evidence, viewed in the light most favorable to the government, is described in relevant part below.

Tuomey Hospital is a non-profit hospital located in Sumter, South Carolina. Approximately 40 percent of Tuomey's business is derived from the Medicare program.  JA 1980.  Tuomey entered into the physician contracts at issue here out of concern about competition that had arisen in its service area for the lucrative facility fees generated by referrals of outpatient procedures.  JA 1499-1500.  The sole GI group in Tuomey's service area was considering performing endoscopies in the group's offices instead of at the hospital.  The GI group and other specialty physician groups in the area also were considering taking their outpatient procedures from Tuomey to the Wesmark Ambulatory Surgery Center (Wesmark ASC), which had recently been built by the local urology practice.  JA 1972-74. Two studies – one by the hospital's chief financial officer (CFO), Paul Johnson, and the other by an outside firm called Cejka Consulting (Cejka) – concluded that

that the hospital could lose anywhere from $6 to $12 million of revenues just from the relocation of GI procedures. JA 1974-78, 4372-74, 4391, 4423.

The possibility of losing these revenues so concerned the hospital that it opposed the urologists' efforts to obtain a state license for their ASC, stopped assisting the urology group with their efforts to recruit additional urologists to serve the community's needs, and threatened to withdraw the urologists' admission privileges at the hospital, even though there was no other urology group in the vicinity to serve Tuomey's patients. JA 1531, 1549-51, 1574-82, 2375-76, 4413-14, 4856-57. The hospital also threatened relator Dr. Michael Drakeford and his group with the same type of "serious repercussions" if they opted to invest in Wesmark, rather than enter into an exclusive arrangement with Tuomey. JA 2375-77.

To dissuade the physicians from moving their outpatient referral business to the Wesmark ASC or into their own offices, either of which would have been less costly for both insurers and beneficiaries,[3] Tuomey offered the physicians contracts solely for the performance of their outpatient procedures. JA 1841, 4180-4238, 4257-75. These contracts paid the physicians cash and non-cash remuneration that substantially exceeded the amounts they had earned before entering into the contracts, and were designed to pay them an average of 19 percent

---

[3] Medicare and private insurers reimburse ASCs about 60 percent of what they pay hospitals for the facility component of outpatient procedures. JA 1979-80.

above the amount the hospital could possibly collect for their professional services. JA 1952, 4403, 4785, 4787. In exchange, the physicians agreed to perform their outpatient procedures exclusively at Tuomey for a period of 10 years and not to compete with Tuomey within a 30-mile radius for another 2 years after contract termination. JA 4180-4238, 4257-75. The contracts were written by Tim Hewson of the Nexsen Pruet law firm, based upon a compensation model devised by Cejka under Hewson's direction. JA 1895-96, 4397, 4776-82, 4935-36.

As this Court recognized in its prior opinion, the outpatient procedures at issue generated two billings: one by the physician for his or her professional services (the "professional fee") and a second by the hospital or other facility for providing the space, the nurses, the equipment, etc. (the "facility component").[4] Drakeford, 675 F.3d at 399. Under the Tuomey contracts, the Tuomey LLCs collected the physicians' professional fees from Medicare, other insurers and patients. The LLCs then paid the physicians a base salary tied to their collections, plus a "productivity bonus" totaling 80 percent of their collections, and up to an additional 5.6 percent of their collections for meeting certain quality measures. See JA 1869-71, 4398-4410. Thus, under this formula, each time a physician performed an outpatient procedure on a Medicare beneficiary, the physician received compensation from Tuomey. The hospital also received a corresponding

---

[4] The term "technical component" is used interchangeably with "facility component."

referral for each outpatient procedure in the form of a facility component, for which it could bill Medicare a facility fee. This Court concluded that the facility components of hospital services and the resulting facility fees are "referrals" for purposes of the Stark Law. Drakeford, 675 F.3d at 406-07.

Once engaged, Cejka sought and received from Tuomey the specific value of the facility fees Tuomey had collected for each specialty group's outpatient procedures and the estimated percentage of those facility fees Tuomey anticipated might be relocated. JA 4453, 4876-79. Cejka then calculated the net present value of 12 years' worth of these facility fees, divided the figure up by the number of physicians in each group and called the resulting amount "the net present value" (or NPV) of the physician's non-compete clause. JA 4372-80, 4423, 4478-81, 4484-91, 4770-72. The NPV number appeared consistently on Cejka's compensation spreadsheets and served as a "benchmark" for the total cash and non-cash compensation paid to each individual physician. JA 4478-81, 4484-91, 4770-72. A December 8, 2004 memorandum from the Tuomey Administration to its Board of Trustees seeking approval to enter into the physician contracts, stated that the base salary and productivity bonus components of the physicians' pay were "partial consideration for the covenant not to compete." JA 2412-13, 4776-77.

16

In addition, the jury heard numerous recordings of meetings held in late 2003 and early 2004, the timeframe during which the hospital was recruiting physicians and developing their compensation plans in anticipation of a February 2004 start date.  See JA 4453, 4879-80.  These meetings included many of the physicians Tuomey was recruiting; Tuomey's then-chief executive officer, Jay Cox; its then-chief operating officer, Gregg Martin; and its principal outside lawyers from Nexsen Pruet, Tim Hewson and Al Pollard.[5]

At an August 27, 2003 meeting attended by Cox and Martin, Hewson and Pollard described the proposed arrangements to the physicians.  Throughout the meeting, the lawyers repeatedly stressed that any employment would simply be "technical" – "something that sort of acts like ownership, but we call it an employment relationship" – but it really would function like "phantom stock" or "phantom ownership" in the hospital's outpatient surgery center.  JA 4604; 4336 (Pollard), 4357-58 (Hewson).  Hewson acknowledged the Stark Law's restrictions and told the doctors that it was "illegal" to "be in a situation where we're paying for referrals," but that nevertheless, the purpose of the proposed contracts was to reward doctors "who have been and continue to be loyal to Tuomey in terms of

---

[5] The parties have stipulated that, for the ease of review by the Court, transcripts of tape recordings that were played at trial, and which were used as demonstrative exhibits, are part of the record on appeal and can be part of the joint appendix. However, Tuomey has not stipulated to the accuracy of the transcripts or the punctuation in the transcripts, and is free to identify, and notify the Court about any perceived inaccuracies. The tapes themselves remain the best evidence.

referrals." JA 4331. Pollard added that Tuomey was "trying to protect the mission of this medical center by sharing revenues with those people who might otherwise, frankly, go out and compete with us by trying to build their own center. . . ." JA 4334-35. He stressed to the doctors that the purpose of the proposed contracts was to "reward you economically for using the ambulatory surgery center, to take your patients there to work on them. . . ." JA 4332-33. He also said that "you get paid for giving up the right to go elsewhere." JA 4340. And Cox explained that the deals were being offered to the surgeons and gastroenterologists, but not to the radiologists and anesthesiologists, because "it wouldn't make any sense for us to do some of the volume-driven things with them because they don't create the volume. Y'all create the volume. They just do the work that's ordered. . . ." JA 4366.

A few months later, at a December 15, 2003 meeting, a doctor asked Martin if the compensation was "indirectly tied to volume," and Martin replied, "yes, yes." JA 4492; 4525. Cox interrupted Martin. He confirmed that the compensation was indirectly tied to volume and that it changed from year to year. Cox then told the doctors:

> I've got to keep saying read between the lines. None of you all ever want to be sitting on the stand, and all we're trying to do is help everybody through this. If we find a way to get legally dollars into your hand that you can somehow go sit down with a pencil yourself and say, "Ah ha!" You know, I just want to figure out the legal way to do it right . . . And you know that we – we did extremely well at the

end of the year because the place ran efficiently, I've got a feeling, you're – you are incentive [sic], even if I cannot tie it directly to that. I'm just trying to make sure we keep each other out of trouble. That's all I'm trying to do.

JA 4526. The jury was entitled to conclude that Cox's statement urging the doctors to "read between the lines" indicated that the real reason for the arrangements was to pay the doctors for their referrals, but to do so indirectly and covertly so as to gloss the relationship with the veneer of legality.

At a meeting held on January 19, 2004, the Tuomey executives and lawyers more overtly connected the physician contracts to the volume and value of the physicians' referrals. Hewson explained to the physicians that even though Tuomey might lose money on the proposed contracts, the arrangements would still be reasonable because "the hospital has other sources of revenue." JA 4545; 4809. Martin observed that the hospital would be losing money on these contracts, and the doctors would be making more money. Dr. Murrell Smith (an OB-GYN who later signed one of the illegal contracts) confirmed his understanding of what Martin had just said: "Just, you're taking a facility fee, which is what we – and we participate in that a little bit. . . ." JA 4814. Moreover, Hewson admitted outright that the hospital was taking into account the volume and value of referrals: "Because of the Stark and Anti-kickback laws, you can't explicitly say, 'Well, it's

19

because we're getting all the referrals for these patients,' and of course that's what we're doing. And that's not a legal consideration." JA 4544; 4594.[6]

In mid-2004, Cejka prepared a series of powerpoint presentations to show the hospital executives and doctors how the compensation plans would work and how much each physician could expect to receive above the total amount of his or her personal collections. Cejka estimated that, on average, the physicians would be paid 19 percent above their individual outpatient collections in cash and benefits, not including health insurance, at a projected annual cost to the hospital of $968,000. JA 1874, 1884-85, 4403. In 2004 and 2005, Cejka also provided fair market value letters for the arrangements. JA 1896.

Although the Cejka compensation formulas cited the same market data that both parties' trial experts used, the compensation plans that Cejka devised deviated sharply from standard valuation practices. JA 2536-39. Saccone, a self-described "apprentice" (JA 1816), calculated the net present value of each physician's non-compete clause, which "represented the value of their business to Tuomey Hospital"; she "used that number as a benchmark in developing their compensation plans"; she asked Tuomey to specify its "desired net gain" above

---

[6] Tuomey challenged the punctuation in the cited excerpt, but the jury heard the audio recording and was entitled to decide if the transcript reflected what was actually said or not.

collections for each physician; and then she "backed into" the physicians' pay ranges. JA 654-55, 1827-28, 3452-54, 4396, 4772, 4869.

As a result, Dr. Goodson, the ophthalmologist, saw his income soar from a little over $500,000 annually before his Tuomey contract to as much as $1 million per year after the contract – with 70-80 percent of his outpatient collections coming from Medicare. JA 3681-82, 4422, 4444. Dr. McDuffie, a GI doctor, testified that while nothing had really changed in the way he worked, other than the addition of perhaps 10-15 hours per year of new administrative duties, his annual salary increased by $100,000 after he entered into the Tuomey contract. JA 2317-26. Meanwhile, one of the gynecologists, Dr. Britton, received remuneration totaling 333 to 478 percent of his outpatient collections because Tuomey paid him full benefits, including his entire malpractice insurance premium, even though he spent no more than 5-7 percent of his time (about 2-4 hours per week) working under the Tuomey contract. Likewise, Dr. Crabbe, a general surgeon, received at least 129-144 percent of his personal collections for outpatient work because Tuomey provided him with full-time benefits for far less than full-time work. JA 2478-79, 2499-2517, 4769, 4784-87. Johnson, Tuomey's CFO, admitted that the hospital lost $1-2 million each year on these physician contracts (even more than Cejka projected), but saved tens of millions of dollars in facility fees by securing the physicians' promise not to refer their outpatient business elsewhere in the

21

community.  JA 1986-88, 2372-74, 4391; <u>see also</u> JA 4783 (government expert's computation of losses); 4403.  Thus, the arrangements were neither fair market value for the physicians' contractual services, nor commercially reasonable in the absence of their referrals.  JA 2517-19, 2523-30, 2551-53.

