Docket No. 13-2219

IN THE UNITED STATES COURT OF

APPEALS FOR THE FOURTH CIRCUIT

United States *ex rel.* Michael K. Drakeford, M.D. .......................... Appellee,

v.

Tuomey Healthcare System, Inc. ............................................................. Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF SOUTH CAROLINA

────────────────────────────

**MOTION FOR STAY**

────────────────────────────

Appellant Tuomey Healthcare System, Inc., ("Tuomey"), moves this Court

for a stay of judgment pending the resolution of the fully-briefed appeal before this

Court.[1]   Tuomey previously filed a motion with the district court for a stay.

*Tuomey's Mot. to Stay J.*, D.S.C. ECF No. 895, attached as Exhibit A.[2] However,

Tuomey is financially unable to comply with the district court's stay order

───────────

[1] In accordance with Local Rule 27(a), FRAP, counsel for Appellant informed
counsel for the Appellees of its intent to file this motion.  Counsel for the
Appellees did not provide their consent and plan to file a response to the motion.
Tuomey and the Government, however, have entered into an escrow agreement
where Tuomey deposited $50,000,000 with an escrow agent, with the caveat that
the escrowed funds remain the property of Tuomey.  In exchange, the Government
agreed to temporarily refrain from collection of its judgment.   The escrow
agreement expires upon this Court's ruling on the motion for stay, at which time
Tuomey is entitled to the return of the escrowed funds.  *See Escrow Agreement*,
D.S.C. ECF No. 895-7, Ex. A.
[2] Exhibit A consists of all briefing done by the parties regarding Tuomey's motion
to stay in the district court, with corresponding exhibits thereto.

requiring it to obtain a $30,000,000 supersedeas bond and place an additional $40,000,000 in escrow without substantially jeopardizing its ability to operate and defaulting on its outstanding bonds. *See April 9, 2014 Order*, D.S.C. ECF No. 909, attached as Exhibit B (herein after the "Stay Order"). Tuomey requests a stay to avoid certain, yet potentially needless, bankruptcy filing before this Court has an opportunity to rule on Tuomey's appeal. This Court is likely to vacate the astronomical judgment because at the retrial, the district court, at the urging of the Government (*Appellant's Reply Br.* at 12-13, ECF No. 52), disregarded this Court's explicit mandate that the jury determine "whether the contracts, **on their face**, took into account the value or volume of anticipated referrals." *United States ex rel. Drakeford v. Tuomey Healthcare Sys. Inc.*, 675 F.3d 394, 409 (4th Cir. 2012) (*Drakeford*) (emphasis added). Rather, the district court permitted the jury to reject the terms of the contracts and find that Tuomey violated the Stark Law solely through extrinsic evidence of intent, contrary to this Court's prior ruling.

Accordingly, Tuomey requests this Court grant it a stay, and if a bond is required, permit Tuomey to deposit $30,000,000 in an interest bearing account with the Court, conditioned upon the Government being required to elect between executing against this deposit in lieu of pursuing any recoupment and/or setoff rights the Government may have in the unlikely event that the judgment is affirmed. *See Proposed Stay Order*, attached as Exhibit C. Any ruling by this

Court which grants a stay conditioned upon a bond greater than that set forth in the Proposed Stay Order, attached as Exhibit C, will result in Tuomey's immediate declaration of bankruptcy.

## ARGUMENT

This Court possesses inherent authority to stay enforcement of its judgment pending appeal "as part of its traditional equipment for the administration of justice." *Nken v. Holder*, 556 U.S. 418, 421 (2009) (internal quotation marks omitted). The purpose of a stay pending appeal is to preserve the status quo so that the appellate court may take the necessary time to make a reasoned decision. *See Nken*, 556 U.S. at 429-30; *id.* at 427 ("The choice for a reviewing court should not be between justice on the fly or participation in what may be an idle ceremony." (internal quotation marks omitted)). If the Court determines that a stay pending appeal is proper, the Court should then consider waiver or departure from the supersedeas bond requirement. *See Van Romer v. Interstate Prods., Inc.*, 2010 WL 1999528, at *2 (D.S.C. May 19, 2010); *Se. Booksellers Ass'n v. McMaster*, 233 F.R.D. 456, 458 (D.S.C. 2006); *see also*, *Kirby v. Gen. Elec. Co.*, 210 F.R.D. 180, 195 (W.D.N.C. 2000).