## III.    Tuomey's Consultations

The retrial jury heard extensive evidence of Tuomey's consultations with attorneys and others about the physician arrangements both before and after they were adopted.  The evidence provided a picture of a company that chose to follow only the advice it favored, and attempted to suppress advice it disfavored.

As already noted, Tuomey's regular outside counsel at the Nexsen Pruet firm were involved in the development of the compensation plans and the physician contracts.  Hewson provided a written legal opinion in which he treated the contracts as direct arrangements with the physicians, but concluded that an exception would apply.   JA 3372-73, 4935-36.  Hewson also supplied the legal analysis in the Tuomey administration's December 8, 2004 memorandum to the Board.  JA 4776-82.  In none of these written opinions did Hewson suggest that the Stark Law might not apply to the arrangements; rather, he treated the arrangements as "financial relationships" under the Stark Law and then discussed potential exceptions.

The initial Nexsen Pruet opinion letter was issued on January 28, 2004, a few days after Tuomey received a "white paper" from Richard Kusserow, a private consultant who had served as Inspector General at the Department of Health and Human Services (HHS) from 1981 to 1992, and in that capacity had enforcement and regulatory oversight responsibility for the Anti-Kickback Statute. JA 1639-40, 1642-44, 4425-35.[7] Earlier that month, Kusserow was asked to provide advice about the contracts. JA 1740. After a telephone conference that included Hewson, Cox and numerous other Tuomey personnel, Kusserow reviewed a draft contract provided by Hewson and then wrote an 11-page memorandum expressing a variety of concerns about whether the proposed payments to the physicians were justified by the services they would be providing to the hospital. He warned of the government's concern about "sham" arrangements and payments that were merely disguised kickbacks for referrals or payments for physician loyalty, and observed that his concerns about the fair market value of the doctors' services under the contracts implicated both the Anti-Kickback Statute and the Stark Law. He also had concerns about whether the contracts could meet the Stark Law's commercial reasonableness requirement, but he lacked sufficient information (including any

_____

[7] While Kusserow is not an attorney, he had extensive investigative experience not only at HHS, but before that at the FBI. He provided Tuomey his perspective on what questions a government investigator, such as he had been, would ask about the proposed arrangements, as well as his own experience in "dealing with quite a few of these type of arrangements and fair market value determinations." JA 1683, 1694.

23

fair market value opinion) to make a full assessment of the risk posed by the

proposed arrangements. JA 1664-79, 1719, 4425-35. At the conclusion of the

memorandum, Kusserow stated that there were "a number of potentially troubling

issues related to the productivity and incentive that have not been fully addressed,"

and he offered to discuss the matter further. JA 4435. Indeed, he was so

concerned about the proposed arrangements that he directed his colleague, Al

Bassett, to contact Tuomey's compliance officer to make sure Tuomey was "aware

of the fact I was worried about this agreement and I think it had troubling aspects

to it." JA 1729. Bassett told Tuomey's compliance officer of Kusserow's concern

that "we had only scratched the surface of this risky proposal." JA 1747-48, 4788.

But neither Kusserow nor Bassett ever heard back from Hewson or anyone at

Tuomey to find out what those concerns were. JA 1678, 1728-29, 1748.

Greg Smith, an attorney at Womble, Carlyle, Sandridge & Rice, who was

engaged to represent Drakeford and his orthopedic practice in their negotiations

with Tuomey, also raised concerns in 2004 and 2005 that the outpatient procedure

contracts might violate the Stark Law and/or the Anti-Kickback Statute. In

particular, Smith told Hewson he was concerned about the validity of Cejka's fair

market value opinions, and also was concerned that the arrangements would not

meet the commercial reasonableness test because the hospital was guaranteed to

lose money on the contracts. JA 2090-92. Smith's concerns were elevated by

Hewson's response that the hospital did not actually lose money on the contracts because it made money on the facility fees referred to the hospital when the doctors performed procedures there. JA 2092. Because Hewson and Smith could not resolve their disagreement, in May 2005, they decided to engage Kevin McAnaney to jointly represent their respective clients and to give an oral opinion on the compliance risks raised by the employment arrangement and an alternative joint venture proposal. JA 2087-88, 2377-79, 2392, 4439-40.

McAnaney was then in private practice, but had previously served as the Chief of the Industry Guidance Branch of the Office of Counsel to the Inspector General for the Department of Health and Human Services. In that capacity, he had issued advisory opinions concerning the Anti-Kickback Statute and had served as a principal author of the Phase I and Phase II Stark regulations and commentary. JA 2025-26. Both Smith and Hewson provided McAnaney with whatever information they thought he might need to evaluate the two proposals. JA 2090, 2378-79, 4436. Under the terms of McAnaney's engagement, either party could provide material or information to McAnaney and ask that he not share it with the other party. JA 2031, 2090, 4439-40. Both Smith and Hewson exercised that option with respect to some information. In particular, Hewson provided McAnaney with a package of materials that had been submitted to the Board, including signed copies of the gastroenterologist contracts, which Hewson asked

that McAnaney not share with Smith.  JA 2033-34, 2080.  Further, Hewson had

substantive one-on-one conversations with McAnaney, and the evidence showed

that he and Martin agreed on a strategy to "steer" McAnaney towards the hospital's

"desired outcome."  JA 118-36, 3463-70, 4482-83.

On June 22, 2005, McAnaney had a conference call with Hewson and Smith

in which he delivered his assessment.  Among other things, McAnaney told

Hewson and Smith that the fact the hospital was losing money on the

compensation paid to the physicians "was basically a red flag to the government"

because the government had already brought and settled cases within the previous

two to three years against Northridge Hospital in Florida and McLeod Hospital in

Florence, South Carolina, where the hospitals had hired local physicians "for

salaries significantly above what they had been making prior to their employment."

Thus, the government would not consider this a novel theory.  JA 2053-54.

McAnaney also informed Smith and Hewson that he found several features of the

arrangements "unusual," including:

- the fact that this was "a part-time arrangement only to do surgery at the hospital.  I had never seen an arrangement like that."

- the "exceedingly long" ten year term; and

- the "exclusivity," "non-compete" and "non-ownership" provisions, which, combined with the long term, meant that if the doctors left the contract, "they couldn't practice any longer in Sumter, a 30-mile non-compete, and they couldn't perform surgery so would have had to go somewhere else."

26

JA 2054-55.  McAnaney advised that these unusual features would make it "likely that the government would think the point of this was that they were reinforcing the view they were paying them above fair market value for the referrals."  He also said that because "all of these doctors were going to be making substantially more than they even collected," he didn't think the terms of these contracts passed the "red face test," meaning you couldn't "make that representation to a government lawyer" without having a red face.  JA 2055.  McAnaney also recalled discussing with Hewson and Smith that "the government did not think it a valid justification to say I can lose money on a physician because I'm making it up on other business they are generating.  Again, that had been a major issue in a case I had been involved with when I was in the government."  JA 2048-49.

McAnaney thought the Cejka valuation was "risky" because it was "readily subject to question. . . ."  He also told Hewson and Smith that the Cejka powerpoint presentation showing the net gain above collections "would be the government's exhibit number one because it just shows they were making more than they were collecting."  JA 2056, 4459-70.  Based on all these things, he told Hewson and Smith that "the government would find this to be an easy case to successfully prosecute."  JA 2078-79.

During the June 2005 call, McAnaney did not give an opinion on the ultimate question whether the contracts were illegal because Hewson specifically

27

asked him not to do that.  Hewson "was comfortable that they were lawful and they had other arrangements, was what he explained. . . ."  JA 2084-85.  Hewson never questioned that the Stark Law applied to the arrangements; the only focus of the discussion was whether they met an exception.  JA 2058.

After the call, Hewson reported McAnaney's views to Martin.  JA 99-115, 3470-72, 4475-77.  Nevertheless, Tuomey pressed Drakeford to enter one of the two proposals – either the employment agreement or the joint venture.  JA 2093-95.  With Smith's assistance, Drakeford wrote a letter on July 19, 2005 to Cox and the Tuomey Board describing some of the things McAnaney had said about the employment arrangements and seeking a meeting with the Board to discuss those concerns in more detail.  The letter also proposed obtaining a written opinion from McAnaney because "[t]here was concern that the gravity of Mr. McAnaney's compliance concerns were not being appropriately communicated to the board and to the employee physicians."  JA 2096-2101, 4446-50.  But the Board refused the meeting request and instead adopted a policy prohibiting any party requesting a meeting with the Board from being accompanied by an attorney.  JA 2388, 2396-99.  And the Board took no steps to determine what McAnaney had actually said, but instead relied on Cox's and Hewson's assertion that Smith had "poisoned the well" with McAnaney by providing him ex parte information.  JA 120, 136, 2223-27, 2300, 2387-88, 3011-12, 3015-17.

Rather than obtain McAnaney's written opinion, Tuomey asked Steven Pratt of Hall, Render, Killian, Heath & Lyman to provide an opinion letter regarding the employment arrangements. Pratt had been advising the hospital regarding the alternative joint venture proposal with Drakeford's group and had not previously been involved with the employment arrangements. JA 3546, 3550-51. When he was informed that McAnaney had been retained jointly to advise Tuomey and Drakeford about both proposed arrangements, Pratt expressed concern about including a third lawyer who was "not committed to the deal," but was "only committed to making the deal safe so we end up stripping out all of the business terms that achieve the intended result." JA 3597, 4419.

In less than a week, Pratt provided a "preliminary" opinion letter to Tuomey in which he concluded that the contracts were indirect compensation arrangements and, based on Cejka's valuation letters, met the applicable exception. JA 4937-40. With Pratt's encouragement, Hewson and Pollard advised the Tuomey Board to direct McAnaney not to write an opinion letter and to discharge him. JA 4941-42. A recorded conversation on August 22, 2005, between Cox and Janet Odom, who was serving at the time as the Board's secretary, revealed that Tuomey did not want McAnaney to give a written opinion on the employment arrangements "in case it would be adverse." JA 2406; 4424; 4765. The two also discussed that

29

Tuomey had sought a second fair market value opinion, but the results of that opinion were never disclosed. JA 4424; 4766-67.

On September 2, 2005, as instructed by the Board, Hewson wrote to McAnaney directing him not to put his opinion in writing and to do no further work on the matter. JA 4416. Hewson then reviewed a draft of Pratt's longer opinion and confirmed the accuracy of the facts and assumptions set out in it. JA 3565-66. On September 20, 2005, Pratt delivered his longer opinion letter to Tuomey approving the physician contracts. JA 4943. Although Pratt relied heavily upon the credibility of Cejka's valuation letters, he never received any information or documentation showing how Cejka had designed the compensation plans. JA 3563-64. Pratt also relied upon Hewson's confirmation of the facts upon which the opinion letter was based, including the statement, "It is our understanding that no purpose of the employment arrangement is to induce or reward referrals of federal health care program business." JA 3574, 4952. Further, it became clear at trial that Pratt did not review numerous significant documents, including the actual signed physician contracts. JA 3564-65. Indeed, Pratt's commercial reasonableness opinion relied significantly on a provision that was absent from the executed contracts, and existed only in the proposed orthopedic contracts. JA 3574-79, 4956.

In short, the jury had sufficient evidence from which it could reasonably conclude that Tuomey selectively relied upon advisors who were "committed to the deal" and whom Tuomey could "steer" to provide favorable opinions about the physician contracts. At the same time, Tuomey ignored warnings that its arrangements violated the Stark Law, even when those concerns came from the former Inspector General of HHS and the attorney who had largely written the Stark regulations and accompanying commentary.