## I.    Stay Pending Appeal

The granting of a stay is "'an exercise in judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case.'"

*Nken*, 556 U.S. at 433 (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672-73 (1926)); *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987) ("Since the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules."). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433. In exercising this discretion, the Court's judgment is to be guided by "legal principles that have been distilled into consideration of four factors." *Id.* A party seeking a stay pending appeal must show: (1) that he will likely prevail on the merits of the appeal; (2) that he will suffer irreparable injury if the stay is denied; (3) that other parties will not be substantially harmed by the stay; and (4) that the public interest will be served by granting the stay. *See Id.*; *Planned Parenthood v. Abbott*, 134 S.Ct. 506, 506 (2013); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970); *Se. Booksellers Ass'n*, 233 F.R.D. at 458 (citing *Hilton*, 481 U.S. at 776). The first two factors are "the most critical." *Planned Parenthood*, 134 S.Ct. at 506 (citing *Nken*, 556 U.S. at 434).

### a.      Tuomey Will Likely Prevail on the Merits.

"The likelihood-of-success element is typically dominated by issues of law that are subject to de novo review." *BCBS of Ohio v. BCBS Ass'n*, 110 F.3d 318, 333 (6th Cir. 1997). This element does not require Tuomey to demonstrate it will

ultimately prevail. *United States v. Jones*, 1999 WL 1057210, at *2 (D.S.C. Oct. 5, 1999) (citing *Hilton*, 481 U.S. at 778).  Rather, Tuomey's burden is satisfied if it demonstrates a substantial case on the merits. *Id.*; *see also*, *Willcox v. Stroup*, 358 B.R. 835, 838 (Bankr. D.S.C. 2006) (holding burden met "by demonstrating that the issues raised are so serious, substantial, difficult or doubtful as to make them fair subject for appellant argument.") (citation omitted).  A case raising legal issues of first impression demonstrates a substantial case on the merits. *Miller v. Brown*, 465 F.Supp. 584, 596 (E.D. Va. 2006), *aff'd*, 503 F.3d 360 (4th Cir. 2007) (citation omitted); *Sweeney v. Bond*, 519 F. Supp. 124, 132 (E.D. Mo. 1981) (establishing that when a case presents difficult legal issues of first impression, "it would be foolhardy to predict that there is no likelihood of success on appeal.")).

Tuomey's appeal presents a substantial case on the merits.  Specifically the appeal challenges a number of purely legal rulings made by the district court, including the district court's (1) failure to follow this Court's mandate thereby improperly allowing subjective intent that is not expressed by the "face of the contract" to determine whether the physician agreements violated Stark and (2) its conclusion that a Stark Law violation can be premised upon a never before recognized "1 to 1" correlation between bonus compensation based upon a physician's personally performed services and the resulting technical fees charged

by a hospital.[3]  These two issues, as well as others argued in Tuomey's brief,[4] stem from legal questions subject to de novo review by this Court.   Accordingly, Tuomey has satisfied this element.

> i.  <u>The district court's failure to adhere to this Court's mandate regarding the "face of the contract" constitutes legal error.</u>

In its prior opinion in this case, this Court directed that on retrial, "the question, which should properly be put to a jury, is whether the contracts, on their face, took into account the value or volume of anticipated referrals." *Drakeford*, 675 F.3d at 409.  However on remand, the Government convinced the district court to ignore this Court's mandate on the grounds that this Court's use of the phrase "on their face" was "a mistake." (*Appellant's Reply Br.* at 12-13, ECF No. 52). Thus, despite this Court's explicit mandate, the district court refused, without explanation,[5] to instruct the jury to determine whether the contracts ***on their face*** took into account the value or volume of anticipated referrals.[6] As a result, the

---

[3] *See Appellant's Opening Br.* at 32-47 [ECF  No. 50]; *Appellant's Reply Br.* at 12-19 [ECF No. 52].