## SUMMARY OF ARGUMENT

The district court conducted a four-week retrial of this case and submitted it to the jury with instructions adhering to this Court's prior decision. After less than five hours of deliberations, the retrial jury concluded – as the original had – that Tuomey's physician arrangements violated the Stark Law. The retrial jury also found that Tuomey violated the FCA, but gave Tuomey "the benefit of the doubt" on its advice of counsel defense, and determined that Tuomey was liable for knowingly submitting false claims to Medicare only after September 2005, when it directed Kevin McAnaney not to give a written opinion about the legality of the arrangements and fired him. As the district court correctly concluded, viewing the evidence in the light most favorable to the United States, as the prevailing party, and drawing all reasonable inferences in the United States' favor, sufficient record

evidence supported the jury's verdict on each element of the United States' FCA claim.

In this second appeal, Tuomey contests the district court's conclusions and insists upon a third trial. Tuomey does not contest the jury's evident finding that Tuomey's physician arrangements were neither fair market value, nor commercially reasonable, and therefore did not qualify for an exception to the Stark Law. Instead, Tuomey repeats its prior argument that the Stark Law did not apply to these arrangements because they did not "var[y] with, or otherwise take[] into account" the volume or value of the physicians' referrals. Tuomey's argument is not only contrary to the record, but also to the specific legal conclusions that this Court reached in its prior decision.

Tuomey has acknowledged that the 19 physician arrangements involved outpatient procedures that simultaneously generated more compensation for the physicians with each facility component referred to the hospital. JA 1346-48. But Tuomey illogically denies that the aggregate compensation paid to the physicians "varie[d] with . . . the volume or value of" the physician's referrals to the hospital. The record evidence supporting the jury's presumptive conclusion that the arrangements did vary with the volume or value of the physicians' referrals to Tuomey is not only sufficient, but uncontroverted. Accordingly, on this ground alone, the jury's finding that Tuomey violated the Stark Law is correct.

Tuomey also contests the jury's presumptive finding that the aggregate compensation Tuomey paid the physicians took into account the volume or value of their referrals, and thus met the alternative test for indirect compensation arrangements subject to the Stark Law. The district court correctly concluded that Tuomey's argument is without merit. First, given the evidence supporting the satisfaction of the "varies with" test, the jury did not need to reach this question. Second, Tuomey's argument relies upon a misinterpretation of this Court's prior legal ruling, which Tuomey erroneously contends limited the Stark Law's reach only to written contracts that take referrals into account "on their face." This Court gave no indication that it intended to so restrict the Stark Law, given Congress's express inclusion of "covert," "indirect," and "in kind" remuneration within the scope of prohibited compensation arrangements. Third, although Tuomey acknowledges that all facts are to be viewed, and all reasonable inferences drawn, in favor of the United States, it completely disregards this standard and recites the evidence and inferences seen only in the light most favorable to its own position. Thus, Tuomey essentially – and improperly – challenges the jury's credibility assessments. The district judge, who presided over the entire trial and thus had a front-row view of the same evidence the jury saw and heard, concluded that the jury reasonably discredited the witnesses Tuomey relies upon, and instead credited the evidence introduced by the United States contradicting those witnesses.

33

Tuomey also attacks the jury's presumptive determination that a physician identified on Tuomey's Medicare claim forms as the "attending" or "operating" physician for an inpatient or outpatient hospital service was a "referring physician" under the Stark Law, as well as the jury's rejection of Tuomey's advice of counsel defense for the period after September 2005. These challenges ignore the substantial evidence and reasonable inferences that supported the United States' position and contradicted Tuomey's.

Further, the district court correctly instructed the jury on the measure of damages under the FCA, following this Court's holding that, if the jury determined that a Stark Law violation occurred (as it did), the jury "must determine the number and value of claims Tuomey presented to Medicare for payment of facility fees resulting from facility component referrals made by the physicians, and for which it received payment," Drakeford, 675 F.3d at 405, and its recognition that prohibited referrals include those for both inpatient and outpatient hospital services, id. at 398-99 & n.4. The United States presented competent evidence of the volume and value of the claims at issue through an experienced data analyst, Ruben Steck, which Tuomey elected not to counter with its own summary witness. The jury plainly, and properly, credited the United States' evidence because it adopted Stecks' methodology for its FCA damages computation.

34

Tuomey contends that it is entitled to a new trial because the district court refused to give certain proposed instructions.  However, the district court properly rejected these proposed instructions because: (1) they were legally incorrect; (2) they sought instruction on an issue that Tuomey had not contested at the first trial or appeal; and/or (3) they were phrased in a non-neutral manner, improperly commented upon the evidence, and/or were sufficiently covered by other instructions given by the court.

Tuomey also argues that the district court's judgment – which trebled the jury-determined damages and assessed penalties at the minimum level set forth in the FCA – was excessive and disproportionate to its misconduct, and therefore violated the Eighth or Fifth Amendments.  The district court properly rejected Tuomey's argument that the judgment was disproportionate to the harm caused to the public fisc by Tuomey's misconduct, and that ruling is confirmed by this Court's recent decision in <u>United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.</u>, 741 F.3d 390 (4th Cir. 2013).

Finally, Tuomey contends the retrial on the United States' FCA claim should not have been granted in the first place, ignoring the fact that Tuomey itself sought a new trial on "the whole FCA issue" in this Court.  Tuomey's argument is baseless.  The original district judge properly exercised his discretion to grant a new trial based upon the erroneous exclusion of critical evidence showing

35

Tuomey's knowledge of the Stark Law violation. The fact that this erroneous evidentiary ruling was, in fact, severely prejudicial to the United States is demonstrated by the difference in the two juries' verdicts: the first jury, which did not have the benefit of the evidence, found a Stark Law violation, but no FCA liability; the second jury, which did hear the previously excluded evidence, properly concluded that Tuomey not only violated the Stark Law, but also the FCA.

## ARGUMENT

### I.  The District Court Properly Denied Tuomey's Motion to Set Aside the Verdict

#### A.  Substantial Evidence Supported the Jury's Finding That Tuomey Violated the Stark Law

As this Court held in its prior opinion, the Stark Law involves a two-part inquiry. The first question is whether a "financial relationship" exists, and the second is whether an exception applies. Fair market value and commercial reasonableness are mandatory elements of the indirect compensation exception, and Tuomey does not contest the jury's presumptive determination that the arrangements met neither of these requirements. Thus, the only question before the Court under the Stark Law is whether the jury reasonably concluded that a "financial relationship" existed because the physicians' aggregate compensation either varied with, or otherwise took into account, the volume or value of the physicians' referrals to Tuomey. 42 C.F.R. § 411.354(c)(2)(ii). Only one of these

two tests needed to be met to sustain the jury's finding that Tuomey violated the Stark Law, but ample record evidence demonstrates that both tests were met.

### 1. <u>The Aggregate Compensation Varied With the Volume or Value of Referrals</u>

The evidence at trial demonstrated conclusively that the aggregate compensation paid to the physicians varied with the volume or value of their referrals of technical components to Tuomey.  In fact, the United States contends that summary judgment could have, and should have, been granted in the United States' favor on this issue because this Court's prior ruling held, as a matter of law, that the facility components of the physicians' outpatient procedures and the accompanying facility fee that Tuomey received were "referrals" under the Stark Law.  <u>Drakeford</u>, 675 F.3d at 406-07.  However, the district court decided to present this issue to the jury.

As the record evidence from the retrial confirmed, there is simply no question that a one-to-one relationship existed between each doctor's aggregate compensation and the volume or value of the doctor's facility component referrals to the hospital.  Paul Johnson, Tuomey's CFO at the time, and Sherri Watkins, a former Tuomey Vice President, admitted that each time one of the 19 physicians did a legitimate procedure on a Medicare patient at the hospital pursuant to the contracts, the physician would receive more compensation, and the hospital also would receive money for a facility component.  JA 2012, 2866.  Kim Saccone, the

37

Cejka employee who designed the plans, also admitted that the more outpatient procedures the physicians did, the more compensation they received. JA 1869-70. Based upon this Court's prior ruling, these admissions were sufficient for a reasonable jury to find – as this jury presumably did – that the aggregate compensation paid by Tuomey to each physician "varied with" the volume or value of that physician's referrals to Tuomey.

Tuomey's arguments on this topic merely repeat those the Court rejected in the last appeal. Specifically, Tuomey contends that the 1:1 correlation between the amount of the physicians' compensation and the volume or value of their referrals is legally irrelevant because the contracts purported to pay the physicians only for "personally performed services." Tuomey again relies upon an agency comment to the Phase II Stark rules concerning a hospital's direct employment of a physician servicing patients who come to the hospital's clinic. The physician receives a productivity bonus for physician services that also generate a facility component. The relevant portion of the comment says:

> The fact that corresponding hospital services are billed would not invalidate an employed physician's personally performed work, for which the physician may receive a productivity bonus (subject to the fair market value requirement).

69 Fed. Reg. at 16088-89. The comment has nothing to say about physicians recruited to bring a stream of lucrative referrals to the hospital from their private practices or about the indirect compensation definition; instead, it plainly addresses

38

the applicability of an **exception** for bonus payments made at fair market value rates for services performed.  Because Tuomey concedes that the physician compensation it paid here failed the fair market value test, Tuomey's reliance upon the comment is unavailing.  Further, the Tuomey contracts included not only a productivity bonus, but also a base salary that varied annually with the volume or value of the physicians' referrals.  For that reason, too, the comment offers Tuomey no refuge from its Stark Law violation.

In sum, it is beyond question that the aggregate compensation that Tuomey paid to the doctors under the contracts "varie[d] with" the volume or value of the doctors' referrals to Tuomey.  As a result, Tuomey's argument fails, and the district court's judgment should be affirmed.

### 2. The Compensation Took Into Account the Volume and Value of Referrals

Because the arrangements clearly varied with the volume and value of the physicians' referrals of outpatient technical components to Tuomey, and because Tuomey does not challenge the jury's presumptive finding that the arrangements failed to meet either or both the fair market value test and the commercial reasonableness test, the Court does not need to resolve Tuomey's claim that "the unrefuted testimony is that compensation under the Contracts simply did not take into account the revenue Tuomey anticipated would results from the physicians' referrals."  Tuomey's Brief at 41.  But Tuomey's argument again simply ignores

the record evidence, which the district court recognized was hotly contested.  JA 4052.

Tuomey argues that the government's position "rests **entirely** on its assertion that Saccone used the net present value of the non-compete clause to calculate compensation under the Contracts."  Tuomey's Brief at 40.  This is not so, but even if it were, sufficient record evidence existed for a reasonable jury to conclude that Saccone did take the volume or value of the referrals into account in devising the compensation plans.  As the district court properly ruled, "it was for the jury to judge Ms. Saccone's credibility regarding **the use of her calculations** and to consider her position along with other evidence in the record."  JA 4052 (emphasis added).  That is exactly what the jury did.

Citing the agency commentary, Tuomey claims that physician non-compete clauses generally raise no concern under the Stark Law.  <u>See</u> Tuomey's Brief at 41 n.26.  The comment Tuomey cites does not support its position.  The comment addressed exclusive arrangements with hospital-based physicians (such as radiologists, anesthesiologists, pathologists and emergency room physicians), who typically do not refer business to a hospital like the surgeons in this case did, as Cox acknowledged when he told the surgeons that radiologists and anesthesiologists "don't create the volume. Y'all create the volume." JA 4604; 4366.  Moreover, the comment notes (and Tuomey's citation omits) the critical

restriction that "[i]f the payments reflect or take into account nonpersonally performed services, they may raise concerns under the statute and would merit a case-by-case determination, regardless of the apparent fixed payment." 69 Fed. Reg. at 16088. Additionally, Tuomey's argument ignores the agency's warning about non-compete clauses in combination with exclusive referral arrangements, as in the contracts at issue here: "In other words, a covenant not to compete might prevent a physician from setting up a private practice or offering services that compete with the entity that purchased his or her practice. If an agreement also included the requirement that the physician refer business to the purchaser, the agreement would be suspect under the anti-kickback statute." 66 Fed. Reg. at 879 (emphasis added); 69 Fed. Reg. at 16069-70.[8] This caution hardly amounts to a general blessing of non-compete clauses, as Tuomey implies.