[4] *See Appellant's Opening Br.* at 50-55, 87-91 [ECF No. 50]; *Appellant's Reply Br.* at 23-25, 30-33 [ECF No. 52].

[5] The district court did not explain why it was not obligated to follow this Court's instruction. The district court stated that under the language provided by this Court "the jury would be limited to the four corners of the agreement, regardless of the parties' actual relationship."  *See Appellant's Opening Br.* at 14 [ECF No. 50].

[6] Specifically Tuomey requested that the jury be charged "***you must decide whether the contracts, on their face, took into account the value or volume of anticipated referrals***."  The District Court denied this request.  As a result, the jury was not provided the appropriate guidepost by which to evaluate evidence of

Government exploited the district court's rejection of this Court's ruling throughout the second trial by imploring the jury to look beyond the face of the contracts and find they "took into account" the value or volume of referrals solely based upon extrinsic evidence of intent offered through the testimony of Tuomey's executives and legal counsel.

This was error. The Stark Law is not a "thought crime" law. The Stark Law was intended to create "bright line" rules which can only be violated by one's actual conduct, not intent. *United States ex rel. Villafane v. Solinger*, 543 F.Supp.2d 678, 693 (W.D.Ky. 2008) (*Villafane*). Indeed this Court recognized that a hospital, in the exercise of its business judgment, may consider income from patient referrals when deciding whether to enter into employment agreements with physicians. Specifically, this Court agreed with Tuomey's argument that subjective intent of the parties should not determine whether the volume or value standard is implicated, stating "[w]e agree with the *Villafane*[7] court that intent alone does not create a violation." *Id.* at 409 n.25. Thus, the existence of an indirect compensation arrangement covered by the Stark Law depends on how the compensation was paid, not how it was made.

---

Tuomey's business evaluation of various proposed financial arrangements with the surgical specialists. *See Appellant's Opening Br.* at 36 [ECF No. 50].

[7] *Id.* at 693 ("[T]he text and history of the Stark Law's desire to create a 'bright-line' rule would seem to argue against establishing a violation on the basis of intent alone.").

ii.    The district court's application of an improper "1 to 1" relationship test constitutes legal error.

The district court improperly concluded that a jury could find the contracts varied with the volume or value of referrals because of an alleged never-before-recognized "1 to 1" correlation between a physician's compensation based on personally performed services and the hospital technical fee charged as a result of the physician's services. The district court reasoned because each time a physician personally performed procedures in the hospital, the hospital could also bill for the "technical component" services it provided to the patients, that the jury could have found that the bonus compensation varied with the value or volume of referrals. The district court's ruling is contrary to controlling Stark Regulations and the prior decision of this Court.

The Stark Regulations provide that a *physician's personally performed services are not "referrals"* under Stark. 42 C.F.R § 411.351. It follows that compensation based only on such services cannot vary with the volume or value of referrals, since such services are not referrals. *See* Stark Regulations, 73 Fed. Reg. 48434, 48709 (Aug. 19, 2008) (stating that "physicians can be paid a percentage of revenues or collections for *personally performed services*" (emphasis in original)). Payment of a productivity bonus based on a physician's personally performed professional services is allowed even if the payment is "inevitably linked to a facility fee" paid to the hospital. *See* Stark Regulations, 69 Fed. Reg. 16054,

16088-89 (March 26, 2004).

Moreover, this Court previously rejected the Government's claim that the physicians' compensation "varies with" the value and volume of referrals because a so-called "1 to 1" ratio exists between the physicians' compensation, based solely upon their own personally performed professional services, and the hospital technical or facility fee. The Government made this same argument in the prior appeal. (No. 10-1819, ECF 55-1 at p. 26.) Yet, this Court carefully stated that the question which should properly be submitted to the jury is whether the Contracts, *on their face*, "**took into account**" the value or volume of anticipated referrals. *Drakeford*, 675 F.3d at 409 (emphasis added). This Court did not frame the question using the phrase "varied with" but instead used the phrase "took into account."

Thus, the district court's conclusion that the existence of the "1 to 1" ratio creates a Stark violation is incorrect as a matter of law.