This Court has already ruled that "anticipated" facility component referrals provide a basis for meeting the "takes into account" prong of the indirect compensation definition. The evidence at trial established that Tuomey did much more than just "think" about referrals. Martin admitted in an email that the physicians' salary "is derived and defended by the analysis of the value of the work that the hospital my loose [or may lose] if the surgeons were to work

---

[8] Compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, is required for an arrangement to meet the indirect compensation exception, 42 C.F.R. § 411.357(p)(3), and, of course, is mandatory in any event.

elsewhere and the value of having them sign an exclusive arrangement with the hospital to do the work only at our place." JA 4456-57. The tape recorded meetings also include an admission by Cox and Martin that the compensation to be paid to the doctors was "indirectly" tied to the volume or value of referrals, JA 4492; 4525-26; statements by Hewson that the hospital wanted to provide an economic incentive to physicians "who have been and continue to be loyal to Tuomey in terms of referrals," JA 4336; 4331, and an outright admission that the hospital was paying for referrals, JA 4544; 4594; and statements by Pollard that Cox wanted to "reward [the physicians] economically for using the ambulatory surgery center," JA 4336; 4332-33, and to "shar[e] revenues with those people who might otherwise, frankly, go out and compete with us by trying to build their own center." JA 4336; 4334-35.

Any remaining doubt about Tuomey's inclusion of anticipated referrals in the physicians' compensation was erased by the testimony of Tuomey's former Board secretary, Janet Odom. Odom was shown the December 8, 2004 memorandum from Tuomey's administration to its Board stating that both the base salary and the productivity bonus were in "partial consideration for the covenant not to compete." JA 4777. Upon reviewing this document, Odom admitted that the $8-12 million that Cox predicted Tuomey might lose if the doctors went to Wesmark to do their surgeries "was part of the consideration for doing the

42

employment agreements with the physicians." JA 2411-13, 4391. This admission alone was sufficient for the jury to reasonably infer that Tuomey "took into account" the volume and value of referrals when it set the doctors' compensation.

To be sure, Saccone's testimony significantly undermined Tuomey's claims that facility fees had nothing to do with the arrangements. In the first trial, Saccone admitted that the net present value of the non-compete clause represented the value of the physician's business to Tuomey, and she used that number as a "benchmark" in developing their compensation plans. JA 654. During the second trial, Saccone admitted making those statements under oath, but claimed that she was "confused" by the questions, although she had not requested any clarification. JA 1827-28. The jury was entitled to believe that Saccone's prior testimony was truthful, and her retrial testimony was not. JA 3973, 3975.

Indeed, the evidence demonstrated that Cejka specifically requested at the outset that the hospital provide information about the "surgical volumes attributable to these physicians for the last two years," and noted, "If we are also doing a noncompete we'll need the estimated volumes that are likely to be lost to a freestanding center." JA 4876-77; see also JA 3414-19, 4453, 4456. A spreadsheet labeled "Final Comp Plan" sent by Saccone to Hewson included the non-compete valuation benchmark and measured each of the physician's proposed compensation against that benchmark. JA 4478-81. The evidence also showed

that Saccone "fiddled and fiddled" with the compensation plan to get it as close as possible to Tuomey's pre-determined "desired net gain above collections." JA 4392-96, 4869.

Although Saccone, Hewson and others claimed the non-compete valuation numbers were for "planning" purposes only, the jury was not obligated to accept this explanation. Tuomey's arguments fundamentally come down to a disagreement with how the jury should have weighed the evidence and judged the credibility of the various witnesses. Such a dispute is not a basis for overturning the jury's well-supported verdict, nor the judgment entered by the district judge who presided over the entire trial and also observed the same evidence.

In an effort to avoid the strength of this record evidence, Tuomey places undue weight on the statement toward the conclusion of this Court's prior opinion that "the question, which should properly be put to a jury, is whether the contracts, on their face, took into account the value or volume of anticipated referrals." Drakeford, 675 F.3d at 409. Tuomey interprets the phrase "on their face" to establish a legal standard that would alter Congress's definition of "remuneration" in the Stark Law and effectively erase Congress's words – "indirectly" and "covertly" – from the definition of "remuneration." This contention is contradicted by the Court's careful description of the applicable legal principles – including the

statutory definition of "remuneration" – at the beginning of the opinion.

Drakeford, 675 F.3d at 398.

Tuomey's claim that the language of the contract governs over the actual facts cannot be reconciled with the definition of "remuneration," which includes arrangements that "indirectly" or "covertly" pay physicians in cash or in kind. Further, the indirect compensation exception expressly exempts employment agreements from the general requirement that the arrangement must be in writing in order to qualify for the exception, see 42 C.F.R. § 411.357(p)(2), just as the Stark statute omits a written agreement requirement for bona fide employment, but includes the requirement for other types of compensation arrangements. Compare 42 U.S.C. § 1395nn(e)(2) with (e)(3). We submit that the Court did not mean to exclude certain statutorily defined forms of "remuneration," nor the entire category of unwritten employment agreements, from the purview of the Stark Law in those situations where the contract, on its face, does not reflect the actual relationship between the parties.

Instead, it appears that the phrase "on their face" is a paraphrase of language from the case, United States ex rel. Villafane v. Solinger, 543 F. Supp. 2d 678 (W.D. Ky. 2008), in which the court declined to rule against the hospital "on the basis of intent alone," where the "face of the arrangement" does not raise any question about either "fair market value" or contain a "provision allowing for

45

increases or decreases in payment based on the number of referrals made." Id. at

693. This Court observed that the Villafane ruling would not help Tuomey if the

contracts took referrals into account (as the jury was entitled to conclude they did).

Drakeford, 675 F.3d at 409 note 25.[9]

Finally, the agency's official commentary, which this Court deemed

"eminently reasonable," Drakeford , 675 F.3d at 407 n.21, makes clear that it is the

substance of the relationship, not how the parties characterize it, that matters:

> The arrangement must satisfy the exception in operation, not just on
> the face of the documentation. Efforts to circumvent improperly the
> statute in any form may evidence improper intent for purposes of the
> physician self-referral statute, which may be relevant to enforcement
> actions for civil monetary penalties and false claims if the financial
> arrangement does not satisfy the requirements of an exception.

72 Fed. Reg. at 51030.

Other courts interpreting and applying the Stark Law have, without

hesitation, examined the true nature and design of arrangements to determine if

they comply with the law or not. In United States ex rel. Singh v. Bradford Reg'l

Med. Center, 752 F. Supp. 2d 602 (W.D. Pa. 2010), which this Court cited

favorably (see Drakeford, 675 F.3d at 409 n.24), the district court concluded that

---

[9] In any event, here there **was** evidence on the face of the contracts themselves both
that the doctors were likely getting paid in excess of fair market value – indeed, the
formula indicated that the physicians would likely be paid more than 100% of the
value of their professional collections, when all their incentives and benefits were
added up – and that their salary would increase or decrease, depending on the
number of referrals made. These features of the Tuomey plans would raise a
concern even under the Villafane ruling, as this Court recognized.

the compensation paid in an equipment lease covertly took into account anticipated referrals. Just like here, the hospital in <u>Bradford</u> paid the doctors a portion of the value of the anticipated referrals as compensation for a non-compete clause included in the agreement. Likewise, in <u>United States ex rel. Roberts v. Aging Care Home Health, Inc.</u>, 474 F. Supp. 2d 810, 818 (W.D. La. 2007), the court found it appropriate to "look behind the terms of the formal arrangement and focus on the actual relationship between a physician and [the health care entity paying the physician]." The district court in <u>Halifax</u> ruled that a bonus pool created for hospital-employed oncology physicians violated the Stark Law by including revenues for designated health services, notwithstanding contractual language describing the pool as a percentage of the oncology program's "operating margin." <u>Halifax</u>, 2013 WL 6017329, at **8-9. Each of these courts thus looked behind the formal documents at the substance of the arrangements and concluded that the physicians' compensation took referrals into account.[10] The jury in this case did exactly the same thing.

---

[10] Tuomey's contention that courts are forbidden by the Medicare statute from examining the true nature of hospital-physician arrangements ignores the fact that the Stark Law amended the Medicare statute. <u>See</u> Tuomey's Brief at 39 n.23.

### 3.  **The Jury Properly Calculated the Number and Value of Referrals**

In its prior ruling, this Court stated that if the jury determined that a financial relationship, as defined in the Stark Law, existed, it would then need to "determine the number and value of claims Tuomey presented to Medicare for payment of facility fees resulting from the facility component referrals made by the physicians, and for which it received payment," <u>Drakeford</u>, 675 F.3d at 405, because **all** of those referrals of inpatient and outpatient hospital services would be prohibited, and any amounts Tuomey received from Medicare for the prohibited claims would have to be repaid, <u>id.</u> at 397-98 & n.4.  Further, the Court ruled, as a matter of law, that the facility components and resulting facility fees that Tuomey received for the doctors' inpatient and outpatient hospital services were referrals.

Notwithstanding those clear rulings, Tuomey argues that the United States failed to submit sufficient evidence of improper claims, and failed to show that any of the physicians with improper contracts referred the services for which those claims sought payment.  <u>See</u> Tuomey's Brief at 77.  The district court properly rejected these arguments.  JA 4059-61.

At both trials, the United States introduced summary evidence, through data analyst Ruben Steck, showing that Tuomey submitted 25,973 claims for the facility components of the inpatient and outpatient procedures performed between the onset of the contracts through June 30, 2009 (the endpoint of the damages

calculation) where one of the physicians in question was designated on the claim form – by Tuomey – as the "attending" or "operating" physician.[11]  JA 2684-86, 2692-94, 2697-2704, 4773-75.  The government's summary exhibits broke the claims totals down by fiscal year so that the jury could more easily make use of the figures.  Steck's testimony and summaries were uncontroverted.  Indeed, the district court observed that Tuomey had a full opportunity to cross-examine Steck, and also was given the opportunity to put on its own summary witness and to offer a competing damages calculation.  But, as at the first trial, Tuomey elected not to do so and instead "pursued a trial strategy of denying application of the Stark Law in the first instance."  JA 4060.  The Seventh Circuit in <u>Rogan</u> rejected a similar argument, concluding that the defendant "didn't bother to provide information on that subject in the district court and has forfeited this position."  517 F.3d at 453.[12]

_____

[11] The district court properly allowed Steck to testify, pursuant to Rule 1006 of the Federal Rules of Evidence, about his summary of the "voluminous writings . . . that cannot be conveniently examined in court," and admitted summaries of those claims as evidence.  <u>United States v. Janati</u>, 374 F.3d 263, 273 (4th Cir. 2004).  Tuomey takes issue with the fact that Steck received the claims records from Thomas MaCurdy, a CMS contractor who extracted the appropriate records from CMS's electronic repositories.  <u>See</u> Tuomey Brief at 86.  MaCurdy thus served as the custodian of the CMS records.  Tuomey points to no authority requiring that a summary witness also be the custodian of the records at issue.

[12] The district court properly did not consider post-trial material that Tuomey attempted to submit in support of its challenge to the jury's verdict on damages, and this Court likewise should disregard such material since Tuomey elected not to present it to the jury and the United States had no opportunity to cross-examine the proponents.  <u>See</u> JA 3989-4042; Tuomey's Brief at 95-96.