### b.    Tuomey and its Other Creditors Would be Irreparably Injured Absent a Stay on the Requested Terms.

As detailed below, if the Government is granted security above $30,000,000 or its alleged setoff or recoupment rights, Tuomey will be forced into bankruptcy to avoid defaulting on its bond covenants and elevating the Government's claims above other secured creditors, resulting in irreparable harm. *See In re Forest Grove, LLC*, 448 B.R. 729, 743 (Bankr. D.S.C. 2011) ("To make a showing of

irreparable harm, a movant must usually show that money damages or a later court decision will be inadequate to remedy the harm suffered.") (citing *MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 726 F.Supp.2d 604, 634 (W.D.Va. 2010); *Witherspoon v. Riley*, 2013 WL 3804576, at *7 (D.S.C. July 19, 2013) (requiring movant to show more than a mere possibility of harm to satisfy the irreparable harm element) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

i.    <u>Compliance with the district court's Stay Order would trigger bond defaults and force Tuomey into bankruptcy.</u>

Compliance with the district court's Stay Order would for all practical purposes force Tuomey into bankruptcy and cause Tuomey to dramatically restrict the services it provides to the community. Tuomey cannot place a total of $70,000,000 outside the reach of its bond holders, as required by the district court's Stay Order without violating the Liquidity Covenant included in Tuomey's 2006 Series Bonds, which requires Tuomey have at least 60 days cash on hand.[8] *See Bond Supp. No. 5*, § 15, pp. 15-16, D.S.C. No. 904-6 at 18-19, Ex. A. Amounts held in a restricted escrow account do not count towards days cash on hand. Excluding the $50,000,000 that is currently in escrow, Tuomey presently has 60 days cash on hand. *4.21.14 Decl. of Tuomey CFO M. Lovell* at ¶ 10,

---

[8] "Days Cash on Hand" is defined in the Bond documents as "the quotient produced by dividing the sum of Unrestricted Cash and Investments by Operating Expenses, and then multiplying the quotient by 365."

attached as Exhibit D (hereinafter "*Lovell Decl.*").  One day's cash on hand is approximately $450,000.  *Id*. at ¶ 8.  Thus, if Tuomey is required to transfer $20,000,000 in security in addition to the $50,000,000 currently in escrow under the escrow agreement, to meet the requirements of the district court's Stay Order, Tuomey's days cash on hand would fall well below 60 days.  Upon such an "Event of Default" under the Master Trust Indenture, the Trustee for the bondholders would have the right to accelerate the indebtedness, take possession of Tuomey's property, foreclose on Tuomey's real property, and seek a receiver, among other remedies.  *See Master Trust Indenture* at § 6.02, pp.47-48, attached as Exhibit E; *Mortgage* at §§ 4.2-4.5, pp.12-13, attached as Exhibit F.

In addition to violating the Liquidity Covenant, transferring $70,000,000 for the security required under the Stay Order would violate the provision of the bond covenants restricting the transfer of cash to entities not in the "Obligated Group" (the "Transfer of Cash Restriction").  As set forth in the bond documents, Tuomey cannot transfer cash to external entities in excess of 15% of its Unrestricted Cash and Investments on Hand at the end of the most recent fiscal year.  Furthermore, Tuomey can only make such a transfer if it has at least 85 days cash on hand after making such transfer.  *See Bond Supp. No. 5*, § 24, pp. 19-20, D.S.C. ECF No. 904-6 at 22-23, Ex. A.  With only $85,439,243 in Unrestricted Cash and Investments on Hand as of the end of its most recent fiscal year, September 30,

2013,[9] Tuomey cannot afford to transfer nearly $70,000,000 [more than 80% of its Unrestricted Cash on Hand] to the district court or a third party as security for a bond without defaulting on the Transfer of Cash Restriction in its bond documents.

Further, in addition to violating its bond requirements, Tuomey would be left with insufficient cash to fund operations if it provided $70,000,000 as security for the stay. This would leave Tuomey with approximately $7,000,000 to operate which amounts to only 16 days cash on hand. *Lovell Decl.* at ¶ 12. This amount would be insufficient to cover *one month* of salaries, wages, physicians' fees, and supplies, which for example totaled over $12.7 million on a consolidated basis in February 2014. *Id.* at ¶ 13. With only 16 days cash on hand, an unexpected expense or even a minor revenue setback or cash flow shortage would jeopardize Tuomey's ability to pay its bills in the ordinary course and operate as a going concern. *Id.* at ¶ 13. As a result, even if Tuomey somehow could post the security required under the district court's Stay Order and Tuomey's bonds were not declared in default, it will not have enough liquidity to operate and avoid bankruptcy.