Nonetheless, Tuomey insists that the measure of damages presented by the United States is not supported by the law or the evidence. Tuomey claims that the **only** way to prove the number and value of claims submitted by referring physicians is by looking at the medical records, and not the "attending" or "operating" physicians identified on the claims. Tuomey cites no authority for its position. Indeed, the courts that have considered this question have come to the opposite conclusion. See Rogan, 459 F. Supp. 2d at 713 ("The 'attending/operating' physician identified in Boxes 82 and 83 of Form UB-92 qualifies as a referring physician as that term is defined by the Stark Statute."); Halifax, 2013 WL 6017329, at **10-11 (absent evidence to the contrary, the "attending" and "operating" fields on the claims form identify "referring" physicians for purposes of the Stark Law); Bradford, 752 F. Supp. 2d at 639-40 (same).

We agree with the Rogan district court holding that this issue involves a question of statutory or regulatory interpretation and should be treated as a question of law. But even if it is treated as a question of fact, as the district court did here, a reasonable jury could unquestionably conclude that "attending" and "operating" physicians are "referring physicians" for purposes of the Stark Law. The district court instructed the jury almost verbatim from the statutory definitions of "referral" and "referring physician," and also instructed the jury on the CMS

50

manual definitions of "attending" and "operating" physicians.  As noted above, a "referral" under the Stark Law includes the request for an item or service, **or** a request or establishment of a plan of care by a physician which includes the provision of the designated health service.  42 U.S.C. § 1395nn(h)(5)(B).  It is clear that when the physicians here performed services at the hospital, they also "requested" that the hospital provide the corresponding inpatient and outpatient hospital services reflected by the claim forms that Tuomey submitted to Medicare for payment.  Moreover, the doctors who testified about this issue confirmed that, regardless of whether they were an "operating" or "attending" physician for a patient, they always established a plan of care for that patient.  JA 1523-30 (Dr. Jackson); 2309 (Dr. McDuffie).  Likewise, Paul Johnson acknowledged that Tuomey could track the facility fees associated with the contracts if one of the 19 physicians was the attending or admitting physician.  JA 2022.  And Therese Janus, Tuomey's office manager for patient financial services, admitted that the name of the doctor who decided to do a colonoscopy at the hospital (i.e. the doctor making the referral to the hospital) would appear on the bill as either the operating or attending physician.  JA 3153-55.  Thus, Tuomey's contention that a referring physician's identity can be determined only by reviewing the medical record is unsupported by the record evidence.

51

Tuomey's reliance upon the deposition testimony of former CMS employee Troy Barsky also is unavailing. Barsky testified in his deposition, portions of which were read to the jury, that the definition of "referral" is "fairly broad" and clearly laid out in the regulation, so that "if the referring physician is ordering . . . inpatient and outpatient hospital services, then that would constitute a referral." JA 3121-22. This is entirely consistent with the definitions of "attending" and "operating" physicians, and with the testimony of Drs. Jackson and McDuffie.

The district court specifically – and correctly – instructed the jury: "In determining the value and number of improper claims, you must determine which claims were referred by each physician who had a compensation arrangement that violated the Stark Law." JA 3984. The jury's verdict adopting Steck's calculations makes clear that the "attending" and "operating" physicians were "referring physicians" as a matter of fact, if not also as a matter of law.

### B.   Substantial Evidence Supported the False Claims Act Verdict

### 1. The Jury Reasonably Rejected the Advice of Counsel Defense

Much of the same evidence cited in Section I above also supports the jury's rejection of Tuomey's advice of counsel defense. The jury apparently concluded that at least by the end of September 2005, Tuomey had sufficient "knowledge" that it was violating the Stark Law and, thus, that it was submitting false claims to Medicare.

52

As the district court correctly instructed the jury, in order for Tuomey to prevail on its affirmative defense of "advice of counsel," Tuomey had the burden of proving four elements:  (1) that it sought the advice in good faith; (2) that it provided full and accurate information to its attorneys; (3) that it reasonably relied on the advice; and (4) that it faithfully followed that advice.  United States v. Butler, 211 F.3d 826, 833 (4th Cir. 2000); United States v. Newport News Shipbuilding, Inc., 276 F.Supp.2d 539, 565 (E.D.Va. 2003); JA 3983.[13]

In determining whether Tuomey reasonably relied on the advice of its counsel, the jury was entitled to consider **all** the advice given to it by **any** source.  See Akeva L.L.C. v. Mizuno Corp., 243 F.Supp.2d 418 (M.D.N.C. 2003) ("The infringer may not pick and choose between what opinions will be relied upon and which will be discarded.  The totality of the circumstances test requires that all knowledge gained by the infringer relating to the advice subject matter must be revealed so that the factfinder can make its own determination as to whether the reliance was reasonable."); Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P., 210 F.R.D. 673, 678 (D. Minn. 2002) ("No one could seriously contend that the original opinion, alone, was discoverable, but not the subsequent one. As 'the reasonableness of a party's reliance on the advice of counsel must be

---

[13] Amici curiae the American Hospital Association and the South Carolina Hospital Association devote their submission to the advice of counsel issue.  However, amici concede that the applicable legal standard is the one given by the district court and do not address the specific facts of this case.

addressed,' in determining whether the Defendants acted in good faith, the

circumstances surrounding the Defendants' election to rely on the first opinion, as

opposed to the second, would be plainly relevant.").

The parties agree that the jury's verdict on damages indicates that the jury

concluded that Tuomey stopped reasonably relying on the advice of its counsel at

least in September 2005, when it fired Kevin McAnaney without having him put

his opinion in writing or otherwise ensuring that the hospital fully understood his

advice.[14]

Tuomey incorrectly characterizes McAnaney's role and his advice to the

hospital to suggest that Tuomey reasonably ignored his advice.  But the jury could

properly find that (1) McAnaney was hired as an attorney for Tuomey, JA 4439-

40, (2) McAnaney was expected to give his "opinion on the risk involved," JA

4436, and (3) Tuomey had a full opportunity to give Mr. McAnaney all the

information it deemed relevant, and according to Jay Cox, he had "been provided

with the necessary information" to accomplish his task.  JA 4436; 2377-79.

---

[14] The government argued in closing that, if the jury wanted to give Tuomey "the benefit of the doubt" on its advice of counsel defense, then it should conclude that Tuomey could no longer reasonably rely on Hewson and Pratt once Tuomey decided to fire McAnaney without fully exploring his warnings about the arrangements.  JA 3904-05, 3910.  The government also indicated to the jury that the damages in that instance would be $39,313,065, and the number of false claims would be 21,730, precisely the figures indicated on the verdict form returned by the jury.  JA 3987-88.  The jury was, of course, entitled to make a reasonable estimate of the damages, using the suggested method.  Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264-65 (1946).

Most importantly, the assessment McAnaney gave the hospital was far more expansive than represented by Tuomey. As detailed above, McAnaney's warnings to Tuomey went well beyond saying that a government regulator "might look unfavorably" on the contracts (see Tuomey's Brief at 80), and identified serious problems with Cejka's work and cases where hospitals that had engaged in similar conduct ended up paying settlements to the government. McAnaney observed that the facts in this case would send up a "red flag" to government enforcement authorities if they became known, and would be a "relatively easy case for the government to successfully prosecute." The jury also heard that Hewson directed McAnaney not to reach the ultimate question of the arrangements' legality because Tuomey already had numerous physician contracts in place at that point.

Thus, the jury could have reasonably inferred from the evidence that if McAnaney had been allowed to reach the ultimate question about the contracts' legality, his opinion would have been adverse to Tuomey, just as Cox and Odom discussed on August 22, 2005. At a minimum, based on this evidence, the jury reasonably could have concluded that Tuomey had an obligation to follow up with McAnaney to give the Board of Trustees a full evaluation of his opinion before continuing with the contracts. A reasonable jury could have concluded (and apparently did) that by the time the hospital made the decision to fire McAnaney without asking him to clarify his assessment or to put it in writing, Tuomey ceased

being able to "reasonably" rely on the advice of Tim Hewson and Nexsen Pruet. The FCA's "scienter" requirement may be satisfied by showing that the defendant acted with either "reckless disregard" or "deliberate ignorance" of the truth or falsity of the claims. 31 U.S.C. § 3729(b). A reasonable jury was entitled to find that Tuomey's actions in response to McAnaney's warnings were the perfect example of "sticking one's head in the sand," which is the classic definition of "deliberate ignorance," just as the district court instructed the jury. JA 3981.

Tuomey Board members tried to explain their refusal to follow up with McAnaney by claiming that McAnaney's opinion had been "tainted" by Greg Smith. However, Tuomey never presented any specific evidence of how Smith had supposedly "poisoned the well" or why the Board refused to consult directly with McAnaney to find out whether this was true. Instead, it was clear that Tuomey had a full opportunity to give McAnaney all the material it believed he needed, and also had full access to discuss with McAnaney its justifications for the contracts. Significantly, it was clear also that Martin and Hewson were trying to "steer" McAnaney's opinion in favor of the hospital. A reasonable jury could have concluded (and apparently did) that Hewson, Martin and Cox did not truly believe that McAnaney was "tainted." Rather, it was Tuomey who had attempted to "steer" McAnaney to their desired outcome, but then decided to prevent him from putting his opinion in writing because they feared it would be "adverse," and they

56

might be forced to discontinue these arrangements, which were lucrative for both the hospital and the physicians.

Furthermore, as the district court properly instructed the jury, it is only necessary for one person in a corporation to have the requisite "knowledge" of all the relevant facts in order to hold the corporate defendant liable under the FCA. JA 3981-82; see Harrison II, 352 F.3d at 918-19. Both Martin and Hewson (as well as Cox) knew the contents of McAnaney's warnings. Therefore, regardless of what the Board might (or might not) have known, the knowledge of Cox and Martin was sufficient for the jury to conclude that Tuomey had at least acted with "reckless disregard" or "deliberate ignorance" when Tuomey chose to ignore McAnaney's warnings and prohibit him from putting those warnings in writing. The Board's utter refusal to explore McAnaney's concerns after they received Drakeford's July 19, 2005 letter sealed the hospital's FCA liability and ended any "benefit of the doubt" that the jury was willing to give Tuomey for its knowing violation of the Stark Law.

Likewise, the jury reasonably rejected Tuomey's claimed reliance upon Pratt's July and September 2005 opinions. First, there was evidence that Pratt's advice was not sought in good faith, because he had already indicated he was "committed to the deal." In addition, at trial, Pratt admitted on the stand that there were substantial pieces of information that he did not receive from Tuomey,

57

including: (a) information about what material and information McAnaney received and what he said about the arrangements; (b) copies of Cejka's work product; (c) information about how much money the doctors made before or after the agreements, or how much money the hospital was going to lose on the arrangements; (d) copies of the Board's minutes; or (e) information about what had been said on the various audio recordings.  JA 3548-49, 3558-65.

Perhaps most importantly, Pratt admitted on the stand that he did not even receive the actual contracts that were signed by the doctors.  The contracts he reviewed had a material provision (concerning Tuomey's right to cancel the contracts if its operating margin dropped below 4%) that he conceded was not in the signed contracts.  Hewson had received a draft of Pratt's September 20, 2005 opinion in early September that contained this obvious and substantial misstatement, but failed to correct it.  Nor, apparently, did the Tuomey executives or Board members notice the misstatement in the final opinion.  From this evidence alone, as well as from its assessment of Pratt's overall credibility, the jury reasonably concluded that Tuomey did not seek Pratt's opinion in good faith, did not provide him with all the relevant information, and perhaps did not bother to carefully read his final opinion.  The jury was therefore entitled to conclude that Tuomey was interested only in having Pratt's opinion as a paper "cover" in the file,

with no concern for its accuracy, to counter McAnaney's negative oral assessment. The district court therefore correctly rejected Tuomey's contrary arguments.

## 2. **The Jury Correctly Calculated Damages**

As discussed above, the jury reasonably calculated damages, based on competent evidence presented by the United States. Tuomey frames its argument as if the government failed to produce evidence of false claims. This argument cannot be reconciled with the direction given by this Court in its previous ruling, nor with the district court's corresponding jury instructions.