---

[9] *Lovell Decl.* at ¶ 15.

ii.    <u>Compliance with the district court's Stay Order would significantly elevate the Government's position to the detriment of other creditors.</u>

Not only would compliance with the $70,000,000 in security required under the Stay Order ultimately force Tuomey into bankruptcy, it would elevate the Government's claims to the detriment of Tuomey's other creditors in the process. Far from maintaining the status quo pending appeal as bonds are supposed to do,[10] as explained below, compliance with the Stay Order would provide the Government with nearly three times what it would otherwise receive if Tuomey instead sought the protection of the automatic stay under the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

If Tuomey were forced to file for protection under the Bankruptcy Code in order to obtain the protection of the automatic stay pending this Court's decision on appeal, the Government's claim would only be secured[11] to the extent of its alleged $39,313,065 right to recoup or setoff against future Medicare receivables, and the remaining amount of $198,141,130 would be treated as an unsecured claim.   *See* 11 U.S.C. § 506(a)(1).  The unsecured portion of the Government's claim is not entitled to priority under any of the grounds for priority set forth in 11 U.S.C. § 507(a).  Thus, it would be paid behind the bondholders' secured claim

---

[10] *See Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.,* 600 F.2d 1189, 1190-91 (5th Cir. 1979).

[11] Tuomey reserves the right to contest the alleged right to recoupment or setoff.

and the claims of creditors which Congress decided were entitled to priority status under the Bankruptcy Code – including creditors providing goods or services after the bankruptcy (§ 507(a)(2)), Tuomey's employees (§ 507(a)(4) and (5)), and vendors who provided Tuomey with critical goods leading up to the bankruptcy (§ 503(b)(9)). Without priority, at best[12] the Government's claim will be classified as a general unsecured claim and paid along with other general creditors, which if Tuomey is forced into bankruptcy liquidation would include large claims of the Pension Benefit Guarantee Corporation (for unfunded qualified pension plan benefits, estimated to be at least $43 million in the Phillips Report)[13] and of retirees (for unfunded postretirement medical and dental benefits, estimated to be $13.2 million in Note 8 to Tuomey's Audited Financial Statements for Year Ending September 30, 2012 and 2011),[14] along with numerous other creditors. Indeed, good arguments could be made that the Government's unsecured penalty claim should be equitably subordinated to unsecured creditors who actually advanced value for their claims.

On the other hand, if the Government is granted security in the amount of the $70,000,000 as provided in the Stay Order, in addition to its $39,313,065

---

[12] Tuomey reserves the right to assert the Government's claim for penalties should be subordinated to the claims of other creditors.
[13] *9.3.13 HMP Report* at 11, D.S.C. ECF No. 895-5 at 20, Ex. A.
[14] *Tuomey 2011 & 2012 Audited Consolidated Financial Statements* at 19, D.S.C. No. 895-4 at 22, Ex. A.

recoupment or setoff rights, its total security would nearly be tripled to $109 million. This would directly impact Tuomey's other creditors – it would take security away from Tuomey's bondholders and destroy Tuomey's ability to pay priority creditors. Under the terms of Tuomey's bond documents, the bondholders have a security interest in all of Tuomey's "Gross Receipts," [15] including all forms of accounts, accounts receivable, and the proceeds thereof. *See Bond Supp. No. 4*, § 3(e), p. 4, attached as Exhibit G; *Bond Supp. No. 5*, § 3(e), p. 4, D.S.C. ECF No. 904-6 at 7, Ex. A. As a result, compliance with the district court's Stay Order is not a realistic option, and if this Court does not grant relief, Tuomey will not have any choice but to file for bankruptcy protection to protect the funds that were previously pledged as security to the bondholders before this appeal is determined. If this Court vacates the district court's judgment on appeal, the significant expense to Tuomey, its creditors and the other harmful consequences of bankruptcy could not be undone.