The Stark Law expressly prohibits Medicare from paying a hospital for **any** designated health services referred by a physician with whom the hospital has an improper financial relationship, **even if that service would otherwise be payable by Medicare.** 42 U.S.C. §§ 1395nn(a)(1)(B), (g)(1). Thus, as this Court recognized and as discussed above, in the context of a Stark Law case, the measure of damages is the total value of **all** the claims for designated health services – including inpatient and outpatient hospital services – that were submitted to, and paid by, Medicare in violation of the Stark Law. Drakeford, 675 F.3d at 397-98, 405. The district court properly followed this Court's mandate when it instructed the jury to determine the number and value of the claims Tuomey submitted to Medicare in violation of the Stark Law. JA 3983-84.

59

Tuomey contends that the district court erred – and Tuomey should be granted a new trial – because the district court did not instruct the jury to subtract the "benefit" the United States received for the illegally referred services. See Tuomey's Brief at 51-54. As in the court below, Tuomey relies upon cases that are inapplicable here, because Congress and the agency have explicitly prohibited Medicare funds from being used to pay for services tainted by a prohibited referral.

The purpose of the Stark Law is to ensure against physicians providing or ordering unnecessary services. The government (and Congress) has no confidence that services rendered in violation of the Stark Law are reasonable and necessary. Even if the services were reasonable and necessary, however, the services were not provided to the United States, and thus courts have recognized that the performance of the services does not reduce or offset the government's damages. In the Rogan case, which involved both the Stark Law and the Anti-Kickback Statute, as well as the FCA, the district court discussed the appropriate measure of FCA damages and held that Medicare would not have paid **anything** to the hospital because of the Stark Law violation. Rogan, 459 F.Supp.2d 692 at 726-27. Affirming the judgment, the Seventh Circuit rejected the precise argument that Tuomey makes here:

> Nor do we think it important that most of the patients for which claims were submitted received some medical care – perhaps all the care reflected in the claim forms. . . . [The hospital] did not furnish any medical service to the United States. The government offers a

subsidy (from the patients' perspective, a form of insurance), with
conditions. When the conditions are not satisfied, nothing is due. Thus
the entire amount that [the hospital] received on these 1,812 claims
must be paid back. Now it may be that, if the patients had gone
elsewhere, the United States would have paid for their care. Or
perhaps the patients, or a private insurer, would have paid for care at
[the hospital] had it refrained from billing the United States. But
neither possibility allows [the defendant] to keep money obtained
from the Treasury by false pretenses, or avoid the penalty for deceit.

Rogan, 517 F.3d 449 at 453.

The district court correctly distinguished this Court's rulings in Harrison I

and Harrison II for the same reasons.  Harrison was not a Stark Law case.  And as

this Court recognized, the Stark Law (unlike the applicable law in Harrison)

expressly prohibits the payment of **any** Medicare funds to a hospital for inpatient

and outpatient services referred by doctors with whom the hospital has prohibited

financial relationships.  An additional distinction separates the facts in Harrison, on

the one hand, from the facts in Rogan and this case, on the other.  In Harrison, the

services were provided to the United States, whereas here, as in Rogan, no value

was provided to the United States. Indeed, in Harrison II, this Court recognized

that "factual scenarios could exist in which the contractor's performance so lacks

any value as to make recovery of all moneys paid by the government an

appropriate remedy."  352 F.3d at 923 & n. 17.  In United States v. Science

Applications Intern. Corp., 626 F.3d 1257 (D.C. Cir. 2010), also cited by Tuomey,

the Court of Appeals for the D.C. Circuit, citing Harrison II, held that one of those

"factual scenarios" would be a situation where the United States does not receive any "tangible benefit" from the program or contract at issue (such as in a grant program for small businesses or in a government healthcare program for private beneficiaries). In those situations (as in the case at bar), the D.C. Circuit agreed with the Seventh Circuit in Rogan, and ruled that the proper measure of damages is the "full amount of the claims." 626 F.3d at 1279 (also citing United States v. TDC Mgmt. Corp., 288 F.3d 421, 428 (D.C. Cir. 2002); United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 197-98, 200 (D.C. Cir. 1995); and United States ex rel. Longhi v. Lithium Power Techs., Inc., 575 F.3d 458, 473 (5th Cir. 2009)).[15]

In contrast to the cases Tuomey cites, Rogan is directly on point because the defendant hospital was found liable under the FCA for violations of the Stark Law and the Anti-Kickback Statute. The case involved illegal payments for referrals to one physician over six years, and to another over four years, resulting in more than $16.8 million in false claims to the Medicare and Medicaid programs. After the damages were trebled and the penalties assessed on all the false claims from these two physicians, the district court entered judgment of approximately $64.3 million,

---

[15] The decision in United States v. Anchor Mortgage Co., 711 F.3d 745 (7th Cir. 2013), has no bearing here. That case involved mortgage guarantees, not Medicare claims filed in violation of the Stark Law. Further, the decision nowhere indicates any reconsideration by the Seventh Circuit of the Rogan holding, a fact that is especially noteworthy since both opinions were penned by the same author.

459 F. Supp. 2d at 727, and the Seventh Circuit affirmed.  Thus, it is not surprising

that Tuomey's illegal contracts with 19 physicians over a comparable period of

time resulted in more than 21,000 individual false claims to Medicare, or that

Tuomey improperly received more than $39 million for those false claims.

Tuomey implausibly argues that the individual claims for payment submitted

by Tuomey to Medicare using electronic versions of Forms UB-92 and UB-04

were not actually "claims" under the FCA.  However, the FCA broadly defines a

"claim" as:

> any request or demand, whether under a contract or otherwise, for
> money or property which is made to a contractor, grantee, or other
> recipient if the United States Government provides any portion of the
> money or property which is requested or demanded, or if the
> Government will reimburse such contractor, grantee, or other recipient
> for any portion of the money or property which is requested or
> demanded.

31 U.S.C. § 3729(c).  The term "claim" as used in the Stark Law falls squarely

within the FCA's definition of the same word, and thus the electronic claims

submitted on the UB-92/04 forms each constitute an individual "request or

demand" for money.

The Supreme Court has recognized for decades that Congress defined the

term "claim" broadly in an effort to reach "all fraudulent attempts to cause the

Government to pay out sums of money."  United States v. Neifert-White Co., 390

U.S. 228, 233 (1968); accord Cook County, Ill. v. United States ex rel. Chandler,

538 U.S. 119, 129 (2003). The determination of the government's damages for a

False Claims Act violation predicated upon a Stark Law violation is

straightforward because, as recognized by this Court, the Stark Law and its

regulations expressly prohibit hospitals from presenting a "claim" for payment to

Medicare for improperly referred designated health services, and, if the claim is

paid, any amounts collected must be refunded in full.[16]  Thus, the district court

correctly charged the jury that such a claim is actionable under the FCA, if it was

presented to the government "knowingly."  See 31 U.S.C. § 3729(b).  The 21,730

claims for facility fees for inpatient and outpatient hospital services that Tuomey

knowingly submitted to Medicare for payment in violation of the Stark Law, and

for which it received reimbursement, are the very "claims" at issue under the FCA,

as this Court plainly recognized when it specifically instructed that the jury must

decide the number and value of those claims.  Drakeford, 675 F.3d at 405.

    If further proof were needed, the 2001 agency commentary to the Stark

regulations made clear that the basic remedy for a violation of the Stark Law is

---

[16] Tuomey asserts that this Court "observ[ed] that there is no implied right of action under the Stark Law" (Tuomey Brief at 53), supposedly leaving the government without a judicial remedy where no FCA claim has been brought and proven.  This Court never suggested that the government could not employ the traditional causes of action for payment by mistake and unjust enrichment to pursue recoupment for a Stark Law violation.  The Court simply characterized those theories as equitable, rather than legal.  Drakeford, 675 F.3d at 403 n.15.  Since those causes of action are not presently on appeal, there is no need to burden the Court with a reiteration of the extensive and binding authorities permitting the government to pursue such theories. We rest upon the arguments made in our brief in Appeal No. 10-1819.

recoupment of the payments made by Medicare for the ineligible services. 66 Fed.

Reg. 856, 859 (Jan. 4, 2001). The agency warned that failure to comply with the

Stark Law "can have a substantial financial result. For example, if a hospital has a

$5,000 consulting contract with a surgeon and the contract does not fit an

exception, every claim submitted by the hospital for Medicare beneficiaries

admitted or referred by that surgeon is not payable, since all inpatient and

outpatient hospital services are DHS." Id. at 860.

Tuomey's argument that only its cost reports[17] – and not the individual

electronically-submitted claims – were actionable false claims makes no sense.

Indeed, such a finding would excuse any health care provider that is not required to

file cost reports from liability under the FCA. Tuomey cites no support for this

extraordinary proposition, and instead relies on cases that do not involve the Stark

Law or the Anti-Kickback Statute. Rulings that do involve those statutes have

consistently held that claims for services submitted in violation these statutes are

not payable because compliance with the statutes is a condition of payment by the

Medicare and Medicaid programs. E.g., United States ex rel. Hutcheson v.

---

[17] Cost reports are a reconciliation of the periodic payments made to the hospital by
the Medicare program throughout the year with the reimbursements actually due to
the hospital for all claims for services rendered to Medicare beneficiaries for that
year. See JA 68-69, at ¶¶ 17-18; see also Rogan, 459 F. Supp. 2d at 709
("Medicare relied upon the hospital's cost report to determine whether the provider
was entitled to more reimbursement than already received through interim
payments or whether the provider was overpaid and was required to reimburse
Medicare.") (citing 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1)).

Blackstone Med., Inc., 647 F.3d 377, 392-93 (1st Cir. 2011) (observing that

hospital Provider Agreement and Cost Report both make clear that "the federal

Medicare program will not pay claims if the underlying transaction that gave rise

to the claim violated" the Anti-Kickback Statute); United States ex rel. Kosenske

v. Carlisle HMA, Inc., 554 F.3d 88, 93, 94, 95 (3d Cir. 2009) ("Falsely certifying

compliance with the Stark or Anti-Kickback Acts in connection with a claim

submitted to a federally funded insurance program is actionable under the FCA,"

and noting that the district court had concluded that the hospital defendant had

submitted claims to Medicare based on services referred by the subject physicians);

Rogan, 517 F.3d at 452; United States ex rel. McNutt v. Haleyville Med. Supplies,

Inc., 423 F.3d 1256, 1259 (11th Cir. 2005) ("The violation of the [Medicare]

regulations and the corresponding submission of claims for which payment is

known by the claimant not to be owed make the claims false under section [ ]

3729(a)(1) . . . ."); United States ex rel. Fry v. Health Alliance of Greater

Cincinnati, 2008 U.S. Dist. LEXIS 102411, at ** 11-12 (S.D. Ohio Dec. 18, 2008)

("The submission of UB-92's in violation of the Stark Statute constitutes a

violation of the FCA."); United States ex rel. Pogue v. Diabetes Treatment Centers

of America, 565 F. Supp. 2d 153, 160-61 (D.D.C. 2008).

### C.    **The District Court Properly Denied Tuomey's Motion for a New Trial Following the Retrial**

This case presents no "exceptional circumstances" warranting review of the district court's denial of Tuomey's Rule 59 motion. See Eberhardt, 167 F.3d at 869; Nichols, 251 F.3d at 500. Other than certain jury instructions that Tuomey complains should have been given, each of the grounds that Tuomey cites in support of its request for a new trial repeats arguments about the sufficiency of the evidence or supposed legal errors which the district court deemed without merit in its ruling below, and which have already been addressed above. The district court carefully considered each of Tuomey's arguments, and denied Tuomey's Rule 59 motion, stating:

> The court has determined that a reasonable jury could have found in favor of the Government and rendered a verdict in the amount awarded. The court further has determined that the verdict is not against the clear weight of the evidence. It follows that allowing the jury verdict to stand will not result in a miscarriage of justice. Tuomey's argument is without merit.