## c. The Government will not be Harmed.

In contrast to the substantial and irreparable harm to Tuomey and its secured creditors in the absence of a stay, and the strong public interest in granting a stay, *see infra*, the Government faces no harm if a stay is granted. A stay pending

---

[15] "Gross Receipts" is broadly defined in the Master Trust Indenture to include "all receipts, revenues, income and other moneys received by or on behalf of any one or more members of the Obligated Group…." *See Master Trust Indenture* at § 1.01, p. 5, Ex. E.

appeal will only delay—if the judgment is affirmed—the Government's ability to collect its judgment.  The most "harm" that the Government could incur would be a delay in collecting on its judgment.  This harm is by definition, not irreparable. *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).

### d.    The Public Interest Favors a Stay.

The citizens of Sumter County will suffer irreparable harm if Tuomey is unable to obtain a stay, in particular the underprivileged and Tuomey's military service men and women. *See Everett v. Franciscan Sisters Healthcare, Inc.*, 882 F.2d 1383, 1386 (8th Cir. 1989) (recognizing the alignment of a "hospital's interests [in matters concerning patient care in its facilities] with those of the public in general").  Tuomey is a nonprofit community[16] hospital located in Sumter, South Carolina serving Sumter County and surrounding areas with a charitable mission to provide high quality healthcare to all patients, regardless of ability to pay. Following the United States' closing of the base hospital at Shaw Air Force Base in 2000, thousands of service members and their dependents rely upon Tuomey for their care needs.  Moreover, the region served by Tuomey is particularly in need of such non-profit care given the region's high economic

---

[16] Tuomey is governed by a Board of Trustees composed of community volunteers, physicians, and Tuomey's chief executive officer. The Board exercises general oversight over hospital operations, and governs the hospital's finances, including matters such as fundraising, capital expenditures, and physician recruitment.

distress, high unemployment, and relatively low levels of employer provided insurance benefits. Tuomey's payor mix is proof of the region's need for nonprofit hospital care: approximately 75% of the Tuomey patient base is covered by Medicare, Medicaid, and Tricare, and approximately 12% are uninsured. *See 6.4.13 Res. of Sumter County Legis. Delegation*, D.S.C. ECF No. 895-12 at 2-3, Ex. A.

Not only is Tuomey a vital source of life-saving care, it is also a significant part of the local economy. The CEO of Sumter Economic Development states,

> [W]ith the possible exception of our public school system, there is perhaps no other single organization that has such a great impact on the well-being of our community, on our health, on our culture and on our economy…Tuomey is the backbone of our surging central business district, provides healthcare to Shaw Air Force Base, is the largest financial investor in our smarter growth campaign, and is the hub for a regional healthcare system with a massive impact on our economy.

*6.4.13 Letter from Sumter Econ. Dev.*, D.S.C. ECF No. 895-13 at 2, Ex. A.

Tuomey is directly or indirectly responsible for 5,000 jobs in the Sumter community—roughly 12 percent of the total workforce. *Id.* The importance of these jobs is even more apparent when one considers that the unemployment rate in the Sumter area is eight percent. Its presence in Sumter County is essential to the County's economic development initiatives. *Id.*

## II.    Waiver of Bond Requirement

### a.    Legal Standard

Federal Rule of Civil Procedure 62(d) and Local Rule 62.01 entitle an appellant to a stay of judgment pending appeal upon posting a supersedeas bond of 125% of the amount of the judgment—here $300 million excluding post-judgment interest and costs. Nevertheless, the district court retains the discretion to stay execution of the judgment without a bond or upon posting of less than a full supersedeas bond. *See Van Romer v. Interstate Prods. Inc.*, 2010 WL 1999528, at *1 (D.S.C. May 19, 2010). The Fourth Circuit has not adopted any particular standard to guide the Court's exercise of discretion in granting unsecured stays. *Se. Booksellers Ass'n*, 233 F.R.D. at 457-59. However, the District Courts in the Fourth Circuit have generally permitted a stay of enforcement of the judgment upon the posting of less than a full supersedeas bond to preserve the status quo where posting a full bond would impose an undue financial burden. *See, e.g., Alexander v. Chesapeake, Potomac & Tidewater Books, Inc.,* 190 F.R.D. 190, 192-93 (E.D.Va.1999) ("In determining whether to issue a stay pending appeal on the basis of less than a full bond, a district court should act to 'preserve the status quo while protecting the non-appealing party's rights pending appeal.'") (citation omitted); *Conn. Gen. Life Ins. Co. v. Riner,* 2005 WL 151933, at *1 (W.D.Va. Jan.