JA 4061-62. On this record, there is no basis to conclude that the district court abused its discretion in denying Tuomey's Rule 59 motion, much less that it **clearly** did so. See Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp., 41 F.3d 182, 186 (4th Cir. 1994).

Tuomey also argues that the district court's refusal to give six instructions it proposed constituted error warranting a new trial. Again, the standard of review in

this Court with respect to the giving and denying of proposed jury instructions is

deferential, and requires that the instructions be viewed as a whole.  Tuomey's

contentions about the proposed jury instructions do not meet this standard.

Tuomey's argument that the jury should have been instructed "whether the

contracts, on their face, took into account the volume and value of referrals" was

properly rejected for the reasons cited in Section I(A)(2), above.  Likewise, its

insistence upon an instruction that to prove damages, the government had to

demonstrate that "the services received were worth less than what the government

paid" was properly rejected for the reasons discussed in Sections I(A)(3) and

I(B)(2), above.  And the proposed instruction to limit the government's damages to

the facility fees Tuomey received only for outpatient services also was properly

rejected for the reasons given in Sections I(A)(3) and I(B)(2).

Tuomey's remaining arguments concern proposed charges addressed to

Tuomey's knowledge.  These proposed instructions also were properly rejected by

the district court.  This Court has recognized that "[d]istrict courts are necessarily

vested with a great deal of discretion in constructing the specific form and content

of jury instructions."  Hardin, 50 F.3d at 1293.  A district court "is not required to

comment on specific evidence in the course of giving a jury instruction."  Id. at

1294.  Further, on review, the charge is to be viewed as a whole.  Id.

The district court properly rejected Tuomey's proposed instruction about the knowledge component of the indirect compensation definition. 42 C.F.R. § 411.354(c)(2)(iii). First, Tuomey waived the issue by raising no objection to the exclusion of the regulatory "knowledge" component from the jury charge at the first trial and therefore failed to preserve it as required by Fed. R. Civ. P. 51(d). Compare JA 1244-48 (relevant portions of jury charge) with JA 1136, 1214-28, 1250-67 (defendant's objections to jury charges). Tuomey also did not contest this issue in the prior appeal. Drakeford, 675 F.3d at 398 note 6. Second, the proposed instruction misconstrued the "knowledge" component. Tuomey erroneously contends that the component essentially incorporates the FCA's scienter element. In fact, the component is simply directed at the question whether the hospital that submitted the Medicare bill knew or reasonably should have known that the physician arrangements existed and how they operated. Its purpose is to ensure that, in an indirect arrangement that may involve multiple entities separated by corporate layers and physical distance, the billing entity was on notice that the physician arrangements existed. Here, there was no question that the hospital had that knowledge before the arrangements came on line. See JA 4398-4410, 4776-82. Presumably, this is why Tuomey never contested the issue at the first trial or on the first appeal. But in any event, Tuomey cannot show it suffered prejudice from the district court's entirely proper refusal to give the instruction because the

69

jury found knowledge under the more exacting FCA standard, and assessed damages after September 2005 – when the jury concluded Tuomey's advice of counsel defense terminated anyway.

The remaining two instructions, at Section III.B.5-6 of Tuomey's Brief, also addressed Tuomey's knowledge. The district court properly denied those proposed instructions because they were not only biased, but also unnecessary, given the proper instructions that the court gave concerning the "knowledge" element of the FCA and the "advice of counsel" defense. See JA 3980-81 ("knowledge" instructions), 3983 ("advice of counsel" instruction). Notably, Tuomey does not object to either of these instructions as charged. The thrust of Tuomey's proposed instructions is that mere mistaken beliefs are not "knowledge" under the FCA. The district court's instructions, however, fully covered this point. The district court instructed the jury that "actual knowledge" did not include acts taken "through ignorance, mistake or accident." And the "deliberate ignorance" instruction stated: "You may not conclude that Tuomey had knowledge, however, from proof of a mistake, negligence, carelessness, or a belief in an inaccurate proposition." JA 3981. Thus, the issues that Tuomey asked the court to cover in these two proposed instructions already were sufficiently – and neutrally – addressed in the district court's knowledge instructions.

## II.    The District Court's Judgment Awarding Treble Damages and Penalties at the Statutory Minimum Is Constitutional

Tuomey argues that the district court's imposition of treble damages and penalties at the statutory minimum was excessively "punitive" and ran afoul of the Fifth and Eighth Amendments.  This argument is without merit.

### A.    Treble Damages In This Case Are Remedial, Not Punitive

As the Supreme Court recognized in Neifert-White, the FCA is a "remedial statute [that] reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money."  390 U.S. at 233.  It has long been recognized that some liability beyond the amount of the fraud is "necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims," United States v. Bornstein, 423 U.S. 303, 315 (1976), including costs of detection and investigation.  United States v. Halper, 490 U.S. 435, 445 (1989).  In Bornstein, 423 U.S. at 314-15, the Court observed that Congress intended the then-extant double damages provision to ensure the government was made completely whole where money was taken from it by fraud.  In Cook County, Ill. v. United States ex rel. Chandler, the Court explained that the treble damages provision enacted in the 1986 amendments to the FCA also has numerous compensatory features.  538 U.S. at 130-31.  The Court observed that trebling the damages accounts for the government's obligation to share 15 to 30 percent of the proceeds of a False

71

Claims Act recovery with a <u>qui</u> <u>tam</u> relator, as well as the absence of a "separate provision for prejudgment interest, which is usually thought essential to compensation. . . ." <u>Id.</u> at 131.  The Court further observed that the treble damages provision was adopted in the 1986 amendments to the FCA as a kind of substitute for consequential damages.   <u>Id.</u> at 131 n.9.  Thus, all of these factors demonstrate that treble damages, or nearly treble damages, is required in this case to properly compensate the United States for its losses.

## B.     <u>The District Court's Damages and Penalties Award Comports with the Fifth and Eighth Amendments</u>

Tuomey argues that the Court should ignore Congress's directive and vacate both the treble damages and the statutory penalties awarded by the district court, based upon the Excessive Fines Clause of the Eighth Amendment or the Due Process Clause of the Fifth Amendment.  For this proposition, Tuomey relied below, as it does in this Court, upon the now-reversed district court decision in <u>United States ex rel. Bunk v. Birkart Globistics</u>, 2012 WL 488256 (E.D. Va. Feb. 14, 2012).  Tuomey's argument not only would defeat Congress's intent in passing the Stark Law and the FCA, but it also ignores Supreme Court and appellate precedents that contradict the premises of its argument.

More than double damages in this case must be considered remedial.  The non-remedial portion of the treble damage award (if any) and the penalty award must comport with the Excessive Fines Clause of the Eighth Amendment.

However, Supreme Court precedent makes clear that a court considering an Excessive Fines challenge to a statutorily prescribed penalty must accord substantial deference to Congress's judgment as to an appropriate sanction and enforce the statute to the fullest extent consistent with the Constitution. The Supreme Court has thus held that a court may not bar the imposition of a statutorily authorized civil penalty under the Excessive Fines Clause unless the sanction is "**grossly** disproportional to the gravity of the defendant's offense." United States v. Bajakajian, 524 U.S. 321, 334 (1998) (emphasis added). The relevant factors for assessing whether a False Claims Act penalty award is unconstitutionally excessive were further discussed in United States v. Mackby, 339 F.3d 1013 (9th Cir. 2003). These factors include (1) the extent of and harm caused by the defendant's violation; (2) the defendant's involvement in other illegal activities; and (3) the total fine available and the availability of other penalties. Other courts have added as a factor the question whether the defendant is within the class of persons to whom the law is directed. See also United States v. Amerigroup Illinois, Inc., 488 F. Supp. 2d 719, 744-48 (N.D. Ill. 2007). Considering all of these factors, the award sought by the United States is clearly within constitutional bounds.

The submission of false claims causes harm to the government well beyond economic damages. Congress, stating that "[t]he cost of fraud cannot always be measured in dollars and cents," agreed that "fraud erodes public confidence in the

government's ability to efficiently and effectively manage its programs" and found

that even in cases where there is no dollar loss, fraud undermines the integrity of

government programs.  S. Rep. No. 99-345 at 3, reprinted in 1986 U.S.C.C.A.N. at

5268.  Courts have accordingly recognized that the government may recover

penalties solely upon proof that false claims were made, without *any* proof of

economic damages.  Id. at 5273 (collecting cases); see also United States ex rel.

Bahrani v. Conagra, Inc., 465 F.3d 1189, 1203 (10th Cir. 2006).   Thus, as this

Court held long ago, and reaffirmed in its recent ruling in Bunk:

> [S]urely, no proof is required to convince one that to the Government
> a false claim, successful or not, is always costly.  Just as surely,
> against this loss the Government may protect itself, though the
> damage be not explicitly or nicely ascertainable.
>
> The Act seeks to reimburse the Government for just such losses.  For
> a single false claim $2,000 [the penalty amount in effect in 1959]
> would not seem exorbitant.  Furthermore, even when multiplied by a
> plurality of impostures, it still would not appear unreasonable when
> balanced against the expense of the constant Treasury vigil they
> necessitate.

Toepleman v. United States, 263 F.2d 697, 699 (4th Cir. 1959) (emphasis added).

In Bunk, this Court observed that the approach it adopted in Harrison I (attaching

FCA liability to each claim for payment), had inevitably resulted in "FCA actions

involving thousands of invoices and exposing culpable defendants to millions of

dollars of liability for civil penalties."  And the Court declared:  "We are entirely

comfortable with that proposition.  When an enormous public undertaking spawns

a fraud of comparable breadth, the rule set forth in <u>Harrison I</u> helps to ensure what we reiterate is the primary purpose of the FCA:  making the government completely whole."  <u>Bunk</u>, 741 F.3d at 407-08.  The same principle applies here.

Fraud like that committed by Tuomey in this case – where the payments for physician referrals were hidden in spreadsheets and discussed behind closed doors – is difficult to detect.  That, in turn, underscores the need for penalties high enough to make a potential wrongdoer wary of risking sanction in circumstances where his secretive conduct makes the risk of detection low.  <u>Cf.</u> <u>BMW of North America, Inc. v. Gore</u>, 517 U.S. 559, 582 (1996) (high punitive damage awards may comport with due process where "injury is hard to detect or the monetary value of noneconomic harm [is] difficult to determine"); <u>Rogan</u>, 517 F.3d at 454 ("The lower the rate of a fraud's detection, the higher the multiplier required to ensure that crime does not pay"); <u>United States v. Jiminez</u>, 507 F.3d 13, 20 (1st Cir. 2007) ("From a deterrence perspective, a stiffer penalty is logically called for when the risk of detection decreases"); <u>see</u> <u>generally</u> Richard A. Posner, <u>Economic Analysis of Law</u> 262, 277 (8th ed. 2011) (same).  Congress has authorized stiff financial penalties to ensure that those who would defraud the government of public funds face appropriate punishment for past misconduct and a strong deterrent to future wrongdoing.  <u>See</u> Pub. L. No. 101-410, § 2, 104 Stat. 890 (1990) (authorizing inflation-adjusted increases to civil money penalties in order to

"maintain the deterrent effect of civil money penalties and promote compliance with the law").

Indeed, this case illustrates why Congress enacted the FCA and has, over a century and a half, acted to strengthen it. The hospital – which receives over 40 percent of its revenues from Medicare – decided to pay the physicians a portion of the facility fees generated by their work to thwart nascent competition for lucrative outpatient procedure referrals. As a result, Medicare and its beneficiaries were forced to pay higher prices for services that could, in the majority of cases, have been performed at a lower cost to both. The distortion of medical decisionmaking by the payment of financial incentives is the principal concern of the Stark Law and the reason why its prohibition is so broad, its exceptions are so specific, and it lacks a scienter requirement. If Dr. Drakeford had not disclosed these arrangements to the government through his qui tam action, Tuomey's scheme might still be in place, since Tuomey refuses to accept what two juries readily found obvious: the arrangements were illegal.