24, 2005) (granting stay without bond).  Waiver of a bond, or at the very least departure from the amount required by the Rules, is appropriate in either of two situations:

> where the defendant's ability to pay the judgment is so plain that the cost of the bond would be a waste of money; and—the opposite case, one of increasing importance in an age of titanic damage judgments—where the requirement would put the defendant's other creditors in undue jeopardy.

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 786 F.2d 794, 796 (7th Cir. 1986); *see Se. Booksellers Ass'n*, 233 F.R.D. at 458 (citing *Alexander*, 190 F.R.D. at 193); *Hofmann v. O'Brien*, 2009 WL 3216814, at *2 (D.Md. Sept. 28, 2009).

### b.    The Court should Waive Tuomey's Bond Requirement or Accept a Lower Amount.

Tuomey is currently faced with the unenviable position of choosing between (i) complying with the Stay Order, which would violate its bond covenants, deplete the bond holders' cash collateral, and decrease its cash to a point that bankruptcy becomes inevitable, or (ii) filing for bankruptcy to obtain the benefit of the automatic stay in order to avoid these devastating consequences.  The relief requested in this Court gives Tuomey the best chance to avoid these outcomes while preserving the status quo for the Government.  As mentioned above, *supra* § I.b.*, the most Tuomey can deposit with the Court without triggering an immediate bankruptcy is $30,000,000, conditioned upon the Government being required to elect between levying against this deposit or exercising whatever setoff or

recoupment rights it has, in the event the judgment is affirmed. This amount is substantially consistent with the Government's recoupment/setoff rights and is consistent with Tuomey's ability to pay the judgment.[17] *10.1.13 Decl. of S. Phillips at ¶ 12, D.S.C. ECF No. 895-5 at 4-5, Ex. A* (herein after *"Phillips Decl."*). Depositing this amount into the Court will provide the Government an immediate remedy equal to the amount that it could realistically expect to collect if its judgment is affirmed and Tuomey then files bankruptcy. Therefore, the Government's ability to recover on its judgment if it is affirmed – after payment of Tuomey's secured bondholders and priority claimants – will be preserved during the appeal.

## CONCLUSION

Based on the foregoing, Tuomey respectfully requests the Court grant its motion to stay.

---

[17] If Tuomey were to file bankruptcy today, the Government would likely recover is only $39,313,065 of its judgment from future Medicare payments owed Tuomey for post-petition services outside of bankruptcy through claims of recoupment and setoff. *See Fischbach v. Ctrs. For Medicare & Medicaid Servs. (In re Fischbach)*, 2013 WL 1194850, at *2 (D.S.C. Mar.22, 2013). Consequently, $30,000,000 in security is substantially consistent with the Government's alleged recoupment/setoff rights. An independent consultant also recently determined that the maximum amount that Tuomey could afford to pay to settle the judgment is $30,000,000. *Phillips Decl.* at ¶ 12, D.S.C. ECF No. 895-5 at 4-5, Ex. A.

Respectfully submitted,


By:     *s/ Margaret N. Fox*
        James M. Griffin
        Margaret N. Fox
        A. Camden Lewis
        LEWIS, BABCOCK & GRIFFIN, L.L.P.
        PO Box 11208
        Columbia, SC 29211
        (803) 771.8000

        E. Bart Daniel
        Seven State Street
        Charleston, SC 29401
        (843) 722.2000

        Daniel M. Mulholland III
        HORTY, SPRINGER & MATTERN, P.C.
        4614 Fifth Avenue
        Pittsburgh, PA 15213
        (412) 687.7677

    Attorneys for Defendant Tuomey
    Healthcare System, Inc.


April 21, 2014
Columbia, South Carolina