Tuomey cannot demonstrate "gross disproportionality" on the facts of this case. The ratio of the penalty awarded by the district court here to the single damages found by the jury is only about 3:1. But under Chandler, even this ratio is overstated because it does not account for the relator's entitlement to a 15 to 25 percent share of the recovery, nor does it include prejudgment interest.

76

Accounting for these factors, the actual ratio of penalties to compensatory damages here is well less than 2:1 and may indeed be nearly 1:1. Either way, the ratio falls well within constitutional bounds. See State Farm Mutual Automobile Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (noting that a punitive damages to compensatory damages ratio below 4:1 generally comports with the Fifth Amendment). As the Seventh Circuit observed in approving a penalty to compensatory damages ratio near 4:1:

> It's hard to see why the [Supreme] Court's approach to punitive damages under the Fifth Amendment would differ dramatically from analysis under the Excessive Fines Clause. (If there is to be a difference, one would think that a fine expressly authorized by statute could be higher than a penalty selected ad hoc by a jury.)

Rogan, 517 F.3d at 454.

A penalty to compensatory damages ratio of less than 2:1 is clearly justified by Tuomey's conduct in this case. Yet Tuomey contends that because it is a not-for-profit hospital (as are the majority of hospitals in the country), it should be exempt from the full legal consequences of its actions. As Tuomey acknowledges, the FCA provides a **legal** – not equitable – remedy. Thus, the impact of the judgment on Tuomey's mission has no bearing on the propriety of the judgment required by the law. If it were otherwise, hospitals across the country would feel free to ignore the Stark Law without facing the significant consequences intended by Congress for those who knowingly commit Medicare fraud. Simply put, there

would be no deterrent whatsoever to violating the Stark Law, contrary to Congress's clear intention, and the abuses the Stark Law was enacted to prevent would proliferate, at great cost to the Medicare program, law-abiding providers and individual beneficiaries.[18]

Tuomey argues that its misconduct here is unrelated to other misconduct. That is simply untrue. The Stark Law also applies to claims for services submitted to the Medicaid program. 42 U.S.C. § 1396b(s). However, the United States exercised its prosecutorial discretion not to seek recovery of the Medicaid damages caused by Tuomey's misconduct, which could have added millions more to the judgment. Further, the government elected to seek penalties at the very bottom of the statutory range. The penalties imposed are thus substantially lower than the maximum Tuomey faced for its misconduct.

Perhaps most significantly, it is Tuomey's own management and Board who are responsible for permitting the damages and penalties to mount to the level ultimately found by the jury. The physician contracts allowed either party to cancel without recourse if the agreement or any part of it were "deemed to be contrary to local, state or federal law by counsel for either party or, [i]n the opinion

---

[18] It is not only Medicare and its beneficiaries who were subjected to higher prices and co-pays as a result of Tuomey's misconduct, but potentially other insurers and insureds, who had to pay extra for health care procedures performed at the hospital that could have been performed at a lower cost in an ambulatory surgery center or a doctor's office.

of counsel, present[ed] substantial legal risk to either party or to the Hospital. . . ." See, e.g., JA 4232, at ¶ 14.15.  Under this provision, Tuomey could have terminated the contracts in 2005 after McAnaney voiced his concerns about the arrangements.  At that point, the refund for the Stark Law violation would have totaled less than $5 million, and FCA liability could have been avoided.  Instead, as Dr. McDuffie testified at the first trial, Tuomey persuaded Dr. McDuffie and his partners not to terminate the contracts because doing so might make them look guilty.  JA 457-59, 461-62.  Tuomey could have terminated the contracts once it learned in early 2006 that the government was investigating them.  And Tuomey could have terminated the contracts in September 2007, when the United States intervened in the case.  But Tuomey's executives and management refused to terminate the contracts until the first jury declared them illegal.  Now, a second jury has found the contracts illegal and, having heard McAnaney's testimony, has also found that Tuomey knowingly submitted 21,730 false claims to the Medicare program, for which Medicare paid $39,313,065.  Tuomey should not now be heard to argue that this Court should relieve it of the consequences of its own cavalier attitude toward the law.

    The district court correctly declined to hold "that the civil penalties authorized by Congress with respect to the FCA are grossly disproportional to the gravity of Tuomey's offense," and observed that "Tuomey's conduct as found by

79

the jury calls into question the efficacy of administering the Medicaid and

Medicare programs and promotes self-interest to the detriment of federal

taxpayers." JA 4066.

## III. The District Court Properly Exercised Its Discretion in Granting the United States' Motion for a New Trial after the First Trial

Tuomey argues that the district court abused its discretion when, after the

first trial of this case in 2010, the district court granted the United States' motion

for a new trial based upon the exclusion of Gregg Martin's deposition testimony

concerning the call Hewson had had with McAnaney and Smith.[19] Tuomey

incorrectly asserts that the district court failed to give its reasons for the ruling, and

that the ruling, in any event, was an abuse of discretion.

As we explained in our filing in this Court in Appeal No. 10-254, the United

States sought a new trial under its FCA cause of action because the district court

had excluded not only Martin's deposition excerpts concerning the McAnaney-

Hewson-Smith conversation, but had also excluded McAnaney himself from

giving live testimony, and had precluded the government from introducing other

evidence as to McAnaney's views. Because Tuomey's knowledge was an essential

element of the FCA claim, and because Tuomey had asserted an advice of counsel

defense to that claim, the government argued that it had been prevented from fully

---

[19] Hon. Michael J. Perry, Jr. presided over the first trial. The case was transferred to Hon. Margaret B. Seymour after Judge Perry's passing.

developing its presentation on those two critical issues. See Schultz v. Butcher, 24 F.3d 626, 632 (4th Cir. 1994).

Although Tuomey raised an advice of counsel defense and had also waived its claims of privilege with respect to McAnaney's engagement, Tuomey objected to McAnaney's testimony at trial. Tuomey then objected on "hearsay" grounds to the introduction of Martin's deposition testimony about the McAnaney call. The district court sustained both objections. The district court did not articulate its reasons for excluding McAnaney's testimony. However, at a post-trial motions hearing, the district court explained the cause of its error in excluding the Martin deposition:

> . . . [I] made clear that the order granting a new trial was based upon an error that the court recognizes occurred when the court sustained the defendant's objection to the publication of the deposition of Mr. Martin, who is or was an officer of the defendant corporation. And I announced that, when the ruling was made, I was not then aware of Mr. Martin's relationship with the defendant. I'm compelled to correct that . . . .
>
> The court sustained the objection on grounds that were urged by the defendant that included assertions of hearsay and whatever else was pointed out to the court at that time. None of the objections to the proffered publication of that deposition rose to the level of rendering that proposed testimony improper.

JA 1342-44. The district court's decision was in accord with rulings of this Court holding: "A statement is not hearsay if it is offered to prove knowledge, or show the effect on the listener or listener's state of mind." United States v. Guerrero-

81

<u>Damian</u>, 241 Fed. Appx. 171, 173, 2007 U.S. App. LEXIS 19409, at ** 3-4 (4th

Cir. Aug. 27, 2007) (per curiam), <u>citing</u> <u>United States v. Safari</u>, 849 F.2d 891, 894

(4th Cir. 1988). Judge Perry deemed the exclusion of the Martin deposition alone

sufficiently grave to require a new trial on the government's FCA claim. Thus,

Judge Perry did not need to resolve the government's other grounds for a new trial,

including the exclusion of McAnaney's testimony.

Judge Perry's new trial ruling was correct not only because of the exclusion

of Martin's testimony, but also because the exclusion of McAnaney's testimony

and related evidence was clearly erroneous and affected the substantial rights of

the government. <u>See</u> Fed. R. Civ. P. 61. By no stretch was the district court's

grant of a new trial a "clear abuse of discretion." Indeed, the exact opposite is true.

Tuomey sought to exclude McAnaney from testifying at the first trial on the

grounds that he was a "mediator," but Tuomey never had any evidence showing

that McAnaney was acting other than as an attorney jointly representing two

clients. Indeed, Tuomey presented the same arguments in a renewed motion in

limine before the retrial. Judge Seymour denied the motion after a hearing and, as

discussed at length above, permitted McAnaney to testify and also permitted the

United States to introduce other evidence about what McAnaney had told Hewson,

and what other information Tuomey had received about McAnaney's warnings

concerning the contracts.  JA 1349-65; R. 730.  Judge Seymour's admission of the evidence also is entitled to deferential review in this Court.

The Martin deposition excerpt was an essential part of the government's presentation at the retrial.  Not only did that excerpt prove that Martin knew what McAnaney had said about the agreements, but it also neutralized Tuomey's claims (through Martin, among others) that Greg Smith had "poisoned the well" with McAnaney, and showed that Martin and Hewson themselves had attempted to "steer" McAnaney to their own "desired outcome."  This was critical evidence, showing both Tuomey's knowledge and the increasing unreasonableness of its reliance upon Hewson's advice.  The evidence also gave the jury important information about Martin's and Hewson's credibility.  Indeed, the jury's ultimate verdict indicates that McAnaney's negative assessment of the arrangements, and Tuomey's response to it (including Martin's) was critical to the jury's decisionmaking and was the point at which the jury determined that Tuomey's Stark Law violation had escalated into an FCA violation.

Tuomey's attempt to appeal Judge Perry's ruling, after the second trial has already occurred, simply confirms the reasons for this Court's deferential review of new trial rulings.  Judge Perry's ruling granting the new trial was proper, as was Judge Seymour's admission of the previously excluded evidence.

83

## CONCLUSION

For all the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

STUART F. DELERY
   Assistant Attorney General

MICHAEL D. GRANSTON
MICHAEL S. RAAB

 /s/ Tracy L. Hilmer
TRACY L. HILMER
(202) 307-0474
   Attorneys, Civil Division
   U.S. Department of Justice
   601 D Street, NW, Room 9154
   Washington, DC  20004
   Tracy.Hilmer@usdoj.gov

G. NORMAN ACKER, III
(919) 856-4315
   Assistant United States Attorney
   301 New Bern Ave., Suite 800
   Raleigh, NC  27601
   Norman.Acker@usdoj.gov

Attorneys for the United States

March 18, 2014

## <u>ORAL ARGUMENT REQUEST</u>

The United States respectfully requests oral argument.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 18th day of March, 2014, I filed the foregoing Brief of Appellee United States of America with the Clerk of the United States Court of Appeals for the Fourth Circuit electronically through the Court's electronic case filing system and by sending eight (8) bound paper copies by overnight commercial carrier (Federal Express).  I further certify that I effected service upon the below-listed counsel of record electronically through the Court's electronic case filing system:

<u>Counsel for Appellant Tuomey Healthcare System, Inc.</u>:

James M. Griffin, Esq.
Margaret N. Fox, Esq.
A. Camden Lewis, Esq.
Lewis, Babcock & Griffin, LLP
P. O. Box 11208
Columbia, SC 29211

Daniel M. Mulholland, III, Esq.
Horty, Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213

E. Bart Daniel, Esq.
Attorney at Law
7 State Street
P. O. Box 856
Charleston, SC 29402

<u>Counsel for Relator Michael K. Drakeford, MD</u>:

Kevin M. Barth, Esq.
Ballenger Barth & Hoefer, LLP
205 North Irby Street
P.O. Box 107
Florence, SC 29503

Sandra L.W. Miller, Esq.
Womble Carlyle Sandridge
  and Rice
550 S Main Street
Suite 400
Greenville, SC 29601

/s/ Tracy L. Hilmer
Tracy L. Hilmer

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____          Caption: _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

   [ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____